**1**

MEETING OF THE EXECUTIVE COMMITTEE
OF
ULLICO Inc.

Held May 5, 1997
At 111 Massachusetts Avenue, N.W.
Washington, D.C.
2:00 p.m.

ATTENDEES:

John J. Barry
Marvin Boede
Kenneth J. Brown
Bill J. Casstevens
John E. Cullerton
John F. Gentleman
Robert A. Georgine

Frank Hanley
Joseph F. Maloney
James F. M. McNulty
James J. Norton
Lester H. Null, Sr.
Jacob F. West

ABSENT:

Arthur A. Coia
John T. Joyce
William H. Wynn

OTHERS IN ATTENDANCE:

Joseph A. Carabillo
John K. Grelle
George Holland*
James W. Luce

Mark A. Maloney
Charles R. Sormani
Michael R. Steed

*Director, Ulico Casualty Company

Chairman Georgine called the meeting to order and noted that Messrs. Coia, Joyce and Wynn were unable to attend.

As of December 31, 1996, the Company had 334,368 1/3 shares of Capital Stock issued and outstanding. Because of reacquisition and issuance of shares, 2,559 shares of Capital Stock were being held pending resale. Also, as of December 31, 1996, the Company had issued 6,141,959 shares of Class A Stock and 133,280 shares of Class B Stock.

The Minutes of the February 14, 1997 Meeting of the Executive Committee were distributed with the Preliminary Agenda. Hearing no changes or modifications, it was

RESOLVED:    "That the Minutes of the Executive Committee Meeting of February 14, 1997, as distributed with the Agenda for this meeting, be and hereby are approved."

Motion was made, seconded and approved.

The Chairman stated that ten years ago there were essentially three corporations: Union

U 000011

Labor Life: USA Life, and Ulico Casualty. Through acquisitions and mergers and development of new businesses. The ULLICO organization now had twenty-four corporations. As companies and new employees were acquired, we accumulated many different benefit plans, including over twenty health plans, nine 401(k) and profit sharing plans, and pension plans. We also experienced changes in accounting rules concerning benefit plans which have impacted our financials, in particular FAS-106 on retiree health insurance.

He stated a need for there to be a more hands-on style of management of the benefit programs. Management proposed a restructuring by eliminating the Welfare Committee of the Board in favor of a Benefit Committee made up of Senior Management. The management committee would meet regularly to administer, plan and effect changes in the benefit plans.

RESOLVED: "That Article VI, Section 1 of the Corporation's By-laws be amended to eliminate reference to the permanent Committee of the Board of Directors known as the Welfare Committee, that Article VI, Section 5 of the Corporation's By-laws be eliminated in its entirety and that the By-laws shall hereby be amended." And, be it

FURTHER
RESOLVED: "The Executive Committee of the Corporation, and each of them, does hereby authorize the creation of a new Benefits Committee to consist of the senior officers of ULLICO Inc., including the Chairman, President and Chief Executive Officer, the Executive Vice President, the Senior Vice President, Insurance Operations, the Senior Vice President, Chief Financial Officer, the Senior Vice President, Investments and the Vice President and Chief Legal Officer." And, be it

FURTHER
RESOLVED: "That the Executive Committee of the Corporation, and each of them, does hereby authorize, direct and empower the above named officers to act as fiduciaries to all plans created, or to be created, for the benefit and welfare of the Corporation's employees and the employees of each of its subsidiaries and/or affiliates in which the Corporation, or its subsidiary, owns 80% or more of the outstanding stock, and the Committee shall have full authority for the administration of all such plans." And, be it

FURTHER
RESOLVED: "That as fiduciaries, the Committee shall be, and hereby is, further authorized, directed and empowered to appoint trustee(s) as may be deemed necessary and desirable and shall be charged with reporting any and all material changes in each and every plan created for the benefit and welfare of the employees of the Corporation and the employees of each of its subsidiaries in which the Corporation owns 80% or more of the outstanding stock, on an at least an annual basis to the Corporation's Executive Committee." And, be it

FURTHER
RESOLVED: "That the appropriate officers and employees of the Corporation shall be, and each of them hereby is, authorized, directed and empowered to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

2

U 000012

Motion was made, seconded and approved.

The Chairman told the Committee that Financial Freedom was attempting to expand its activities. Part of the expansion involved endorsements from CalPERS and the National Conference of Senior Citizens. Both organizations mandate that Financial Freedom be authorized to provide loans other than our own product under a Fannie Mae program and loans under a HUD program. Fannie Mae required an assurance that Financial Freedom would maintain at least $250,000 in net worth as long as they were a contracted seller or servicer of Fannie Mae products. The next resolution authorized ULLICO to issue a guaranty to support the net worth of Financial Freedom to that extent.

RESOLVED: "That the appropriate officers of the Corporation, and each of them, are hereby authorized, directed and empowered to, on behalf of the Corporation, provide a guaranty to the Federal National Mortgage Association on behalf of Financial Freedom Senior Funding Corporation, in an amount not to exceed $250,000, for the purpose of maintaining the net worth requirements necessary to remain a qualified seller and/or servicer of the Federal National Mortgage Association's reverse mortgage programs."

Motion was made, seconded and approved.

The Chairman next stated that the next resolution represented something very new. Management was proposing a change in the very nature of our relationship with the Company's stockholders. ULLICO's stockholders are much larger today than they were when the Company formulated its original relationship with its stockholders. Stockholders' capital increased more than forty-four times from what it was at year-end 1991. Also, the average holding of a stockholder has increased forty times from close to sixteen thousand dollars, to over six hundred thousand dollars.

The Chairman introduced Bill Egan from Credit Suisse/First Boston who made a presentation concerning the repurchase program (a copy of Mr. Egan's presentation is attached and made a part of these minutes). Following the presentation, there was significant discussion by the Directors. They focused on the calculation of yield and the benefits of this program to both stockholders and the Company. Mr. Egan, from First Boston, responded that the value added to the corporation in book value as a measure of value was practical, and passing along his measure to the stockholders aligned both the stockholders' interests and the Company's interests. The Company benefits by being able to retain capital for future growth, the stockholders benefit by participating in that growth more directly than they ever have in the history of the Company.

One director asked why the Company does not go public. The response by another director was that it would destroy the mission of the Company and its very unique nature as a labor-owned entity that operates independently but serves the organized working men and women of America.

Another director commented that this really was a major step forward because one of the issues raised in the original purchase of Preferred Certificates was "what was the value of this stock" and did one generate any appreciation in its value. This answers both questions in a very cost efficient, practical manner.

Several officers participating in the discussion indicated that this repurchase program created a market, therefore, set the price for the stockholders, especially those which are pension funds and need to record this in their portfolio. Another indicated that one of the issues which has concerned rating agencies is the payment of large dividends which has hampered investment in future growth,

3

U 000013

and in this competitive environment, that has become a critical factor in the future of the Company. Following additional discussions a motion was made, seconded and passed unanimously. It was

RESOLVED: "That the Corporation is hereby authorized to enter into a repurchase program designed to provide liquidity for up to $180,000,000 of the holdings of Class A, Class B and Preferred Certificates over the next 11 years." And, be it

FURTHER
RESOLVED: "That in 1997, the Corporation on June 1st, or as soon thereafter as is practical and in conformance with law and regulation, will offer to repurchase $30,000,000 worth of equity from the holders of Class A, Class B and Preferred Certificates with the repurchase to be effective on June 30, 1997, or as soon thereafter as is practical and in conformity with law and regulation." And, be it

FURTHER
RESOLVED: "That in each of the subsequent years, beginning in 1998 and ending in the year 2007, the Corporation will, solely from its operating cash flow, make available up to $15,000,000 in cash to, at the stockholders' request, repurchase stock from holders of Class A, Class B and any remaining Preferred Certificates." And, be it

FURTHER
RESOLVED: "That said repurchase program will be in conformity with the Term Sheet which is attached and made part of this resolution and which will be included in its entirety with the minutes of this meeting (See Tab E)." And, be it

FURTHER
RESOLVED: "That the repurchase program will be based on "Book Value". The Book Value will be determined at each repurchase date based on the prior year end audited financials of ULLICO Inc. The calculation shall be accomplished by taking the "Total of Stockholders' Equity" as shown on the financial statement and dividing it by the total number of shares outstanding of Class A, Class B, Capital Stock and any Preferred Certificates still outstanding."

FURTHER
RESOLVED: "In the event that subscriptions for repurchase exceed the dollar amount available in each of the years of the program, the Corporation shall determine a pro rata allocation among all requesting stockholders and allocate the dollars available among the stockholders requesting repurchase."

FURTHER
RESOLVED: "That the appropriate officers and employees of the Corporation shall be, and each of them hereby is, authorized, directed and empowered to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

The Chairman noted that this concluded the action items on the agenda and introduced Mr. Grelle. The Chairman said he had asked Mr. Grelle to give a short overview of how the Companies did during 1996.

4

U 000014

Mr. Grelle stated that his report would supplement the information contained in the Annual Report. He reminded the Committee that all financial results were now presented on a Generally Accepted Accounting Principles or "GAAP" basis. This included prior year comparisons which were restated for consistency with the current year's financial results.

Total Company earnings at year-end were $10 million. Earnings were $16.9 million in 1995. Certain items negatively impacted this year results and without three of these items, earnings would have been $17.2 million. The three items included $6.9 million of Diplomat related costs ($4.5 million after taxes), $2.4 million in realized capital losses due to the write-off of a marketing venture ($1.6 million after taxes), and $1.7 million related to a write-down in value for two real estate properties held by Union Labor Life as a result of foreclosure ($1.1 million after taxes).

Mr. Grelle stated that Union Labor Life bore the brunt of these items. Excluding the Diplomat costs and the real estate write-downs, after tax earnings for Union Labor Life were $9.3 million, a 23% increase over 1995. He noted that premium and fee revenues increased by 7% to $232 million. This was a trend reversal and proved to be beneficial in A.M. Best's latest rating review.

Property and Casualty had net earnings of $1.3 million in 1996. 1995 results were only $1.2 million, but Mr. Grelle pointed out that current year results were aided by an accounting change which eliminated a statutory reserve. Operations were negatively impacted by higher than planned loss ratios for the Workers Compensation line and a reserve increase for reported claims of $5 million in the fourth quarter.

Zenith had a net loss of $300,000 compared with a $1,000,000 loss in 1995. Excluding after tax intercompany interest costs, Zenith had a net gain of almost $1 million. The improvement was a result of a 2% increase in fee income and a decrease in costs.

TFA earned $1.7 million after tax. Results from 1995 were $1.9 million. The decrease was due to the loss of funds under management, as reported earlier to the Committee.

MRCo realized net income of $2.2 million, a 47% increase from 1995. The improvement was attributable to AMI Capital's strong performance, offset to some extent by the capital loss from the discontinuance of the Securitas venture.

Overall, ULLICO's balance sheet indicated that total assets grew by $165 million to $2.8 million, a 6% increase over year-end, 1995. Separate Account growth was again important with the GIC maturities of $100 million reducing the overall increase.

Total Stockholder Equity, previously referred to as Capital and Surplus, was $258.7 million, down from 1995's figure of $272 million. While the Company earned $10 million, dividends and Preferred Certificate payments of approximately $20 million caused the net decrease in equity.

Mr. Grelle also indicated that all unrealized Capital gains or losses were recognized under GAAP. The Company had an unrealized gain net of deferred tax of $14.8 million at year-end, 1996.

The Chairman asked the Committee if they had any questions of Mr. Grelle or from any of the written materials provided in the Agenda from the various business units. He stated that the Agenda would be attached to the minutes and become a part of the record.

The Chairman asked for an Executive Session and delivered his report to the Committee (a

5

U 000015

complete copy of which is attached as an addendum to these minutes). Afterwards, the Meeting was adjourned and the Chairman was authorized to select the time and place of the next meeting.

Joseph A. Carabillo
Vice President and
Assistant Secretary

Attachments

Attachments

U 000016

Chairman's Statement
Executive Session
May 5, 1997

As you heard during the meeting, looking at the bottom line, we did not have as good a year as we did in 1995. That is only one test. I think 1996 was a good year in that we resolved a major problem for this Company. Putting the Diplomat into a position where the Company can finally act on its sale is very important.

We take that event and add to it the one-time write-off on two properties we acquired in foreclosure and the write-off of our investment in the project called Securitas. After eliminating those write-offs from prior year activities, we had virtually an identical year to 1995. In fact, operating gains were up two percent. So the base operations are still sound and getting the Diplomat behind us will be beneficial.

As you know, we are in the process of trying to sell the property and I will tell you that based on the offers we received to date, any gain from this property, even based on the restated value of 40 million dollars at ULLICO Inc., is unlikely. In fact, we may record an additional loss in 1997. Time will tell. We are still evaluating offers. I will keep you advised as to our progress.

What is most important today is the change in our relationship with our stockholders. Many of whom are represented in this room. We were very successful in offering the Certificates and for that I thank all of you in this room who have supported that effort. As we noted in the agenda item, it changed our relationship to our stockholders in a very fundamental way. Because we are a closely held corporation, we had always provided the market for our stock. But if you look at our traditional stockholders, it was not a difficult market to provide. In 1991, when we started the offering, our stockholders had 5.2 million dollars in capital. Even today, our largest Capital stockholder holds less than 800 thousand dollars worth of Capital Stock. Today, we have stockholders who hold 30 million dollars worth of equity. The Company could not go forward with a repurchase of a 30 million dollar block of stock without advanced planning. Therefore, the repurchase program is being established to create liquidity for our stockholders.

At the same time, the pressures in the marketplace are such that payment of cash dividends of the size we were paying, which were four times greater than the average and in some cases more than that, was hamstringing the Company. Therefore, tomorrow, management is going to recommend a two percent dividend. With the change to book value, holders of the shares will have an unrealized gain of two dollars and six cents per share, or about eight and a quarter percent for the year. Total return, unrealized and realized, will be slightly in excess of ten percent. We think that is a good return and that this program will be more positive in the long run. We also believe that the provision of liquidity and value are important goals of the corporation if we are going to remain as we have always been, a labor-owned entity.

There is one additional benefit. I have been emphasizing with the officers the need to add value to our stock. This change will focus attention on book value. It puts additional pressure on the officers who work for us to make sure that our business endeavors add value to the stockholders. This will benefit everyone and I look forward to your support as we move forward on this tomorrow and announce it at the Stockholders Meeting.

One additional item before we leave today. At its meeting, the Nominating Committee decided to move one of our members to a new class of directors. As you know, our directors are elected in groups of a third each year. I would like a motion electing Bill Casstevens to a vacancy which is in the class that will be up for election in 1999. Thank you.

That concludes our meeting.

320 Corporate Secretary Meetings May 5 '97 EXEC CTTE
Chairman's STATEMENT EXEC SESS

U 000017

Addition to Chairman's Statement
Executive Session

RE:    ULLICO PCG/Nautilus


    At our last Executive Committee meeting we brought two resolutions to you concerning an investment opportunity. You gave preliminary approval to the formation of a joint venture with the Pacific Capital Group to be called "ULLICO/PCG Advisors." That project has been put on hold. I had questions concerning Mr. Winnick and the adequacy of the due diligence concerning this individual and his company. Also, a statement was made at our last meeting by Mr. Steed which indicated that Pacific Capital Group had a net worth of $200 million. We have been unable to confirm that statement. Mike's response appears to have been an unintentional error since it appears that Mr. Winnick may have personal worth of that magnitude, there is no indication that Pacific Capital Group, who would be our joint venture partner, has that magnitude of capitalization. Thus, I have put this on hold pursuant to that resolution which allowed for additional due diligence and discussion. It is my intent to meet with Mr. Winnick and see if we can reach a common understanding as to going forward and what our business activities would be and some reasonable limitations on Mr. Winnick so that we can be reasonably assured that these are in line with our goals as a company.

    I would also like to bring you up-to-date concerning the Nautilus transaction. You will remember that we had extensive discussions about this fiber optic cable that was to be laid under the Atlantic. This transaction did close, though we have not as yet seen final documents. However, when we approved the transaction, we authorized an investment up to $10 million. The actual investment was $8 million as you saw in the resolution we just adopted which authorized a loan of $8 million from Union Labor Life to MRCo.

Addition to Chairman's Statement

U 000018

**2**

# ULLICOmemo

**Date:**      October 7, 1997

**To:**        Benefits Committee

**From:**      R. Silas

**Re:**        Request Authority for Human Resources to Approve Select Actions

With the establishment of the newly formed Benefits Committee by the Board of Directors, I wanted to take this opportunity to determine what actions the Committee wishes to directly approve and what actions Human Resources may approve to be able to efficiently execute its responsibilities in the administration of the various benefit programs for which we have responsibility.

Attached for your review and approval are the recommendations associated with functions to be performed, to include approval authority recommendations for HR.

AC 00044

## Actions Required to Administer the Benefit Programs
## and Approval Authority Recommendations

| Subject | Recommended Approval Authority |
|---|---|
| **ULLICO Inc. Pension Plan & Trust** | |
| Approval of Plan amendments | Benefits Committee |
| Direct the investment and management of plan assets, to include providing investment guidelines and approval of investment and other fees. | Benefits Committee |
| Administer day-to-day operation of the plan, consistent with approved Plan provisions | Benefits Committee |
| Approve normal and early retirements; and commencement of pension payments for terminated and vested employees entitled to a retirement benefit | Human Resources |
| Deposit deposits to retirement trust fund, e.g., dividend checks, employer contributions, etc. | Human Resources |
| Pay administrative expenses, e.g., audit and actuarial expenses. | Human Resources |
| **401(k) Plan and Trust** | |
| Approval of Plan amendments | Benefits Committee |
| Approve Guaranteed Account rates. | Benefits Committee |
| Administer day-to-day operation of the plan, consistent with approved Plan provisions | Human Resources |
| Process and approve loans, distributions and changes employees make, consistent with approved Plan provisions | Human Resources |
| Pay administrative expenses, e.g., audit expenses. | Human Resources |
| **Employees' Health and Welfare Plans** | |
| Approval of Plan amendments | Benefits Committee |
| Administer day-to-day operation of the plan, consistent with approved Plan provisions | Benefits Committee |
| Approve Plan renewals | Benefits Committee |
| Changing carriers | Benefits Committee |

AC 00045

**3**

# ULLICOmemo

DATE:       October 18, 1999

TO:        Benefits Committee

FROM:     L.Hejl

RE:        Agenda for October 20, 1999 Meeting – Updated.


Attached for your review is an updated version of the Agenda for the October 20, 1999 Benefits Committee meeting.   The meeting will be held in the large Executive Conference Room on the 8th floor. The meeting is scheduled from 10:00 a.m. to approximately 12:00 noon.


Attachment


Cc.    R. Silas

AC 00046

**Benefits Committee Meeting**
**10:00 AM – 12:00 Noon, October 20, 1999**
**Agenda**

I.    Call Meeting to Order

II.   Old Business
    A. Review and approve minutes for the meeting of August 17, 1998.**(TAB A)**
    B. Discuss feasibility of establishing a Guaranteed Account within the ULLICO Inc. 401(k) Plan. **(TAB B)**

III.  New Business
    A. Review recommendation to redefine the definition of compensation in the ULLICO Inc. Pension Plan and Trust. **(TAB C)**
    B. Review recommendation to improve the benefit computation formula for the ULLICO Inc. Pension Plan and Trust. **(TAB D)**

    **(TAB E)** summarizes the cost if all of the above items were approved.

IV.   Next Meeting – March 16, 2000

V.    Adjourn Meeting

AC 00047

**A**

MEETING OF THE BENEFITS COMMITTEE
OF
ULLICO INC.
Held August 17, 1999
At 111 Massachusetts Avenue, N.W.
Washington, D.C.
10:00 a.m.

ATTENDEES:

Joseph A. Carabillo
Robert A. Georgine
John K. Grelle
James W. Luce

OTHERS IN ATTENDANCE:

Brian M. Hechinger
Lou Hejl
Richard A. Silas

     Chairman Georgine called the meeting to order. Mr. Silas stated that the minutes of the meeting of the Committee on November 20, 1998 had been distributed previously for review by the Committee. A motion was requested to approve all the minutes. It was

RESOLVED:    "That the minutes requested of the meeting of the Committee on November 20, 1998 are approved."

Motion was made, seconded and approved.

     Mr. Hejl reviewed the status of the guaranteed account wrap-around through July 31, 1999 and inquired whether the Committee wished to provide participants a fixed value guaranteed fund in the ULLICO Inc., 401(k) Plan. The Committee decided to continue to investigate a fixed value guaranteed fund.

     Mr. Silas reviewed the profit-sharing plan contribution formula for plan years 1998, 1999 and beyond. Mr. Grelle stated that corporate earnings from the Global Crossing Investment has skewed the current stock value formula and he recommended that 1999 stock value be calculated solely from earnings from operations. Mr. Luce recommended that the second 1% must at least require net income from operations. It was

RESOLVED:    "That the profit sharing plan contribution for 1999 will be 1% of each employee's base annual salary as of December 31 based on Net Income as defined. An additional 1% will be contributed if there is an increase of not less than a 3% in the per share value of ULLICO stock, regardless of any dividend."

FURTHER
RESOLVED:    That the profit sharing plan contribution for 2000 will be 1% of each employee's base annual salary as of December 31 based on Net Income, as defined. An additional 1% will be contributed if there is an increase in the net income from operations after payment of expenses.

Motion was made, seconded and approved.

AC 00048

Mr. Hejl reviewed the profit-sharing plan eligibility requirements for participants to receive a profit-sharing contribution during their first year of employment. Mr. Hejl recommended that participation be based on the date of employment. It was

RESOLVED: "That the 401(k) plan be amended to reflect that, effective beginning in the 1999 plan year, participants shall be eligible for a pro-rated profit-sharing contribution based upon their date of employment in the prior calendar year.

Motion was made, seconded and approved.

Mr. Hejl reviewed the Taxpayer Relief Act of 1997 which increased the minimum account balance of a terminated participant which may be involuntarily distributed. Mr. Hejl recommended that the ULLICO Inc. 401(k) Plan be amended accordingly. It was

RESOLVED: "That the ULLICO Inc., 401(k) Plan be amended to increase the amount at which terminated employees' non-forfeitable account balances may be involuntarily distributed from $3,500 to $5,000."

Motion was made, seconded and approved.

Mr. Hejl reviewed the current ULLICO Inc. 401(k) Plan loan provisions and participant loan activity during 1997 and 1998. He recommended that participants be allowed no more than three outstanding loans concurrently and that the loan origination fee be paid by the participants. Mr. Carabillo recommended that participant loans be limited to no more than one loan per calendar year and no more than three loans in any five year period. Mr. Hejl also suggested that beneficiaries be excluded from the loan provisions and recommended that the minimum loan repayment amount be not less than $20 per payroll period. Mr. Hejl further recommended that the loan default language suggested by Arnold & Porter to comply with current IRC requirements be adopted. It was

RESOLVED: "That the Plan be amended effective January 1, 2000 to reflect that participants shall be permitted no more than one loan per year and no more than three loans in five years;"

FURTHER
RESOLVED: "That beneficiaries shall not be eligible for loans, and a minimum loan requirement amount of $20 per payroll period be adopted;" and

FURTHER
RESOLVED: "That the plan language on loan defaults be revised to comply with current IRC Regulations, and loan origination fees will continue to be paid by the employer."

Motion was made, seconded and approved.

Mr. Silas recommended that future Committee Meetings be fixed on the calendar. It was

RESOLVED: "That the Committee meet on the dates of October 20, 1999, March 16, 2000, June 16, 2000 and September 22, 2000, if schedules permit."

Motion was made, seconded and approved.

Meeting was adjourned at 12:20 pm.

300/075/benefits Committee
August 17, 1999 meeting minutes

AC 00049

**B**

# ULLICOmemo

DATE:        October 1, 1999

TO:          Benefits Committee

FROM:        L. Hejl

RE:          Availability of a Guaranteed (Fixed Value) Fund for the ULLICO 401(k)


As per the request of the Committee at the August 17, 1999 meeting, I have investigated
the possibility of providing a Fixed Value fund as an option in the ULLICO Inc. 401(k)
Plan.  This request was forwarded to Pamela Rose, Vice President of Retirement Services
with Nicholas-Applegate (our Plan Fund Manager) for additional research.  On
September 27 Ms. Rose responded that:

> "There are no providers who can give a daily valued and tradeable product that
> pre-announce or pre-guarantee the rate of interest for any period of time.
> Additionally, CNA Trust does not allow non daily valued investment options as
> anything other than a frozen asset in their daily 401(k) platform."


I have also included, for reference, a copy of the August 16, 1999 memo from Mr.
Maloney expressing the opinion that there is no Guaranteed product available for use in a
daily valued system.

Ms. Rose and I also investigated the various Stable Value funds available in the market
place and found that the Federated Capital Preservation Fund is among the most
competitive with respect to historical rates of return.

AC 00050





# Memo

**To:** M.R. Steed

**From:** M.A. Maloney

**Date:** 08/16/99

**Re:** Benefits Committee Meeting

---

I have reviewed the agenda for the Benefits Committee meeting scheduled for August 17, 1999, and I have several comments regarding the Guaranteed Account and the change in loan provisions.

Union Labor Life does not offer a "Guaranteed Account" product that would be applicable to any 401(k) Plans, and the current Accumulation Account, previously used by the ULLICO Inc. 401(k) Plan, is slowly being phased out due to Harris Trust. The Accumulation Account will be replaced by an Account that guarantees the 90 day T-bill rate.

We may be able to customize a product for the ULLICO Inc. 401(k) Plan, but we still could not handle the administrative requirements of a 401(k) Plan. Furthermore, by adding a product that is not valued on a daily basis, we would negate the benefits of a daily valued plan. For example, participants could no longer move assets on a daily basis nor could they obtain a daily balance if they were invested in the Union Labor Life product. Reports would not be produced within 15 days after the end of a quarter. Therefore, I would strongly recommend that we not offer any type of Guaranteed product to the 401(k) Plan.

It is our understanding that the 401(k) Plan participants are extremely pleased with the new daily valued investment options. Before, the Benefits Committee members make any changes to the new plan, I would suggest that a survey be distributed to the plan participants. The survey could include a question asking if participants are pleased with the current investment options.

Finally, I agree with Lou Hejl's recommendation that the loan provisions for the ULLICO Inc. 401(k) Plans be tighten. I would further suggest that that loans be limited to hardship only.

Please feel free to call me if you would like to discuss these issues in greater detail.

AC 00051

**C**

**TAB C**

The current definition of compensation in the ULLICO Inc. Pension Plan and Trust (the Plan) contained in Article 2.63. "Sponsoring Employer ULLICO Group Compensation" and section 2.77. "Zenith Central Compensation" do not include incentive compensation except for limited inclusion for the United Food and Commercial Workers Union, AFL-CIO & CLC. (See attached copies).

As part of ULLICO Inc.'s continuing efforts to remain competitive in our business markets, reward employees for their contribution to our business success and link pay to performance, a greater portion of employees' compensation will continue to be at risk and paid in the form of incentive compensation. As such, the current definition of compensation in the Plan, which generally excludes incentive pay (bonuses) as eligible compensation, unfairly penalizes employees who may have a significant portion of their compensation during a Plan Year paid through incentive payments.

Mike Karlin of The Segal Company was requested to actuarially evaluate and report on the potential FAS87 impact of changing the definition of compensation in the ULLICO Inc. Pension Plan and Trust to include 100% of incentive compensation to a maximum of $50,000 per Plan Year. At the same time, the language addressing the United Food and Commercial Workers Union Group Field Incentive compensation could be deleted as unnecessary. A draft of the proposed revised definitions is attached for reference. Utilizing the January 1, 1999 valuation, Mr. Karlin reported that this change in compensation definition would have resulted in approximately a 4.3% increase in covered compensation and an associated FAS87 expense increase of $201,000 to the Qualified Plan and $168,000 to the Non-Qualified Plan. Mr. Karlin further noted that due to the current funding position of our Plan, no additional cash funding would be required in the foreseeable future. Increasing the maximum incentive compensation amount for consideration to $75,000 or $100,000 would increase costs by no more than ~~50%~~ *17%* or ~~100%~~ *17%* respectively.

In consideration of the above, it is requested of the Benefits Committee that it be:

**Resolved,** that the definition of compensation in the ULLICO Inc. Pension Plan and Trust be amended to reflect the inclusion of Incentive Compensation up to a maximum of $50,000 per Plan Year and that the language relating to the United Food and Commercial Workers Union Group Field Incentive compensation be eliminated.

**Resolved,** that Article 2. Definitions be amended to include the definition "Incentive Compensation" means any regularly established and ongoing form of compensation designed to motivate employees to produce specific outputs. Further, be it

**Resolved**, that this amendment become effective with the Plan Year beginning on January 1, 2000.

AC 00052

- 17 -

2.63.    "Sponsoring Employer ULLICO Group Compensation" means the total
basic regularly-scheduled salary and wages paid to a Sponsoring Employer ULLICO Group
Employee by the Sponsoring Employer ULLICO Group for personal services rendered during
the Plan Year to the Sponsoring Employer ULLICO Group, excluding **Incentive Compensation
in excess of $50,000.00, other** bonuses, commissions, overtime, fringe benefits, payments by the
Employer under the Plan or any other employee benefit plan, including, without limitation, any
group health, life, accident, or other insurance plans, contributions to which are not excludable
from the Employee's gross salary or wages. ~~However, the Sponsoring Employer ULLICO Group
Compensation of an Employee who is a member of the United Food and Commercial workers
Union, AFL-CIO & CLO shall include fifty percent (50%) of any discretionary Group Field
Incentive compensation earned during the consecutive thirty-six (36) month period during the
one hundred twenty (120) months preceding the date the Employee ceases to be employed by the
Sponsoring Employer ULLICO Group during which the Participant's average monthly
compensation for Sponsoring Employer ULLICO Group Service was the highest.
Notwithstanding the above,~~ Sponsoring Employer ULLICO Group Compensation shall not be
reduced by contributions made on behalf of the Employee pursuant to a salary reduction
agreement.

2.64.    "Sponsoring Employer ULLICO Group Employee" means an Employee
performing Sponsoring Employer ULLICO Group Service.

2.65.    "Sponsoring Employer ULLICO Group Service" means Service for a
corporation that is a member of the Sponsoring Employer ULLICO Group.

2.66.    "Sponsoring Employer ULLICO Group Years of Benefit Service"

(a)    Plan Years After 1994.

(1)    In General.  A Sponsoring Employer ULLICO Group Year
of Benefit Service means, for Plan Years after 1994, twelve (12) Months of Sponsoring
Employer ULLICO Group Benefit Service.  A Sponsoring Employer ULLICO Group Employee
will receive one (1) Month of Sponsoring Employer ULLICO Group Benefit Service for each
month of Sponsoring Employer ULLICO Group Service he or she performs during a Plan Year
after 1994 during which the Employee has at least one thousand (1,000) Hours of Service.  In a
Plan Year after 1994 during which the Employee does not have at least one thousand (1,000)
Hours of Service, he or she

AC 00053

22 -

Section 5.3(b) (relating to computation of Zenith Central Early Retirement Pension); Section 5.4 (relating to computation of Zenith Central Disability Retirement Pension); or Section 5.5(b) (relating to computation of Zenith Central Deferred vested Retirement Pension).

> 6531 West Lincoln Avenue
> Milwaukee, Wisconsin 53219

2.77.    "Zenith Central Compensation" means the regular weekly base compensation paid to the Employee by Zenith Central for any week during the Plan Year that is the greatest amount of such regular weekly base compensation paid to the Employee by Zenith Central during such Plan Year multiplied by fifty-two (52), **plus Incentive Compensation not exceeding $50,000.00 paid during such Plan Year.**

2.78.    "Zenith Central Employee" means an Employee performing Zenith Central Service.

2.79.    "Zenith Central Plan" means the Zenith Administrators, Inc. Central Region Pension Plan, originally effective January 1, 1985, as amended and restated effective October 1, 1992, as in effect on December 31, 1994.

2.80.    "Zenith Central Service" means Service for Zenith Central.

2.81.    "Zenith Central Year of Benefit Service."

(a)    Plan Years After 1994.

(1)    In General.  A Zenith Central Year of Benefit Service means, for Plan Years after 1994, means a Plan Year after 1994 during which the Employee has at least one thousand (1,000) Hours of Service for Zenith Central.  An Employee may not receive both Zenith Central Benefit Service and Sponsoring Employer ULLICO Group Benefit Service during the same Plan Year.  An Employee who otherwise satisfies the requirements for both during the same Plan Year shall be deemed to have performed Service during that Plan Year only for Zenith Central or the Sponsoring Employer ULLICO Group, whichever would produce the highest additional accrual to such Employee's Normal Retirement Benefit under the Plan. For purposes of this section, Hours of Service during periods during which the Employee is not eligible to participate in the Plan under Section 3.2(a) with respect to Zenith Central Benefits shall be disregarded.

AC 00054

**D**

## TAB D

As part of our ongoing analysis of employee benefits and continuing efforts to remain competitive in our labor markets, Human Resources recently evaluated several potential enhancements to the ULLICO Inc. Pension Plan and Trust. These enhancements included the following:

1.  Increase the pension formula percentage factor for each Year of Benefit Service from the current 2% to 2.25%, 2.50%, or 2.75%. Note, the maximum available benefit would remain at 80% of final average compensation under each of these scenarios.
2.  Allow for Early Retirement at age 62 with 10 years of service. Retirement benefits would continue to be actuarially reduced.
3.  Increase the current 50% spousal death benefit to 75%.

Attached for comparative purposes is a chart detailing the current ULLICO Inc. Pension Plan with the pension plans of the Bridge & Ironworkers Staff Retirement Plan and the AFL-CIO Staff Employees Retirement Plan.

During this review, Mike Karlin of The Segal Company was asked to review selected Plan changes and estimate the additional FAS87 costs utilizing the January 1, 1999 valuation data. A chart detailing his estimates is included for your review.

Based upon these figures, Human Resources would recommend that the Benefits Committee authorize an increase in the formula percentage factor to 2.5%, increase the spousal death benefit to 75%, and permit employees who have attained age 62 with at least 10 years of service to elect Early Retirement. The increased formula percentage combined with the increased spousal death benefit would increase the 1999 FAS87 expense for the Qualified Plan by $2,839,000 and the Non-Qualified Plan by an additional $503,000, according to Mr. Karlin. Further, Mr. Karlin concludes that under our current funding level no additional cash contribution would be required to the Plan in the near future. Mike also noted that permitting Early Retirement at age 62 with 10 years of service would have a negligible impact on the fund.

In consideration of the above analysis it is requested of the Benefits Committee that it be

**Resolved,** that the formula percentage factor in the ULLICO Inc. Pension Plan and Trust be increased to 2.5%, and it be

**Resolved,** that the spousal death benefit be increased to 75%, and that it be further

**Resolved,** that participants who have attained age 62 with a minimum of 10 years of benefit service be permitted to elect Early Retirement, subject to normal benefit reductions. Finally, the above resolutions shall become effective January 1, 2000.

AC 00055

# Union Labor Life Insurance Company Retirement Plan

## Additional FAS 87 Expense for Plan Improvements

| | Increase in 1999 FAS 87 Expense | | | |
|---|---|---|---|---|
| | Without Incentive Compensation | | With 100% of Incentive Compensation Up to $50,000 | |
| Improvement | Qualified Plan | Non-Qualified Plan | Qualified Plan | Non-Qualified Plan |
| Current Plan – 2% accrual rate | N/A | N/A | $ 201,000 | $168,000 |
| 1a. 2.25% accrual rate (maximum 80%) | $1,049,000 | $ 58,000 | 1,291,000 | 227,000 |
| 1b. 2.50% accrual rate (maximum 80%) | 2,104,000 | 118,000 | 2,373,000 | 304,000 |
| 1c. 2.75% accrual rate (maximum 80%) | 2,971,000 | 147,000 | 3,266,000 | 351,000 |
| 2. Unreduced early retirement at 62/15 | 330,000 | 17,000 | 537,000 | 177,000 |
| 3. Unreduced early retirement at 62/10 | 393,000 | 20,000 | 601,000 | 182,000 |
| 4. 75% spousal death benefit | 257,000 | 22,000 | 466,000 | 199,000 |

Note: Based on 6.5% discount rate and January 1, 1999 valuation data.

344570/01475.001

THE SEGAL COMPANY

## Comparison of Select Features of Defined Benefit Retirement Plans

| Plan Feature | Bridge & Ironworkers Staff Retirement Plan | AFL-CIO Staff Employees Retirement Plan | ILI Retirement Plan |
|---|---|---|---|
| | | Plans Compared | |
| Credit for years of service | 4.0% for each year of credited service | 2.8% for first 25 years service; .5% for each year of service in excess of 25 | 2% for each year of credited service |
| Maximum years which can be credited | 20 years | N/A | 40 years |
| Maximum % of salary which can be earned | 90% of one year's average | N/A | 80% |
| Formula used to determine average salary for computing annual benefit | average annual salary for the year preceding retirement | final average salary based on highest consecutive 36 month period | average annual salary based on three consecutive years within most recent 120 month period |
| Normal retirement date | age 60 and 4 years credited service | age 65 and 5 years credited service. Plan provides for 55-80 option where minimum age 55 & years of service equal to 80 will give normal retirement. | age 65 and 5 years credited service |
| Early retirement date | age 55 and 4 years credited service | age 60 and 10 years credited service | age 55 and 15 years credited service |
| Vesting period | 5 years | 5 years | 5 years |
| Social security offset | none | none | none |
| Employee contributions | yes - .25% for earnings above $3,600 | none | none |
| Discount for early retirement | .03% per month for each month prior to retirement | .06% per month for each month prior to normal retirement | .03% per month for each month prior to normal retirement |
| Joint & Survivor Option | 100% benefit (no discount required) | 50% benefit | 50% benefit |
| Annual cost-of-living adjustment | none | none | not part of plan, but increases have been provided every 2 years |

AC 00057

**E**

**Summary of the**
**Projected Impact Of Proposed Changes To**
**The ULLICO, Inc. Pension Plan**
**(TABS C and D)**

|  | Actuarial Value | Market Value |
|---|---|---|
| January 1, 1998 Valuation | $ 74,860,482 | $ 93,575,602 |
| Income (Actual) | 12,059,760 | 13,384,830 |
| Benefits and Admin.(Actual) | (2,864,919) | (2,864,919) |
| Current Valuation (1/1/1999) | $ 84,055,323 | $ 104,095,513 |
| **PROPOSED: Incentive Compensation** | (201,000) | (201,000) |
| **2.5% Funding Percentage** | (2,373,000) | (2,373,000) |
| **75% Spousal Death Benefit** | (466,000) | (466,000) |
| Net Projected Value (1/1/1999) | $ 81,216,122 | $ 101,256,312 |
| Less Present Value of Future Benefits | 51,343,585 | 51,343,585 |
| Current Funding Overage (Underage) | $ 29,872,537 | $ 49,912,727 |
| Projected Funded Liability Percentage | 158.18 % | 197.21 % |

Note: Mike Karlin of The Segal Company also indicated that even in the current over funded status of our Pension Plan, we continue to use very conservative assumptions in our calculations and projections. We use 7.5 % as our funding projection percentage, when the accepted standard is 8 – 8.5 %. Additionally, our funding methodology assumptions are very conservative compared to those generally accepted. This continues to yield very significant differences between our actuarial valuation and the market valuation of Plan assets.

Source of data: January 1, 1999 Actuarial Valuation of The Union Labor Life Insurance Company Retirement Plan, prepared by The Segal Company.

AC 00058

**4**

MEETING OF THE BENEFITS COMMITTEE
OF
ULLICO INC.
Held October 20, 1999
At 111 Massachusetts Avenue, N.W.
Washington, DC
10:10 a.m.


ATTENDEES:

Joseph A. Carabillo
Robert A. Georgine
John K. Grelle
James W. Luce
Michael R. Steed

OTHERS IN ATTENDANCE:

Brian M. Hechinger
Louis Hejl
Richard A. Silas

    Chairman Georgine called the meeting to order.   The minutes of the meeting of the committee on August 17, 1999 had been distributed previously for review by the committee. A motion was requested to approve all the minutes.  It was

RESOLVED:   "That the minutes of the meeting of the committee on August 17, 1999 are approved."

Motion was made, seconded and approved.

    Mr. Hejl reported on his investigation into a guaranteed account.  He had not found a guaranteed fund that was daily valued.  It was discussed whether a fund could be offered based on an index and not tradable daily which CNA may be able to administer.

    There was then discussion of the current definition of compensation in the plan, which excludes incentive pay as eligible compensation and may unfairly penalize employees who are compensated significantly through incentive payments.  Incentive compensation represents a growing portion of the employees' total compensation.  A Segal Company report on the impact of changing the definition of compensation to include 100% of regularly established annual incentive compensation programs to a maximum of $50,000.00 per plan year noted changing compensation would result in a 4.3% increase in covered compensation and a FAS87 expense of $201,000 to the qualified plan and $168,000 to a nonqualified plan.  Several alternatives were discussed.  A motion was made to amend the definition of compensation to include regularly established annual incentive compensation with no maximum, effective January 1, 2000.  It was

RESOLVED:   "That the definition of compensation in the ULLICO Inc. Pension Plan and Trust be amended to reflect the inclusion of regularly established annual incentive compensation with no maximum, effective January 1, 2000."

Motion was made, seconded and approved.

    Mr. Hejl reviewed increasing the pension formula percentage factor for each year of benefits service from the current 2%, allow for early retirement at age 62 with ten (10) years of service and increase the current 50% spousal death benefit to 75%.  After discussion it was recommended to reject the proposal.

Motion was made, seconded and approved.

       Mr. Silas reviewed a request to offer Zenith officers with vice president titles or higher a one time option of electing to participate in the Union Labor Life Retirement Plan, and to allow Zenith employees who in the future become Zenith vice presidents or higher to participate in the Union Labor Life Retirement Plan and 401(k) plan. After discussion, it was recommended that the proposal be tabled.

Motion was made, seconded and approved.

Meeting was adjourned at 12:30 p.m.

300/075/Benefits Committee
October 20, 1999-Minutes

LUCE 00060

5

**ULLICO Inc.**
**Human Resources**

# ULLICOmemo

**Date:** July 17, 2001

**To:** Benefits Committee

**From:** L. Hejl

**Re:** Potential Union Labor Life Retirement Plan Changes

---

The purpose of this memo is to review the status of the funding of the Union Labor Life Insurance Company Retirement Plan and to discuss potential enhancements should the Benefits Committee desire to consider any changes.

To assist the Benefits Committee in evaluating whether a change in the pension accrual rates should be considered, the Actuarial staff has developed the analysis under tabs one and two.

Under tab one, they are demonstrating the impact on the income statement assuming higher accrual rates, and what happens should there be changes in the elements that affect the income or expenses. Also provided under tab one are similar charts that demonstrate the impact on the funding level of the Pension Plan under similar scenarios. While all of these calculations are based on asset funding as of end of 2000, we are also providing a chart that shows the change in those assets from December 31, 2000 to May 31, 2001.

Under tab two, we have attempted to make some comparisons between ULLICO's retirement benefits and those of other union affiliated organizations as well as those of other corporations.

In addition to presenting the impact of the pension benefit accrual, we have also identified the cost associated with permitting employees who attain age 62 who have a minimum of ten years of service, to retire without reduction of benefits. We have also determined the cost of increasing the Special Spouse Death Benefit from 50 percent to 75 percent.

One issue that needs to be considered as part of the discussion of this subject is whether any changes should be passed on to all active employees covered by the Plan or should the changes be limited to all covered employees except those employees covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU, Local 153 ("the Agreement"). While the Agreement is silent on the retirement plan (except for the reference to eligibility for retiree life and health insurance), Local 153 does

LUCE 00097

2

have the right to request changes since retirement plans are regarded as benefits and thus subject to mandatory bargaining. Local 153 has made requests for changes in the past, but we have resisted those changes.

During the 2000 labor negotiations with Local 153, the parties agreed that the Employer would make a limited contribution to the OPEIU, Local 153 Retirement Plan on behalf of the covered employees. The result is that the approximately 245 employees covered by that Agreement now have two defined benefit retirement plans, albeit the benefit under the OPEIU, Local 153 Plan is directly related to the Employer's contribution. We are currently contributing $7.00 per week for each covered employee. That contribution increases to $11.00 per week effective July 1, 2002. The estimated current cost to the Company is approximately $90,000 annually. While there is no additional cost to the Company, Local 153 also agreed to provide the covered employees with approximately 65% of the value of their past service, thus further improving the benefit for all the employees, but especially those employees who have been with the Company for an extended period of time. This benefit is not available to our other employees. We can certainly anticipate that Local 153 will include in its negotiating proposals in August 2003, a higher level of contribution from the Company or attempt to negotiate some of the changes the Committee may consider for the other employees at this time. This is a very valuable negotiating tool we cannot afford to give away.

It is our recommendation that whatever changes the Committee might elect to consider, those changes be limited to the SPONSORING EMPLOYER ULLICO GROUP retirement plan participants with the exception of the employees covered by the Agreement between Union Labor Life and OPEIU, Local 153. Moreover, these changes would only apply to employees who retire directly from the Company in the future. Employees who leave the Company and retire at some future date will have their retirement benefit computed based on the provisions of the Plan that are in effect prior to any changes that may be approved today.

As part of our review of this matter, we looked at the provisions of the AFL-CIO Staff Retirement Plan and the similar plan for the Ironworkers. We also researched what is available in the corporate sector. Tab 2 compares select provisions of the plans with that of our current Plan.

In summary, the changes that have been costed out for your consideration should assist you in determining what enhancements, if any, that the Committee may wish to make.

**1**

## Assumptions

Charts shown are for the Qualified Pension Plan

The figures shown are projected from the January 1, 2000 Actuarial Valuation.   *

Figures shown are in millions.

If Net Periodic Pension Cost (NPPC) is expense it is shown with ( ), if income it is not

Surplus is the difference between the Actuarial Value of Assets and the Liabilities less Projected Benefit Obligation (PBO)

Estimated Actuarial Value of Assets as of 1/1/01 is 108,008,369

The asset valuation method used is based on the average value of assets over the last  four plan years.
The value is computed by:
(1) Determining the fair market value of plan assets annually;
(2) Adding the current fair market value of assets and their adjusted values for the prior four years;
     The adjustments account for deposits, withdrawals, investment income, and dividend income.
(3) Dividing the sum by five.

Current Discount Rate is 7.50%


  * The Actuarial Valuation for January 1, 2001 is not complete.

LUCE 00099

**Chart 1: FAS 87 - Potential Plan Enhancements**
**Effective 1/1/2001**

**FAS 87 (Expense) Income**
**Net Periodic Pension Cost (millions)**

| Scenarios | Pension Benefit Accrual Rates | | | | |
|---|---|---|---|---|---|
| | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| -100 BP Discount Rate<br>-25% Equity Markets | $0.0 | ($1.3) | ($2.6) | ($3.7) | ($4.7) |
| -100 BP Discount Rate<br>+25% Equity Markets | $1.6 | $0.3 | ($1.0) | ($2.1) | ($3.1) |
| **No Change Discount rate**<br>**No Change Equity Markets** | **$2.5** | **$1.4** | **$0.3** | **($0.6)** | **($1.3)** |
| +100 BP Discount Rate<br>-25% Equity Markets | $3.4 | $2.5 | $1.6 | $0.9 | $0.5 |
| +100 BP Discount Rate<br>+25% Equity Markets | $5.0 | $4.1 | $3.2 | $2.5 | $2.1 |

7/18/01 14:13

LUCE 00100

**Chart 2: Surplus - Potential Plan Enhancements**
**Effective 1/1/2001**

**Funding Surplus (millions)**

| Scenarios | Pension Benefit Accrual Rates | | | | |
|---|---|---|---|---|---|
| | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| -100 BP Discount Rate -25% Equity Markets | $24.0 | $18.2 | $12.5 | $6.7 | $0.9 |
| -100 BP Discount Rate +25% Equity Markets | $33.8 | $28.0 | $22.3 | $16.5 | $10.7 |
| **No Change Discount rate No Change Equity Markets** | **$39.9** | **$35.5** | **$31.1** | **$26.7** | **$22.3** |
| +100 BP Discount Rate -25% Equity Markets | $46.0 | $43.0 | $40.0 | $36.9 | $33.9 |
| +100 BP Discount Rate +25% Equity Markets | $55.8 | $52.8 | $49.8 | $46.7 | $43.7 |

7/18/01 14:14

LUCE 00101

**Chart 2a: Surplus - Potential Plan Enhancements - Change**
**Effective 1/1/2001**

**Change in Funding Surplus (millions)**

| Scenarios | Pension Benefit Accrual Rates | | | | |
|---|---|---|---|---|---|
| | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| -100 BP Discount Rate<br>-25% Equity Markets | ($15.9) | ($21.7) | ($27.5) | ($33.2) | ($39.0) |
| -100 BP Discount Rate<br>+25% Equity Markets | ($6.1) | ($11.9) | ($17.7) | ($23.4) | ($29.2) |
| **No Change Discount rate**<br>**No Change Equity Markets** | **$0.0** | **($4.4)** | **($8.8)** | **($13.2)** | **($17.6)** |
| +100 BP Discount Rate<br>-25% Equity Markets | $6.1 | $3.1 | $0.1 | ($3.0) | ($6.0) |
| +100 BP Discount Rate<br>+25% Equity Markets | $15.9 | $12.9 | $9.9 | $6.8 | $3.8 |

7/18/01 14:18

LUCE 00102

**Chart 1a: FAS 87 - Potential Plan Enhancements - Change
Effective 1/1/2001**

**FAS 87 (Expense) Income
Change in Net Periodic Pension Cost (millions)**

| Scenarios | Pension Benefit Accrual Rates | | | | |
|---|---|---|---|---|---|
| | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| -100 BP Discount Rate -25% Equity Markets | ($2.5) | ($3.8) | ($5.1) | ($6.2) | ($7.2) |
| -100 BP Discount Rate +25% Equity Markets | ($0.9) | ($2.2) | ($3.5) | ($4.6) | ($5.6) |
| **No Change Discount rate No Change Equity Markets** | **$0.0** | **($1.1)** | **($2.2)** | **($3.1)** | **($3.8)** |
| +100 BP Discount Rate -25% Equity Markets | $0.9 | $0.0 | ($0.9) | ($1.6) | ($2.0) |
| +100 BP Discount Rate +25% Equity Markets | $2.5 | $1.6 | $0.7 | $0.0 | ($0.4) |

7/18/01 14:14

LUCE 00103

## Pension Plan

### Historical Summary of Discount Rates

| Year | Rate | Range |
|------|------|-------|
| 1990 | 8.26% | |
| 1991 | 8.26% | |
| 1992 | 8.00% | |
| 1993 | 7.50% | |
| 1994 | 7.00% | |
| 1995 | 7.50% | |
| 1996 | 7.50% | |
| 1997 | 7.50% | |
| 1998 | 7.00% | 6.50% to 7.25% |
| 1999 | 6.50% | 6.00% to 7.00% |
| 2000 | 7.50% | 7.50% to 8.00% |
| 2001 | 7.50% | 7.25% to 7.75% |

LUCE 00104

Pension Plan

**Historical Summary of Equity Yields**

**Annual % Changes 12-31 to 12-31**

| Year | Dow Jones Industrial Average* | S&P 500* | NASDAQ* | SEPARATE ACCOUNT A | SEPARATE ACCOUNT M |
|---|---|---|---|---|---|
| 1991 | 20.32 | 26.31 | 59.49 | 30.68 | |
| 1992 | 4.18 | 4.46 | 17.33 | 11.98 | |
| 1993 | 13.72 | 7.06 | 16.18 | 14.92 | |
| 1994 | 2.14 | -1.54 | -2.16 | -3.89 | 4.74 |
| 1995 | 33.45 | 34.11 | 40.65 | 26.95 | 37.49 |
| 1996 | 26.01 | 20.26 | 23.26 | 20.47 | 21.44 |
| 1997 | 22.64 | 31.01 | 22.38 | 29.21 | 32.11 |
| 1998 | 16.10 | 26.67 | 40.44 | 4.24 | 37.09 |
| 1999 | 25.22 | 19.53 | 85.59 | -0.20 | 45.63 |
| 2000 | -6.18 | -10.14 | -39.29 | 20.62 | -22.45 |
| 1st 6 months of 2001 | -2.64 | -7.26 | -12.55 | 2.22 | -20.14 |

\* Source of Data:   Weisenberger, A Thomson Financial Company

LUCE 00105

Comparison of Assets

| Assets 1/1/01 | | 12/31/00 | 5/31/01 | % Change | |
|---|---|---|---|---|---|
| Fixed Income Account | Fixed Income | $22,529,324 | $21,731,890 | -3.54% | * |
| Separate Account A✔ | Equity | $19,076,587 | $20,299,396 | 2.22% | |
| Separate Account P | Private Placements | $5,064,275 | $6,352,627 | 30.68% | |
| Separate Account I | Investment Grade Bonds | $2,965,670 | $3,073,324 | 3.95% | |
| Separate Account J | Mortgages | $6,385,681 | $6,619,397 | 4.41% | |
| Separate Account M✔ | Growth Equity | $24,799,521 | $20,724,960 | -20.14% | |
| Separate Account R | Fixed Income | $2,988,407 | $3,093,300 | 3.76% | |
| Separate Account T | Short Term | $4,255,395 | $4,258,374 | 0.38% | |
| Separate Account E ✔ | Small Cap. | $8,503,054 | $9,343,156 | 9.77% | |
| Ullico Inc. Stock       ✔ | Common Stock | $38,442,547 | $19,274,471 | -49.86% | |
| Total | | $135,047,352 | $114,807,936 | -14.99% | |

* Pension Benefits are paid from this account. The current expected annual yield is 5.7%

LUCE 00106

2

## Pension Plan Comparison

Assumptions: Normal retirement, single life annuity, salaries given are final average pay

| | Maximum % of Salary | YOS | Company Contribution | Monthly Benefit at Retirement | Monthly Benefit after 10 Years (COLA Included) | Relationship to ULL at Retirement | Projected Matching Funds at Retirement for DC Plan |
|---|---|---|---|---|---|---|---|
| **Scenario 1** Final average pay $40,000 | | | | | | | |
| ULL | 80% | 20 | 2% | $1,333.33 | $1,545.33 | | $42,833.00 |
| Bridge and Ironworkers | 90% | 20 | 4.50% | $3,000.00 * | $3,000.00 | 125% greater | None |
| AFL-CIO | 100% | 20 | 3.00% | $2,000.00 | $2,000.00 | 50% greater | $7,139.00 |
| ALPHARMA USPD | 100% | 20 | .8% to 1.45% | $563.50 | $563.50 | 58% less | $71,388.00 |
| **Scenario 2** Final average pay $100,000 | | | | | | | |
| ULL | 80% | 20 | 2% | $3,333.33 | $3,863.33 | | $107,083.00 |
| Bridge and Ironworkers | 90% | 20 | 4.50% | $7,500.00 * | $7,500.00 | 125% greater | None |
| AFL-CIO | 100% | 20 | 3.00% | $5,000.00 | $5,000.00 | 50% greater | $17,847.00 |
| ALPHARMA USPD | 100% | 20 | .8% to 1.45% | $2,013.50 | $2,013.50 | 40% less | $178,472.00 |

*Required employee contributions over 20 years, maximum pension amount available

7/17

LUCE 00107

## COMPARISON OF SELECT PENSION PLANS

| Plan Feature | Bridge & Ironworkers | AFL-CIO | ALPHARMA USPD | ULL |
|---|---|---|---|---|
| Company contribution for credited years of service | 4.5% for each year of credited service | 3% for first 25 years of service; .5% for each year of service in excess of 25 | .8% (Covered Compensation)* for 1.45% (Excess Compensation)* for each year of credited service | 2% for each year of credited service |
| Maximum years which can be credited | N/A | N/A | 30 years | 40 years |
| Maximum % of salary | 90% of last year salary | 100% | 100% | 80% |
| Formula used to determine average salary for computing annual benefit | Final actual earnings for the year preceding retirement | Final average salary based on highest consecutive 36 month period of employment | Final average salary is the highest 5 years of the last 10 years | Average annual salary based on the highest 36 consecutive months within most recent 120 month period |
| Normal retirement date | Age 60 and 4 years credited service | Age 65 and 5 years credited service. Plan provides for 55-60 option where minimum age 55 and years of service equal to 80 | Age 65 and 5 years credited service | Age 65 and 5 years credited service |
| Early Retirement date | Age 55 and 4 years credited service | Age 60 and 10 years credited service. Eligible for early retirement at 50 if from active service | Age 55 and 5 years credited service | Age 55 and 15 credited years of service |
| Discount for early retirement | 1/4 of 1% per month for each month prior to normal retirement | .6% per month for each month prior to normal retirement | 5% per month | .3% per month for each month prior to normal retirement |
| Vesting Period | 5 years | 3 years | 5 years | 5 years |
| Social security offset | None | None | Yes, per formula | None |
| Employee contributions | .25% for earnings above $3,600 | None | None | None |
| Joint & Survivor Option | 100% benefit (no discount required) | 50% and 100% options available | 50% or 100% | 50% or 75% |
| Annual cost-of-living adjustment | None | None | None | Not part of plan, but historically COLAs provided every 2 years |
| Definition of Compensation | Base Only | Base Only | Base plus overtime | Base plus incentives |
| Defined Contribution Plan | 401(k), no employer match | 401(k), match .5% up to maximum of $500/year | 401(k), match 3%-6% based on service | 401(k), match 3% profit sharing maximum of 2% |

*Covered compensation is average social security wage base for previous 35 years

7/1.

LUCE 00108

| Average Pension Plan Profile | |
|---|---|
| | |
| Employer Contribution Rate | 1.5% |
| Formula for Compensation | Final Average Pay |
| Normal Retirement Date | Age 65-48%   Age 62-66% |
| Early Retirement Date | Age 55<br>10 years credited service |
| Vesting | 5 years |
| Social Security offset | Yes, by formula |
| COLA | No |
| Defined Contribution Plan | Yes |

Developed using data from Employee Benefit Research Institute, 4th Edition

LUCE 00109

Table 10.1
## RETIREMENT PLAN PARTICIPATION

PERCENTAGE OF FULL-TIME EMPLOYEES PARTICIPATING IN RETIREMENT AND CAPITAL ACCUMULATION PLANS,[a] BY TYPE OF PLAN:  MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1986, 1988, 1991, AND 1993; SMALL PRIVATE ESTABLISHMENTS, 1992 AND 1994; STATE AND LOCAL GOVERNMENTS, 1990, 1992, AND 1994

| | Medium and Large Private Establishments[b] | | | | | Small Private Establishments[c] | | State and Local Governments[d] | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1986 | 1988 | 1988 | 1991 | 1993 | 1992 | 1994 | 1990 | 1992 | 1994 |
| | (old scope) | | (new scope) | | | (new scope) | | | | |
| Total Full-Time Employees | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Any Retirement Plan[e] | 91 | 82 | 86 | 78 | 78 | 47 | 42 | 96 | 93 | 96 |
| Defined benefit | 76 | 63 | 70 | 59 | 56 | 22 | 15 | 90 | 87 | 91 |
| Defined contribution[f] | 47 | 45 | 52 | 48 | 49 | 33 | 34 | 9 | 9 | 9 |
| profit sharing | 22 | 18 | 21 | 16 | 13 | 16 | 13 | g | g | g |
| savings and thrift | 28 | 25 | 32 | 29 | 29 | 14 | 17 | 1 | 2 | 2 |
| money purchase | 2 | 6 | 3 | 7 | 8 | 5 | 5 | 8 | 7 | 7 |
| employee stock ownership | 30 | 2 | 2 | 3 | 3 | 1 | 1 | g | g | g |
| stock bonus | h | h | h | h | h | i | i | g | g | g |
| simplified employee pension | i | i | i | g | g | 1 | 1 | h | g | g |

Source: U.S. Department of Labor, Bureau of Labor Statistics, *Employee Benefits in Medium and Large Firms,* 1986 and 1988 (Washington, DC: U.S. Government Printing Office, 1987 and 1989);  *Employee Benefits in Medium and Large Private Establishments,* 1991 and 1993 (Washington, DC: U.S. Government Printing Office, 1993, 1995); *Employee Benefits in Small Private Establishments,* 1992 and 1994 (Washington, DC: U.S. Government Printing Office, 1994 and 1996); and *Employee Benefits in State and Local Governments,* 1990, 1992, and 1994 (Washington, DC: U.S. Government Printing Office, 1992, 1994, and 1996).

[a]Includes only retirement and capital accumulation plans that provide for employer contributions. Freestanding accounts are not included.

[b]The Bureau of Labor Statistics (BLS) survey scope was expanded significantly in 1988 to include private, nonfarm establishments employing 100 or more workers. The former survey coverage, which previously included full-time employees in establishments with 50, 100, or 250 workers, depending on industry, is referred to as old scope. The expanded survey coverage, which in 1988 and after includes full-time employees in private, nonagricultural establishments employing 100 or more employees in the District of Columbia and all states except Alaska and Hawaii, is referred to as new scope. In order to permit comparisons of 1988 findings with those of prior years, BLS also tabulated selected 1988 survey respondents, for old scope establishments. In 1991 and following years, the survey includes establishments in Alaska and Hawaii.

[c]These tabulations provide representative data for full-time employees in private, nonagricultural establishments with fewer than 100 employees.

[d]The BLS survey scope was expanded significantly in 1990 to include part-time workers, all governments regardless of size, and Alaska and Hawaii. The former survey coverage, which included only full-time workers in government units employing 50 or more workers in the 48 contiguous states and the District of Columbia, is referred to as old scope. The expanded survey coverage is referred to as new scope.

[e]Does not include capital accumulation plans for years 1986, 1988, and 1991. Includes only retirement plans that do not allow withdrawal of employer contributions until retirement age, death, disability, separation from service, age 59 1/2, or hardship. The total is less than the sum because it does not include capital accumulation plans, and some employees participated in both defined benefit and defined contribution plans.

[f]Includes retirement and capital accumulation plans. The total is less than the sum of the individual items because many employees participated in more than one type of defined contribution plan.

[g]No participants in this category.

[h]Less than 0.5 percent.

[i]Data not available.

EBRI Databook on Employee Benefits. 4th edition

| Demographic Characteristics | Total Workers (thousands) | Sponsorship Rate[a] | Participation Rate | Sponsored Participation Rate[b] | Vesting Rate | Participant Vesting Rate |
|---|---|---|---|---|---|---|
| **Table 10.5 (continued)** Retirement Plan Sponsorship, Participation, and Vesting | | | | | | |
| **Gender** | | | | | | |
| Male | 55,582 | 62.3% | 50.0% | 80.2% | 42.8% | 85.6% |
| Female | 50,233 | 61.8 | 44.0 | 71.2 | 37.6 | 85.3 |
| **Union Status** | | | | | | |
| Union covered | 18,498 | 88.4 | 78.7 | 89.0 | 67.0 | 85.1 |
| Not union covered | 87,317 | 56.5 | 40.5 | 71.6 | 34.7 | 85.7 |
| **Industry** | | | | | | |
| Federal government | 3,268 | 90.0 | 79.0 | 87.7 | 70.4 | 89.2 |
| State and local government | 15,228 | 89.3 | 74.4 | 83.3 | 66.0 | 88.7 |
| Mining | 648 | 73.3 | 66.9 | 91.3 | 60.4 | 90.2 |
| Construction | 4,898 | 35.1 | 29.7 | 84.5 | 25.5 | 84.8 |
| Manufacturing-nondurables | 8,095 | 68.2 | 55.5 | 81.3 | 45.8 | 82.5 |
| Manufacturing-durables | 10,714 | 76.5 | 63.5 | 83.0 | 54.9 | 86.5 |
| Transportation | 4,064 | 60.4 | 47.0 | 77.8 | 39.0 | 83.1 |
| Communications, utilities | 2,426 | 89.0 | 77.9 | 87.5 | 69.7 | 89.4 |
| Wholesale trade | 4,426 | 56.6 | 45.4 | 80.3 | 38.2 | 84.1 |
| Retail trade | 18,175 | 42.2 | 24.1 | 57.0 | 19.3 | 80.0 |
| Finance, insurance, real estate | 6,927 | 70.4 | 52.6 | 74.7 | 45.6 | 86.7 |
| Business, personal entertainment services | 10,629 | 30.3 | 19.0 | 62.8 | 15.8 | 83.0 |
| Professional services | 16,346 | 63.2 | 42.5 | 67.3 | 35.3 | 83.1 |
| **Race** | | | | | | |
| White | 90,654 | 62.2 | 47.7 | 76.6 | 41.0 | 86.1 |
| Black | 11,622 | 62.7 | 45.3 | 72.3 | 36.8 | 81.3 |
| Other | 3,539 | 57.1 | 40.1 | 70.2 | 32.7 | 81.7 |

Source: Employee Benefit Research Institute tabulations of the April 1993 Current Population Survey employee benefit supplement.
Note: See Appendix D for a technical explanation of this source.
[a]The fraction of workers whose employer or union sponsors a plan for any of the employees at the worker's place of employment.
[b]The fraction of workers participating in a plan among those whose employer or union sponsors a plan for any of the employees at the worker's place of employment.

LUCE 00111

Table 21.2
## TRENDS IN PRIVATE PLAN PROVISIONS

*PERCENTAGE OF FULL-TIME EMPLOYEES PARTICIPATING IN PRIVATE PENSION PLANS,[a] BY TYPE OF VESTING SCHEDULE, RETIREMENT REQUIREMENTS, BENEFIT FORMULAS, AND INTEGRATION WITH SOCIAL SECURITY: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS,[b] 1983, 1986, 1989, 1991, 1993, AND 1995*

| | 1983[c] | 1986 | 1989 | 1991 | 1993 | 1995 |
|---|---|---|---|---|---|---|
| | (old scope) | | (new scope) | | | |
| **Total Defined Benefit Plan Participants** | 100% | 100% | 100% | 100% | 100% | 100% |
| **Defined Benefit Plans' Vesting Schedules[d]** | | | | | | |
| Cliff vesting | e | e | 89 | 92 | 96 | 97 |
| Cliff vesting with full vesting after | | | | | | |
| 5 years' service at any age | e | e | 44 | 69 | 79 | 84 |
| 10 years' service at any age | 65 | 69 | 29 | 16 | 12 | 10 |
| 5 years' service after age 18 | e | e | 6 | 6 | 4 | e |
| 10 years' service after age 18 | e | 9 | 9 | f | f | e |
| Graduated vesting | e | e | 11 | 8 | 4 | 2 |
| Graduated vesting with full vesting after | | | | | | |
| 7 years' service | e | e | 1 | 4 | 3 | 1 |
| more than 7 years' service | e | e | e | e | 1 | 0 |
| 10 years' service | e | 6 | 7 | 2 | e | e |
| 15 years' service | 4 | 3 | 2 | g | e | e |
| **Defined Benefit Plans' Normal Retirement Requirements** | | | | | | |
| Age and service requirement[h] | | | | | | |
| no age requirement | 17 | 13 | 8 | 8 | 5 | 6 |
| age 55 | 5 | 3 | 3 | 2 | 4 | 4 |
| age 56–59 | 2 | 1 | f | 1 | f | f |
| age 60 | 13 | 14 | 13 | 12 | 13 | 8 |
| age 61 | f | 1 | 1 | f | f | f |
| age 62 | 17 | 19 | 22 | 24 | 21 | 26 |
| no service requirement | 2 | 4 | 6 | 6 | 3 | 3 |
| 10 years' service | 6 | 7 | 10 | 7 | 7 | 9 |
| age 63–64 | 1 | 2 | 2 | 1 | 2 | f |
| age 65 | 36 | 36 | 38 | 45 | 48 | 48 |
| no service requirement | 31 | 32 | 33 | 30 | 26 | 36 |
| Sum of age plus service[i] | 9 | 11 | 12 | 6 | 8 | 9 |

(continued)

LUCE 00112

Table 21.2 (continued)
Trends in Private Plan Provisions

| | 1983c | 1986 | 1989 | 1991 | 1993 | 1995 |
|---|---|---|---|---|---|---|
| | (old scope) | | (new scope) | | | |
| **Defined Benefit Plans' Early Retirement Requirements** | | | | | | |
| Age and service requirement[h] | | | | | | |
| participants in plans permitting early | | | | | | |
| retirement | 97% | 98% | 97% | 98% | 95% | 96% |
| no age requirement | 6 | 5 | 6 | 7 | 5 | 7 |
| under age 55 | 9 | 10 | 10 | 8 | 9 | 9 |
| age 55 | 61 | 66 | 68 | 68 | 68 | 67 |
| no service requirement | 10 | 10 | 6 | 5 | 2 | 4 |
| 5 years' service | 3 | 3 | 9 | 5 | 2 | 4 |
| 10 years' service | 35 | 41 | 43 | 17 | 20 | 21 |
| 15 years' service | 9 | 7 | 8 | 32 | 32 | 31 |
| 20 years' service | 3 | 4 | 1 | 10 | 12 | 9 |
| age 56–59 | 1 | 1 | 1 | 1 | 2 | 1 |
| age 60 | 11 | 7 | 6 | 1 | 1 | 1 |
| age 62 | f | 7 | 6 | 6 | 7 | 6 |
| Sum of age plus service[i] | 9 | 9 | 2 | 2 | 3 | 1 |
| | | | 4 | 6 | 3 | 4 |
| **Defined Benefit Plans' Benefit Formulas** | | | | | | |
| Benefit formula[j] | | | | | | |
| Terminal-earnings formula | 54 | 57 | 64 | 56 | 61 | 58 |
| Career-earnings formula | 16 | 15 | 11 | 14 | 11 | 11 |
| Dollar-amount formula[k] | 28 | 26 | 22 | 23 | 22 | 23 |
| Percentage-of-contributions formula | 1 | f | 1 | 4 | 2 | 2 |
| Other formula | 1 | 1 | 2 | 3 | 4 | 5 |
| **Integration of Defined Benefit Plans with** | | | | | | |
| **Social Security Provision** | | | | | | |
| Total[l] | 100 | 100 | 100 | 100 | 100 | 100 |
| With integrated formula | 55 | 62 | 63 | 54 | 48 | 51 |
| Offset by Social Security payment | 35 | 43 | 41 | 19 | 17 | 14 |
| based on service | 28 | 36 | 32 | 15 | e | e |
| not based on service | 7 | 7 | 9 | 5 | e | e |
| Pure excess | 1 | 1 | f | 1 | e | e |
| Step-rate excess | 19 | 23 | 24 | 35 | 31 | 37 |
| Without integrated formula | 45 | 38 | 37 | 46 | 52 | 49 |
| **Defined Contribution Plans** | | | | | | |
| Vesting Schedules of Savings and Thrift Plans | | | | | | |
| Total[d] | e | 100 | 100 | 100 | 100 | 100 |
| Immediate full vesting | e | 26 | 30 | 31 | 34 | 33 |
| Cliff vesting with full vesting after | e | 20 | 25 | 31 | 29 | 25 |
| 1–2 years | e | 5 | 2 | 2 | 2 | 1 |
| 3–4 years | e | 7 | 11 | 9 | 9 | 5 |
| 5 years | e | 7 | 11 | 19 | 18 | 18 |
| Graduated vesting with full vesting after | e | 25 | 32 | 35 | 33 | 24 |
| 4 years or less | e | 2 | 4 | 3 | 5 | 3 |
| 5 years | e | 15 | 15 | 21 | 18 | 17 |
| 7 years | e | | 3 | 6 | | |
| 10 years | e | 4 | 2 | f | f | f |
| more than 15 years | e | f | f | f | e | e |

(continued)

### Table 21.3
### NORMAL RETIREMENT REQUIREMENTS

*MINIMUM AGE AND SERVICE REQUIREMENTS FOR NORMAL RETIREMENT FOR FULL-TIME PARTICIPANTS IN DEFINED BENEFIT PENSION PLANS[a]: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1995; SMALL PRIVATE ESTABLISHMENTS, 1994; STATE AND LOCAL GOVERNMENTS, 1994*

**Medium and Large Private Establishments[b]**

| Age and Service Requirement[c] | | Age and Service Requirement[c] | |
|---|---|---|---|
| **Total** | 100% | Age 62 | 26% |
| No Age Requirement | 6 | No service requirement | 3 |
| 30 years' service | 5 | 5 years' service | 4 |
| 35 years' service | d | 10 years' service | 9 |
| | | 15 years' service | 3 |
| Age 55 | 4 | 20 years' service | 4 |
| No service requirement | d | 25 years' service | 1 |
| 5 years' service | d | 26–29 years' service | d |
| 20 years' service | d | 30 years' service | 2 |
| 25 years' service | d | More than 30 years' service | d |
| 30 years' service | 3 | | |
| More than 30 years' service | d | Age 63–64 | d |
| | | No service requirement | d |
| Age 56–59 | d | | |
| 20 years' service | d | Age 65 | 48 |
| 30 years' service | d | No service requirement | 36 |
| | | 1–4 years' service | d |
| Age 60 | 8 | 5 years' service | 9 |
| No service requirement | 1 | 10 years' service | 2 |
| 5 years' service | 1 | 15 years' service | d |
| 10 years' service | 3 | 25 years' service | d |
| 15 years' service | d | 30 years' service | d |
| 20 years' service | d | | |
| 25 years' service | d | Sum of Age Plus Service[e] | 9 |
| 30 years' service | 2 | Equals less than 80 | 1 |
| More than 30 years' service | d | Equals 80 | 1 |
| | | Equals 81–89 | 6 |
| Age 61 | d | Equals 90 | 1 |
| 15 years' service | d | Equals more than 90 | d |

**Small Private Establishments[f]**

| Age and Service Requirement[c] | | Age and Service Requirement[c] | |
|---|---|---|---|
| **Total** | 100 | Age 62 | 19 |
| No Age Requirement | 7 | No service requirement | 2 |
| 20–29 years' service | 1 | 5 years' service | 5 |
| 30 years' service | 2 | 10 years' service | 4 |
| 35 years' service | 2 | 15 years' service | d |
| More than 35 years' service | 2 | 20 years' service | 2 |
| | | 26–29 years' service | 1 |
| Age 55 | 6 | 30 years' service | 5 |
| No service requirement | d | | |
| 15 years' service | d | Age 65 | 46 |
| 30 years' service | 6 | No service requirement | 25 |
| More than 30 years' service | d | 5 years' service | 13 |
| | | 10 years' service | 6 |
| Age 60 | 12 | 15 years' service | d |
| No service requirement | 1 | 25 years' service | 1 |
| 5 years' service | 1 | | |
| 10 years' service | 6 | Sum of Age Plus Service[e] | 8 |
| 15 years' service | 1 | Equals less than 80 | 1 |
| 20 years' service | 1 | Equals 80 | 1 |
| 25 years' service | d | | |
| 30 years' service | 2 | | |
| More than 30 years' service | 1 | | |

(continued)

Table 21.4
**EARLY RETIREMENT REQUIREMENTS**

*MINIMUM AGE AND SERVICE REQUIREMENTS FOR EARLY RETIREMENT, FOR FULL-TIME PARTICIPANTS IN DEFINED BENEFIT PENSION PLANS[a]: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1995; SMALL PRIVATE ESTABLISHMENTS, 1994, STATE AND LOCAL GOVERNMENTS, 1994*

### Medium and Large Private Establishments[b]

| Age and Service Requirement[d] | |
|---|---|
| Total with Defined Benefit Plan | 100% |
| Participants in Plans Permitting | |
|   Early Retirement | 96 |
| No Age Requirement | 7 |
|   Less than 20 years' service | e |
|   20–29 years' service | 1 |
|   30 years' service | 6 |
| Under Age 55 | 9 |
|   No service requirement | e |
|   5 years' service | 3 |
|   6–9 years' service | e |
|   10 years' service | 2 |
|   15 years' service | 1 |
|   20 years' service | e |
|   25 years' service | 3 |
| Age 55 | 67 |
|   No service requirement | 4 |
|   1–4 years' service | e |
|   5 years' service | 21 |
|   6–9 years' service | e |
|   10 years' service | 31 |
|   11–14 years' service | e |
|   15 years' service | 9 |
|   20 years' service | 1 |
|   25 years' service | 1 |
| Between Ages 56–59 | 1 |
|   10 years' service | e |
|   30 years' service | 1 |
| Age 60 | 6 |
|   No service requirement | e |
|   5 years' service | 2 |
|   10 years' service | 1 |
|   15 years' service | 2 |
|   20 years' service | e |
|   30 years' service | 1 |
| Age 62 | 1 |
|   10 years' service | e |
|   15 years' service | 1 |
| Sum of age plus service | 4 |
|   Equals less than 80 | 3 |
|   Equals 80 | e |
|   Equals 81–89 | e |
| Early retirement not available | 4 |

### State and Local Governments[c]

| Age and Service Requirement[d] | |
|---|---|
| Total with Defined Benefit Plan | 100% |
| Participants in Plans Permitting | |
|   Early Retirement | 87 |
| No Age Requirement | 23 |
|   Less than 20 years' service | 7 |
|   20–29 years' service | 7 |
|   30 years' service | 8 |
| Under Age 55 | 17 |
|   5 years' service | 7 |
|   10 years' service | 1 |
|   15 years' service | 1 |
|   20 years' service | 4 |
|   25 years' service | 1 |
|   30 years' service | 3 |
| Age 55 | 40 |
|   1–4 years' service | 3 |
|   5 years' service | 10 |
|   6–9 years' service | 1 |
|   10 years' service | 8 |
|   15 years' service | 4 |
|   20 years' service | 3 |
|   25 years' service | 9 |
|   30 years' service | 2 |
| Age 60 | 3 |
|   5 years' service | e |
|   10 years' service | 1 |
|   20 years' service | 2 |
| Age 62 | e |
|   10 years' service | e |
| Sum of age plus service | 3 |
|   Equals less than 80 | 3 |
|   Equals 80 | e |
| Early retirement not available | 13 |

### Small Private Establishments

| Age and Service Requirement[d] | |
|---|---|
| Total with Defined Benefit Plan | 100% |
| Participants in Plans Permitting | |
|   Early Retirement | 97 |
| No Age Requirement | 4 |
|   Less than 20 years' service | 1 |
|   20–29 years' service | e |
|   30 years' service | 2 |
| Under Age 55 | 6 |
|   10 years' service | 3 |
|   15 years' service | 2 |
|   25 years' service | e |
|   30 years' service | e |
| Age 55 | 74 |
|   No service requirement | 1 |
|   1–4 years' service | 1 |
|   5 years' service | 22 |
|   6–9 years' service | 1 |
|   10 years' service | 40 |
|   11–14 years' service | 2 |
|   15 years' service | 6 |
|   20 years' service | 2 |
| Age 60 | 8 |
|   5 years' service | 2 |
|   10 years' service | 4 |
|   15 years' service | e |
|   20 years' service | 1 |
| Age 62 | 1 |
|   5 years' service | 1 |
|   10 years' service | 1 |
| Sum of age plus service | 3 |
|   Equals less than 80 | 2 |
|   Equals 80 | 1 |
|   Equals 81–89 | e |
| Early retirement not available | 3 |

Source: U.S. Department of Labor, Bureau of Labor Statistics, *Employee Benefits in Medium and Large Private Establishments, 1995* (Washington, DC: U.S. Government Printing Office, 1997); the data used here for 1994 small private establishments are from unpublished estimates from the Bureau of Labor Statistics (BLS) that do not meet publication standards; *Employee Benefits in State and Local Governments, 1994* (Washington, DC: U.S. Government Printing Office, 1996).

Note: See table 21.2 for historical trends in private defined benefit plan early retirement requirements.

[a]Excludes supplemental pension plans.

[b]These tabulations provide representative data for full-time employees in private, nonagricultural establishments with 100 or more employees in all U.S. states and the District of Columbia. The estimated number of full-time workers employed by medium and large private establishments was 33.4 million.

[c]These tabulations provide representative data for full-time employees in state and local governments in all U.S. states and the District of Columbia. The estimated number of full-time workers employed by state and local governments was 12.9 million.

[d]Early retirement is defined as the point at which a worker could retire and immediately receive accrued benefits based on service and earnings but reduced for each year prior to normal retirement age. If a plan had alternative age and service requirements, the earliest age and associated service were tabulated; if one alternative did not specify an age, it was the requirement tabulated.

[e]Less than 0.5 percent.

Table 21.9
### BENEFIT FORMULAS

PERCENTAGE OF FULL-TIME DEFINED BENEFIT PLAN[a] PARTICIPANTS
BY METHOD OF DETERMINING RETIREMENT PAYMENTS: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1995;
SMALL PRIVATE ESTABLISHMENTS, 1994; STATE AND LOCAL GOVERNMENTS, 1994

| Benefit Formula[c] | Medium and Large Private Establishments[b] | | | |
| --- | --- | --- | --- | --- |
| | All Employees | Professional, Technical, and Related | Clerical and Sales | Blue Collar and Service |
| Total[d] | 100% | 100% | 100% | 100% |
| Terminal-Earnings Formula | 58 | 71 | 67 | 46 |
|   With alternative formula | 18 | 24 | 17 | 15 |
| Career-Earnings Formula | 11 | 13 | 9 | 11 |
|   With alternative formula | 5 | 5 | 4 | 5 |
| Dollar-Amount Formula | 23 | 10 | 14 | 37 |
|   With alternative formula | e | e | e | e |
| Contribution Formula | 2 | e | 1 | e |
|   With alternative formula | e | f | 1 | 4 |
| Cash Account | 3 | 4 | 5 | 2 |
|   With alternative formula | e | e | e | e |
| Other | 2 | 1 | 4 | 1 |

| | Small Private Establishments[g] | | | |
| --- | --- | --- | --- | --- |
| | All Participants | Professional, Technical, and Related | Clerical and Sales | Blue Collar and Service |
| Total[d] | 100% | 100% | 100% | 100% |
| Terminal-Earnings Formula | 51 | 68 | 58 | 39 |
|   With alternative formula | 8 | 9 | 9 | 7 |
| Career-Earnings Formula | 18 | 9 | 9 | 7 |
| Dollar-Amount Formula[h] | 20 | 18 | 25 | 29 |
| Percentage-of-Contributions Formula | 5 | 4 | 1 | 8 |
| Cash Account | 5 | 1 | 1 | 1 |
| Other | 1 | 1 | 1 | 1 |

| | State and Local Governments[i] | | | |
| --- | --- | --- | --- | --- |
| | All Participants | White Collar, Except Teachers | Teachers | Blue Collar and Service |
| Total[d] | 100% | 100% | 100% | 100% |
| Terminal-Earnings Formula | 99 | 100 | 98 | 99 |
|   With alternative formula | 18 | 17 | 19 | 19 |
| Career-Earnings Formula | e | e | 2 | e |
|   With alternative formula | e | e | f | e |
| Dollar-Amount Formula[h] | e | e | e | 1 |

Source: U.S. Department of Labor, Bureau of Labor Statistics, *Employee Benefits in Medium and Large Private Establishments, 1995* (Washington, DC: U.S. Government Printing Office, 1997); the data used here for 1994 small private establishments are from unpublished estimates from the Bureau of Labor Statistics (BLS) that do not meet publication standards; *Employee Benefits in State and Local Governments, 1994* (Washington, DC: U.S. Government Printing Office, 1996).

[a] Excludes supplemental pension plans.
[b] These tabulations provide representative data for full-time employees in private, nonagricultural establishments with 100 or more employees in all U.S. states and the District of Columbia. The estimated number of full-time employees employed by medium and large private establishments was 33.4 million.
[c] Alternative formulas are generally designed to provide a minimum benefit for employees with short service or low earnings.
[d] Because of rounding, sum of individual items may not equal totals.
[e] Less than 0.5 percent.
[f] No employees in this category.
[g] These tabulations provide representative data for full-time employees in private, nonagricultural establishments with fewer than 100 employees. The estimated number of full-time workers employed by small private establishments was 35.9 million.
[h] Includes formulas based on dollar amounts for each year of service and schedules of benefits that vary by length of service.
[i] These tabulations provide representative data for full-time employees in state and local governments in all U.S. states and the District of Columbia. The estimated number of full-time workers employed by state and local governments was 12.9 million.

Table 21.10
## RETIREMENT AND CAPITAL ACCUMULATION PLAN COMBINATIONS

*PERCENTAGE OF FULL-TIME PARTICIPANTS IN RETIREMENT PLANS AND CAPITAL ACCUMULATION PLANS[a]*
*BY COMBINATION OF PLANS: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1993;*
*SMALL PRIVATE ESTABLISHMENTS, 1994; STATE AND LOCAL GOVERNMENTS, 1994*

### Medium and Large Private Establishments[b]

| Type of Plan | All Participants | Professional, Technical, and Related | Clerical and Sales | Blue Collar and Service |
|---|---|---|---|---|
| Defined Benefit[c] | 100% | 100% | 100% | 100% |
| Defined benefit with | | | | |
| no other plan | 55 | 40 | 46 | 67 |
| savings and thrift | 31 | 43 | 38 | 20 |
| money purchase pension | 3 | 3 | 2 | 3 |
| other combinations[d] | 12 | 14 | 13 | 10 |
| Savings and Thrift[c] | 100 | 100 | 100 | 100 |
| Savings and thrift with | | | | |
| no other plan | 18 | 13 | 14 | 26 |
| defined benefit | 59 | 64 | 60 | 53 |
| other combinations[d] | 23 | 23 | 26 | 21 |
| Deferred Profit Sharing[c] | 100 | 100 | 100 | 100 |
| Deferred profit sharing with | | | | |
| no other plan | 46 | 40 | 46 | 49 |
| other combinations[d] | 54 | 60 | 54 | 51 |

### Small Private Establishments[e]

| Type of Plan | All Participants | Professional, Technical, and Related | Clerical and Sales | Blue Collar and Service |
|---|---|---|---|---|
| Defined Benefit[c] | 100% | 100% | 100% | 100% |
| Defined benefit with | | | | |
| no other plan | 55 | 53 | 50 | 60 |
| savings and thrift | 29 | 31 | 35 | 23 |
| other combinations[d] | 16 | 16 | 15 | 17 |
| Savings and Thrift[c] | 100 | 100 | 100 | 100 |
| Savings and thrift with | | | | |
| no other plan | 53 | 54 | 53 | 53 |
| defined benefit | 26 | 22 | 28 | 26 |
| other combinations[d] | 21 | 23 | 19 | 21 |
| Deferred Profit Sharing[c] | 100 | 100 | 100 | 100 |
| Deferred profit sharing with | | | | |
| no other plan | 75 | 72 | 77 | 75 |
| savings and thrift plan | 15 | 17 | 12 | 18 |
| other combinations[d] | 9 | 10 | 11 | 7 |

### State and Local Governments[f]

| Type of Plan | All Participants | White Collar, Except Teachers | Teachers | Blue Collar and Service |
|---|---|---|---|---|
| Defined Benefit[c] | 100% | 100% | 100% | 100% |
| Defined benefit with | | | | |
| no other plan | 97 | 96 | 98 | 96 |
| savings and thrift | 1 | 2 | 1 | 1 |
| money purchase pension | f | f | f | f |
| other combinations[d] | 2 | 3 | 1 | 3 |
| Money Purchase Pension[c] | 100 | 100 | 100 | 100 |
| Money purchase pension with | | | | |
| no other plan | 67 | 71 | 77 | 56 |
| defined benefit | 29 | 25 | 23 | 40 |
| savings and thrift | f | f | f | f |
| other combinations[d] | 3 | 4 | 9 | 4 |

(continued)

LUCE 00117

*EBRI Databook on Employee Benefits. 4th edition*

Table 21.12
## BENEFIT FORMULAS AND ACCRUAL RATES

*PERCENTAGE OF FULL–TIME EMPLOYEES PARTICIPATING IN DEFINED BENEFIT PENSION PLANS,[a] BY METHOD OF DETERMINING RETIREMENT PAYMENTS AND TYPE AND AMOUNT OF FORMULA: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1983, 1986, 1989, 1991, 1993, AND 1995; STATE AND LOCAL GOVERNMENTS, 1987, 1990, 1992, AND 1994*

| | Medium and Large Private Establishments[b] | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1983[c] | 1986 | 1989 | 1991 | 1993 | 1995 |
| | (old scope) | | (new scope) | | | |
| Total Full-Time Participants | 100% | 100% | 100% | 100% | 100% | 100% |
| Terminal-earnings formula | 54 | 57 | 64 | 56 | 61 | 58 |
| Career-earnings formula | 16 | 15 | 11 | 14 | 11 | 11 |
| Dollar-amount formula[d] | 28 | 26 | 22 | 23 | 22 | 23 |
| Percentage-of-contributions formula | 1 | e | 1 | 4 | 2 | 2 |
| Other[f] | 1 | 1 | 2 | 3 | 4 | 5 |
| | | | | | | |
| Terminal-Earnings Formula[g] | 100 | 100 | 100 | 100 | 100 | 100 |
| Flat percentage per year of service | 47 | 57 | 54 | 42 | 48 | 43 |
| less than 1.00 | 1 | 1 | 4 | 3 | 4 | 2 |
| 1.00–1.24 | 7 | 6 | 8 | 6 | 5 | 10 |
| 1.25–1.49 | 6 | 8 | 7 | 6 | 8 | 5 |
| 1.50–1.74 | 17 | 24 | 18 | 18 | 22 | 13 |
| 1.75–1.99 | 4 | 5 | 5 | 3 | 4 | 3 |
| 2.00–2.24 | 10 | 10 | 9 | 5 | 5 | 4 |
| 2.25–2.49 | h | h | 2 | e | h | h |
| 2.50–2.74 | h | h | 1 | e | h | h |
| 2.25 or greater | 1 | 3 | 3 | h | e | 0 |
| 2.75 or greater | h | h | e | e | h | h |
| Percentage per year varies | 53 | 43 | 46 | 57 | 51 | 62 |
| by service | 24 | 16 | 16 | 9 | 7 | 8 |
| by earnings | 23 | 20 | 24 | 36 | 36 | 41 |
| by age | 3 | 2 | 3 | h | e | e |
| by earnings and service | 3 | 5 | 3 | 12 | 7 | 13 |
| Other[i] | e | j | e | 1 | 1 | e |
| | | | | | | |
| Career-Earnings Formula[g] | 100 | 100 | 100 | 100 | h | h |
| Flat percentage per year of service | 37 | 40 | 40 | 36 | h | h |
| less than 1.00 | 3 | 1 | h | e | h | h |
| 1.00–1.24 | 4 | 4 | 8 | 6 | h | h |
| 1.25–1.49 | 6 | 6 | 5 | 6 | h | h |
| 1.50–1.74 | 20 | 23 | 18 | 15 | h | h |
| 1.75–1.99 | 1 | e | 2 | 1 | h | h |
| 2.00–2.24 | 2 | 3 | 6 | 2 | h | h |
| 2.25–2.49 | h | h | h | 3 | h | h |
| 2.50–2.74 | h | h | h | 2 | h | h |
| 2.25 or greater | e | 1 | 2 | 6 | h | h |
| 2.75 or greater | h | h | h | 1 | h | h |
| Percentage per year varies | 63 | 60 | 59 | 60 | h | h |
| by service | 3 | 4 | 4 | 4 | h | h |
| by earnings | 60 | 56 | 43 | 51 | h | h |
| by age | j | e | e | e | h | h |
| by earnings and service | 1 | j | 12 | 5 | h | h |
| Other[i] | j | j | e | 4 | h | h |

(continued)

LUCE 00118

Table 21.13
## INTEGRATION OF DEFINED BENEFIT PLANS WITH SOCIAL SECURITY

### PROVISION FOR INTEGRATION OF DEFINED BENEFIT PENSION PLAN[a] WITH SOCIAL SECURITY BENEFITS, BY OCCUPATIONAL GROUP:
### MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1995; STATE AND LOCAL GOVERNMENTS, 1994

| Provision | Medium and Large Private Establishments[b] | | | | State and Local Governments[c] | | | |
|---|---|---|---|---|---|---|---|---|
| | All employees | Professional technical, and related | Clerical and sales | Blue collar and service | All participants | Teachers | White collar, except teachers | Blue collar and service |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| With Integrated Formula | 51 | 58 | 58 | 42 | 4 | 3 | 5 | 4 |
| Offset by Social Security Payment | 14 | 16 | 16 | 12 | d | d | 1 | d |
| Step-Rate Excess | 37 | 42 | 42 | 30 | 3 | 3 | 3 | 4 |
| Integrated with Social Security Breakpoint | 33 | 36 | 39 | 27 | 3 | 3 | 3 | 4 |
| Integrated with a Specific Dollar Breakpoint | 4 | 5 | 3 | 4 | d | d | e | d |
| Other Integrated Formula | e | e | e | e | e | e | e | e |
| Without Integrated Formula | 49 | 42 | 42 | 58 | 73 | 76 | 66 | 74 |
| Not Covered under Social Security | d | 1 | f | f | 24 | 21 | 30 | 22 |

Source: U.S. Department of Labor, Bureau of Labor Statistics, *Employee Benefits in Medium and Large Private Establishments, 1995* (Washington, DC: U.S. Government Printing Office, 1997); *Employee Benefits in State and Local Governments, 1994* (Washington, DC: U.S. Government Printing Office, 1996).

Note: See table 21.2 for historical trends in integration of defined benefit plans with Social Security.

[a]Excludes supplemental pension plans.

[b]These tabulations provide representative data for full-time employees in private, nonagricultural establishments with 100 or more employees in all U.S. states and the District of Columbia. The estimated number of full-time workers employed by medium and large private establishments was 33.4 million.

[c]These tabulations provide representative data for full-time employees in state and local governments in all U.S. states and the District of Columbia. The estimated number of full-time workers employed by state and local governments was 12.9 million.

[d]Less than 0.5 percent.

[e]No employees in this category.

[f]Data not available.

LUCE 00119

Table 21.15
## COST-OF-LIVING ADJUSTMENTS (COLAs)

### PERCENTAGE OF FULL-TIME EMPLOYEES PARTICIPATING IN DEFINED BENEFIT PENSION PLANS, BY TYPE OF POSTRETIREMENT INFLATION ADJUSTMENT: MEDIUM AND LARGE PRIVATE ESTABLISHMENTS, 1983, 1986, 1989, 1991, 1993, AND 1995; SMALL PRIVATE ESTABLISHMENTS, 1990, 1992, AND 1994; AND STATE AND LOCAL GOVERNMENTS, 1987, 1990, 1992, AND 1994

| | Medium and Large Private Establishments[a] | | | | | |
|---|---|---|---|---|---|---|
| | 1983[b] | 1986 | 1989 | 1991 | 1993 | 1995 |
| | (old scope) | | (new scope) | | | |
| Total Full-Time Employees | 100% | 100% | 100% | 100% | 100% | 100% |
| Automatic COLA Adjustment | 3 | 3 | 7 | 5 | 4 | 3 |
| Pension Plans Providing at Least One Postretirement Benefit During | 1978–1982[b] | 1981–1985 | 1984–1988 | 1986–1990 | 1988–1992 | 1991–1995 |
| Ad hoc pension increase | 51 | 35 | 22 | 7 | 6 | 4 |
| Lump-sum payment | c | 6 | 6 | 0.5 | c | c |

| | Small Private Establishments[d] | | |
|---|---|---|---|
| | 1990 | 1992 | 1994 |
| Total Full-Time Employees | 100% | 100% | c |
| Automatic COLA Adjustment | 2 | 4 | c |
| Pension Plans Providing at Least One Postretirement Benefit During | 1985–1989 | 1987–1991 | 1989–1993 |
| Ad hoc pension increase | 7 | 4 | c |
| Lump-sum payment | e | c | c |

| | State and Local Governments[f] | | | |
|---|---|---|---|---|
| | 1987 | 1990 | 1992 | 1994 |
| | (old scope) | | (new scope) | |
| Total Full-Time Employees | 100% | 100% | 100% | 100% |
| Automatic COLA Adjustment | 51 | 50 | 52 | 45 |
| Pension Plans Providing at Least One Postretirement Benefit During | 1982–1986 | 1985–1989 | 1987–1991 | 1988–1993 |
| Ad hoc pension increase | 33 | 16 | 10 | 10 |
| Lump-sum payment | 6 | c | e | c |

(continued)

LUCE 00120

**Union Labor Life Insurance Company**
**Increase in 2001 FAS 87 Expense for Pension Plan Improvements**

| | Bargaining Unit | Non-Bargaining Unit | Total |
|---|---|---|---|
| **1.  75% Spousal death benefit** | | | |
|    a)  Qualified Plan | $ 37,094 | $ 180,861 | $ 217,955 |
|    b)  Non-Qualified Plan | 0 | 45,631 | 45,631 |
|    c)  Total | $ 37,094 | $ 226,492 | $ 263,586 |
| | | | |
| **2.  62/10 Early Retirement With reduction (assumes 25% retire at 62/10)** | | | |
|    a)  Qualified Plan | $ 43,982 | $ 125,385 | $ 169,367 |
|    b)  Non-Qualified Plan | 0 | 34,868 | 34,868 |
|    c)  Total | $ 43,982 | $ 160,253 | $ 204,235 |
| | | | |
| **3.  62/10 Unreduced Early Retirement (assumes 50% retire at 62/10)** | | | |
|    a)  Qualified Plan | $ 143,712 | $ 416,201 | $ 559,913 |
|    b)  Non-Qualified Plan | 0 | 63,092 | 63,092 |
|    c)  Total | $ 143,712 | $ 479,293 | $ 623,005 |

LUCE 00121

**6**



MEETING OF THE BENEFITS COMMITTEE
OF
ULLICO INC.
Held July 24, 2001
At 111 Massachusetts Avenue, N. W.
Washington, D.C.
9:00 a.m.

ATTENDEES:

Robert A. Georgine
Joseph A. Carabillo
John K. Grelle
James W. Luce
Grover McKean

OTHERS IN ATTENDENCE:

Blaine Barham
William Blanton
Louis Hejl
Craig W. Patenaude
Richard A. Silas

    Chairman Georgine called the meeting to order. The Committee reviewed the minutes for the Meeting of May 4, 2001 distributed previously. A motion was requested to approve the minutes. It was

RESOLVED: " That the minutes of the Committee meeting on May 4, 2001 are approved."

Motion was made, seconded and approved.

    Mr. Blanton and Mr. Barham reviewed the impact on FAS 87 expenses and the funding surplus of changes in the benefit accrual rates for Sponsoring Employer ULLICO Group Participants in the ULLICO Inc. Pension Plan ("Plan"). Mr. Hejl reported on comparisons between various benefit features of the Plan and those of several other union affiliated and corporate defined benefit retirement plans. He also discussed the increase in FAS 87 expenses associated with additional changes in Plan benefits, including allowing employees to retire with or without reduction of benefits at age 62 and increasing the spousal death benefit from fifty (50%) to seventy-five (75%). The Committee then discussed a number of alternatives for changes in Plan Benefits and the financial impact of those changes. It was

1

AC 01631



RESOLVED: "That the percentage of a Sponsoring Employer ULLICO Group Participant's Average Salary used to determine his monthly retirement benefit under the ULLICO Inc. Pension Plan be increased from two percent (2%) to two and one-half percent (2.5%) for all Years of Benefit Service, effective January 1, 2002. This change in benefit will not apply to Sponsoring Employee ULLICO Group Participants covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU, Local 153."

FURTHER RESOLVED: "That the amount of the Qualified Preretirement Survivor Annuity payable to a surviving spouse of a Sponsoring Employer ULLICO Group Participant in the ULLICO Inc. Pension Plan be increased from fifty percent (50%) to seventy-five percent (75%), effective January 1, 2002. This change in benefit will not apply to Sponsoring Employee ULLICO Group Participants covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU, Local 153."

FURTHER RESOLVED: "That Sponsoring Employer ULLICO Group Participants in the ULLICO Inc. Pension Plan be eligible for an unreduced early retirement benefit upon attainment of age sixty-two (62) and completion of fifteen (15) or more Years of Service, effective January 1, 2002. This change in benefit will not apply to Sponsoring Employee ULLICO Group Participants covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU, Local 153."

Motion was made, seconded and approved.

**REDACTED**

The meeting was adjourned at 11:15 a.m.

2

AC 01632

7

INTERNAL REVENUE SERVICE                    DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201


Date: SEP 2 5 2002                  Employer Identification Number:
                                       52-1579726
                                    DLN:
                                       17007079014022
ULLICO INC                          Person to Contact:
111 MASSACHUSETTS AVE NW               THELIA BUTLER          ID# 52039
WASHINGTON, DC  20001               Contact Telephone Number:
                                       (877) 829-5500
                                    Plan Name:
                                       ULLICO INC PENSION PLAN

                                    Plan Number: 001


Dear Applicant:


     We have made a favorable determination on the plan identified above based
on the information you have supplied.  Please keep this letter, the application
forms submitted to request this letter and all correspondence with the Internal
Revenue Service regarding your application for a determination letter in your
permanent records.  You must retain this information to preserve your reliance
on this letter.

     Continued qualification of the plan under its present form will depend
on its effect in operation.  See section 1.401-1(b)(3) of the Income Tax
Regulations.  We will review the status of the plan in operation periodically.

     The enclosed Publication 794 explains the significance and the scope of
this favorable determination letter based on the determination requests
selected on your application forms.  Publication 794 describes the information
that must be retained to have reliance on this favorable determination letter.
The publication also provide examples of the effect of a plan's operation on
its qualified status and discusses the reporting requirements for qualified
plans.  Please read Publication 794.

     This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other federal
or local statutes.

     This determination is subject to your adoption of the proposed amendments
submitted in your letter dated 09/16/02 & 09/23/02.  The proposed amendments
should be adopted on or before the date prescribed by the regulations under
Code section 401(b).

     This determination letter is applicable for the amendment(s) executed
on 02/28/2002.

     This determination letter is also applicable for the amendment(s) dated
on 01/31/1997.

     Issues arising from the amendment of a defined benefit plan's benefit


                                       Letter  835 (DO/CG)


LUCE 00212

ULLICO INC

formula to convert that formula into a cash balance type benefit formula are under study, and this determination letter does not express an opinion on any of these issues. A cash balance type formula generally defines a benefit for each employee by reference to a single-sum amount, such as 10 percent of final average pay times years of service, or the amount of the employee's hypothetical account balance.

This letter considers the changes in qualification requirements made by the Uruguay Round Agreements Act, Pub. L. 103-465, the Small Business Job Protection Act of 1996, Pub. L. 104-188, the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353, the Taxpayer Relief Act of 1997, Pub. L. 105-34, the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, and the Community Renewal Tax Relief Act of 2000, Pub. L. 106-554.

This letter may not be relied on with respect to whether the plan satisfies the requirements of section 401(a) of the Code, as amended by the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub L. 107-16.

The requirement for employee benefits plans to file summary plan descriptions (SPD) with the U.S. Department of Labor was eliminated effective August 5, 1997. For more details, call 1-800-998-7542 for a free copy of the SPD card.

We have sent a copy of this letter to your representative as indicated in the power of attorney.

If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

*Paul T. Shultz*

Paul T. Shultz
Director,
Employee Plans Rulings & Agreements

Enclosures:
Publication 794

Letter  835 (DO/CG)

LUCE 00213

**8**

# ULLICOmemo

Date:        April 1, 2002

To:          Participants in the ULLICO Inc. Pension and 401(k) Plans

From:        Lou Hejl
             Director, Corporate Benefits

Re:          Summary of Material Modifications to the ULLICO Inc. Pension Plans
             and the ULLICO Inc. 401(k) Plans.

The ULLICO Inc. Benefits Committee has recently approved a number of significant
amendments to the Pension Plans as well as the 401(k) Plans. These amendments were
enacted to improve the benefits available under these plans as well as comply with
recently passed legislation collectively known as GUST and EGTRRA. Following is a
summary of how these changes affect your plans. Except where otherwise noted, all
amendments are effective immediately.

Both the ULLICO Inc. 401(k) Plan and the ULLICO Inc. Pension Plan have been revised
and filed with the Internal Revenue Service. New Summary Plan Descriptions (SPD) are
presently being developed and will be distributed to all participants in the next several
months. Until you receive the new documents, please place this summary with your
current retirement plan documents. As always, if you have any questions about these
changes, please contact your local Human Resources Representative or me at (202) 682-
7940, email lhejl@ullico.com.

Pension Plan

• Effective January 1, 2000, the definition of compensation in the ULLICO Inc.
  Pension Plan was amended to include all regularly established annual incentive
  compensation.

• Effective for those retiring on or after January 1, 2002, the percentage of final average
  compensation used in the calculation of pension benefits for ULLICO Group
  participants, who are not part of OPEIU, Local 153, is increased from 2% to 2.5% for
  all years of service.

• The Qualified Pre-retirement Survivor Annuity for the surviving spouse of an eligible
  ULLICO Group participant, who is not covered by the collective bargaining
  agreement with OPEIU Local 153, is increased from 50% to 75%.

LUCE 00122

- ULLICO Group participants, except participants covered by the collective bargaining agreement with OPEIU Local 153, may elect to retire early with an unreduced benefit upon attainment of age 62 and completion of 15 years or more of service.

- Active employees in the ULLICO Inc. Pension Plan who attain the age of 70 and ½ may make a one time election to postpone taking Minimum Required Distributions from their account until after they retire from active service.

The ULLICO Inc. 401(k) Plans

- The four (4) separate Plans (i.e., The ULLICO Group 401(k) Plan, the Zenith Administrators, Inc. Northwest Profit Sharing Plan, the Zenith Administrators, Inc. Northwest Employer Matching Contribution Plan, and the Zenith Administrators, Inc. Midwest Employer Matching Contribution Plan) have been merged as a single Plan and filed with the Internal Revenue Service as The ULLICO Inc. 401(k) Plan and Trust. However, the provisions applicable to employees of the individual Sponsoring Employers within the Plan will remain the same.

- As a Plan allowing for participant-directed investments, the ULLICO Inc. 401(k) Plan and Trust is intended to be administered under ERISA Section 404(c), and the fiduciaries' liability for losses as a result of participant investment selection is limited.

- The ULLICO Inc. 401(k) Plan was amended to increase the limits established for plan benefits to the maximums permitted by law. For the 2002 Plan year these limits are:

| | |
|---|---|
| Elective deferral contributions | $11,000 |
| Limit on Qualified Compensation | $200,000 |
| Catch-up Contributions | $1,000 |

- Participants that have attained the age of 50 or older by December 31 of any year may, in addition to their regular contributions, make a "catch-up contribution" for that year. For the year 2002, the maximum allowable "catch-up contribution" is $1,000. Contributions in excess of the regular annual deferral limits will be classified, and identified in your statements, as "catch-up contributions". These limits will be adjusted annually as established by law.

- Effective with the conversion to Mellon Employee Benefit Solutions' (MEBS) administration of the 401(k) Plan the following new Fund offerings will be available for participant investments:
  The Franklin U.S. Government Securities A Fund
  The T. Rowe Price Mid-Cap Value Fund
  The Vanguard 500 Index Fund
  The Putnam Balanced Retirement A Fund

- The Plan was amended to accept "Rollover Contributions" from other qualified plans (i.e., 401(k), 403(b), 457(b), IRA, etc.) to the fullest extent permitted by law. Previously, only funds from other qualified 401(k) Plans could be rolled over to your ULLICO Inc. 401(k) Plan.

- The component of participant contribution limits based on percentage of compensation has been removed to allow contributions to the Plan to the fullest dollar contribution permitted by law. Therefore, you may make contributions to your account, through payroll deductions, in any full percentage or dollar amount to the maximum dollar limits established by the Internal Revenue Code ($11,000 in 2002). This was previously limited as well to 14% of base wages.

- The Plan was amended to reduce the period during which voluntary contributions for a participant is suspended following a "hardship" withdrawal from one (1) year to six (6) months. Participants whose voluntary contributions are currently suspended as a result of a "hardship" withdrawal may submit a new deferral election as soon as six (6) months from the date of the withdrawal have elapsed.

- Active participants in the Plan who attain the age of 70 and ½ may make a one-time election to postpone taking Minimum Required Distributions from their account until after they leave active employment.

LUCE 00124

**9**

ULLICO Inc. Pension Plan and Trust
Amendment Number 1
Adopted by the Board of Directors of ULLICO Inc.
April 23, 2003

*June 1, 2003 Early Retirement Program*

Effective April 16, 2003, the Plan is Amended to Include Article 16 as follows:

ARTICLE 16      June 1, 2003 Early Retirement Program

16.1      Eligibility. Effective April 16, 2003, all employees of the Sponsoring Employer ULLICO Group, as such term is defined in Section 2.59 of this Plan, that have attained age 55 with 15 years of service, or who have attained age 65 with 5 years of service by June 1, 2003. Such Sponsoring Employer ULLICO Group Employees must elect to retire by submitting a properly completed Election and Release Agreement to ULLICO Inc.'s Director of Corporate Benefits by no later than June 1, 2003, and retire effective June 1, 2003. The Chairman of the Board, President, and Chief Executive Officer of ULLICO Inc.. shall not be eligible to participate in the June 1, 2003 Early Retirement Program.

16.2      Calculation of Benefits.     Notwithstanding an other provision of the Plan, employees who meet the eligibility requirements as contained in Section 16.1 shall receive an unreduced retirement benefit, calculated in accordance with Section 5.1 of the Plan

AC 00909

**10**

# ULLICOmemo

Date:       May 6, 2003

To:         J.W. Luce

From:       L.F. Hejl

Re:         Benefits Provided By the June 1, 2003 Early Retirement Program

I am happy to provide you with the following information concerning your benefits should you elect to exercise your rights to the June 1, 2003 Early Retirement Program that was authorized by the Board of Directors:

➢ Monthly pension benefit payable to you beginning June 1, 2003 of approximately $7,306 from the ULLICO Inc. Pension Plan and Trust based upon a 50% Joint & Survivor election;

➢ Monthly pension benefit payable to you beginning June 1, 2003 of approximately $18,333 from the ULLICO Inc. Auxiliary Retirement Benefits Plan based upon a 50% Joint & Survivor election;

➢ The benefits of the ULLICO Inc. Employee Health & Welfare Plan pursuant to the normal retirement provisions, providing the medical, dental, vision and prescription drug benefits afforded current active employees;

➢ Life and AD&D benefits payable to your surviving beneficiary in the amount of $219,000.

In addition, you have the right to leave your current assets in the ULLICO Inc.401(k) Plan and Trust and continue to manage the assets within the Plan, or execute a distribution of the funds at your discretion. As of May 5, 2003, your funds in the Plan were $563,023.80. Future balances are subject to the earnings/losses of your selected investment options. You are 100% vested in these funds.

LUCE 00131

**11**

## ULLICO Inc. Pension Plan and Trust
## Amendment Number 3
## Adopted by the Board of Directors of ULLICO Inc.
## October 15, 2003

*Limitation on Inclusion of Incentive Compensation – ULLICO Group*

**Section 2.61(a) is added as follows:**

2.61(a)     Effective December 15, 2003, incentive compensation paid to a Sponsoring Employer ULLICO Group Employee by the Sponsoring Employer ULLICO Group for personal services rendered during the Plan Year to the Sponsoring Employer ULLICO Group shall not be included in Sponsoring Employer ULLICO Group Compensation.

AC 00911

**12**

MEETING OF THE BOARD OF DIRECTORS
OF
ULLICO INC.
THURSDAY, JANUARY 29, 2004
AT THE OFFICES OF THE LABORERS' INTERNATIONAL
UNION OF NORTH AMERICA (LIUNA)
LOCATED AT 905 16th STREET, NW
WASHINGTON, D.C.

PARTICIPANTS:

DIRECTORS:

John J. Flynn
James A. Grogan (via teleconference)
James Heczko
Joseph Hunt
Earl J. Kruse (via teleconference)
Lenore Miller (via teleconference)
Jeremiah J. O'Connor

Terence M. O'Sullivan
Richard Ravitch
Vincent R. Sombrotto
Edward C. Sullivan
Michael J. Sullivan
George Tedeschi
Richard L. Trumka

ABSENT:

Morton Bahr
Dana A. Brigham
Alexis Herman

Martin J. Maddaloni
James H. Rankin

OTHERS:

Edward Grebow, President
Theodore T. Green, Senior Vice President, General Counsel
James J. Kennedy, Jr., Senior Vice President Government and Public Affairs
Herbert A. Kolben, Vice President Real Estate Banking
James M. Paul, Senior Vice President, Human Resources
John Marshall, Senior Financial Analyst
Jacquelyn K. Nunez, Acting Vice President, Group Life and Health
Mark E. Singleton, Senior Vice President and Chief Financial Officer
Damon Silvers, Counsel to the Chairman and CEO
K. Erin Barrow, Senior Executive Assistant to Theodore Green
Joseph Semo, Esq., Feder & Semo, P.C.
Jonathan Short Esq., McKenna Long & Aldridge

1. The Role call.   The Chairman called the meeting to order and took the role of Board members in attendance.

2. Adoption of Minutes of Meeting of ULLICO Inc. Board of Directors Meeting held on December 19, 2003. After due consideration the following resolution was moved, seconded and unanimously carried by the Board of Directors of ULLICO Inc.: (TAB 1

AC 01398

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

AC 01400

REDACTED

REDACTED

REDACTED

REDACTED

AC 01401

REDACTED

REDACTED

REDACTED

REDACTED

AC 01402

REDACTED

16. <u>Technical and Conforming amendments to the ULLICO Inc. Pension Plan</u>. The Board of Directors of ULLICO Inc. separately received a report from outside counsel, discussed, moved, seconded, and unanimously carried each of the following four technical resolutions amending the Company's Pension Plan:

WHEREAS, the ULLICO Inc. Pension Plan and Trust (the "Plan") was adopted by the Board of Directors effective December 31, 1994 and amended and restated effective as of February 28, 2002. And,

WHEREAS, Article 11, Section 11.1 of the Plan reserves to the ULLICO Inc. Board of Directors (the "Board") the right to modify or amend the Plan in any manner that the Board deems advisable. And,

WHEREAS, on October 15, 2003, the Board adopted a Resolution, effective December 15, 2003, amending Section 2.61 of the Plan to provide that incentive compensation paid to a Sponsoring Employer ULLICO Group Employee by the Sponsoring Employer ULLICO Group for personal services rendered during the Plan Year to the Sponsoring Employer ULLICO Group shall <u>not</u> be included in "Sponsoring Employer ULLICO Group Compensation." And,

WHEREAS, such Resolution further directed the Employee Benefit Plans Administrative Committee (formerly the Benefits Committee) to examine the advisability and cost of including any portion of incentive compensation in the Plan's definition of "Sponsoring Employer ULLICO Group Compensation," and the parameters that should be considered in including incentive compensation in such definition. And,

WHEREAS, the Board has determined that its prior Resolution does not effect Zenith Central Employees who participate in the Zenith Administrators Inc. Central Pension Plan and Trust. And,

WHEREAS, it is the desire of the Board to exclude incentive compensation paid to Zenith Central Employees participating in the Zenith Administrators Inc. Central Pension Plan and Trust. And,

6

AC 01403

WHEREAS, notwithstanding anything to the contrary, this Resolution shall not be construed as ratifying the actions of the Benefits Committee with respect to its purported amendment of the Plan, and does not in any way waive, alter, or modify claims that ULLICO Inc. may have against former officers who served on the Benefits Committee and who purported to amend the Plan's definition of compensation, including claims with respect to such former officers' benefits under the Union Labor Life Auxiliary Retirement Benefits Plan (the "Auxiliary Plan"). Therefore, be it

RESOLVED:    "That effective April 1, 2004, Section 2.75 of the Plan shall be amended to ADD the following, to be codified as new Section 2.75(a):

"Effective April 1, 2004, incentive compensation paid to a Zenith Central Employee by Zenith Central for personal services rendered during the Plan Year shall not be included in the calculation of Zenith Central Compensation." And, be it

FURTHER
RESOLVED:    "That the Employee Benefit Plans Administrative Committee, during the course of its examination of incentive compensation matters, is to further examine the advisability and cost of including any portion of incentive compensation in the Plan's definition of Zenith Central Compensation and the parameters that should be considered in including incentive compensation in such definition. In carrying out such examination, the Employee Benefit Plans Administrative Committee is directed and empowered to consult with such corporate officers, employees, consultants, actuaries, and other experts as the Committee deems advisable, and that following such examination, the Committee shall report its findings and recommendations to the Board for consideration."

WHEREAS, the ULLICO Inc. Pension Plan and Trust ("Plan") was amended and restated effective February 28, 2002. And,

WHEREAS, pursuant to Article 8, Section 8.4, of the Plan, the Employee Benefit Plans Administrative Committee ("Committee") is responsible for the implementation and general administration of the Plan. And,

WHEREAS, the Committee has recommended that the Plan be amended to incorporate benefit improvements previously recommended and implemented. And,

WHEREAS, in order to provide for consistent administration of the Plan, the following amendment has the effect of increasing the Special Qualified Joint and Survivor Annuity Spouse Benefit from 50 percent to 75 percent, increasing the Qualified Pre-retirement Survivor Annuity Benefit from 50 to 75 percent, and increasing the Special Qualified Pre-retirement Survivor Annuity Spouse Benefit from 50 to 75 percent. And,

WHEREAS, the Board of Directors, hereby accepts the recommendation of the Committee. Therefore, be it

AC 01404

RESOLVED:     "That the Plan is hereby amended, effective January 1, 2002, as follows:

(1) Plan section 6.1(c)(2)(A) is amended as follows by adding the following sentence immediately after the second sentence thereof:

Notwithstanding the foregoing, for a Participant who was employed after December 31, 2001 in the Sponsoring Employer ULLICO Group, other than a Sponsoring Employer ULLICO Group Participant covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU Local 153, the Survivor Annuity shall be paid on the basis of a 75% (rather than 50%) survivor annuity.

(2) Plan section 7.1(a) is amended by inserting the designation "(1)" immediately following the header for that subsection.

(3) Plan section 7.1(b)(3) is restated as follows:

retired with an immediate fifty percent (50%) Qualified Joint and Survivor Annuity under Section 6.1(a) and (b), without regard to Section 6.1(c), at the Earliest Retirement Date, except that in the case of a Participant who was employed after December 31, 2001 in the Sponsoring Employer ULLICO Group, other than a Sponsoring Employer ULLICO Group Participant covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU Local 153, the Survivor Annuity shall be paid on the basis of a 75% (rather than 50%) survivor annuity.

(4) Plan section 7.1(e)(2)(A) is amended as follows by adding the following sentence immediately following the first sentence thereof:

Notwithstanding the foregoing, for a Participant, other than a Sponsoring Employer ULLICO Group Participant covered by the collective bargaining agreement between The Union Labor Life Insurance Company and OPEIU Local 153, in the employ of the Sponsoring Employer ULLICO Group after December 31, 2001 and on the day immediately preceding the date of death or at the time of incurring a Disability, and who otherwise fulfills the requirements of Plan Section 7.1(e)(1)(A) or (B) above, the monthly payment of the portion of the Qualified Preretirement Survivor Annuity payable under 7.1(a) or (b) above that is attributable to Sponsoring Employer ULLICO Group Years of Benefit Service shall be increased, if necessary, to make it equal to seventy-five percent (75%) (rather than 50%) of the amount of the monthly Normal Retirement Benefit or Deferred Retirement Benefit that would have been payable to the Participant as a single life annuity beginning at age sixty-five (65) or the date of his death, whichever is later, based upon the Participant's

8

AC 01405

Average Salary and Sponsoring Employer ULLICO Group Years of Benefit Service as of the date of death."

WHEREAS, the ULLICO Inc. Pension Plan and Trust ("Plan") was amended and restated effective February 28, 2002. And,

WHEREAS, pursuant to Article 11, Section 11.1, of the Plan, the Board of Directors has the right to amend the Plan to ensure the continued qualification of the Plan under the provisions of the Internal Revenue Code ("Code"). And,

WHEREAS, the Board of Directors desires to amend the Plan in accordance with Revenue Procedure 2002-29 to comply with final and temporary regulations under Code Section 401(a)(9), which provide new rules regarding the manner and forming which distributions must be made to, or on behalf of, a Participant who reaches his or her required benefit payment commencement date. Therefore, be it

RESOLVED:    "That the Plan is hereby amended as follows:

(1) Section 2.19 of Article 2 shall be renumbered Section 2.20, Section 2.20 of Article 2 shall be renumbered Section 2.21, and so on.

(2) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.19:

Designated Beneficiary means an individual or trust designated as a Beneficiary under the Plan pursuant to Section 2.8. The members of a class of Beneficiaries capable of expansion or contraction shall be treated as being identifiable if it is possible to identify the class member with the shortest Life Expectancy. In the event a Participant designates a trust as his Beneficiary under Section 2.8 of the Plan, the beneficiaries of the trust shall be treated as the Participant's Designated Beneficiaries, provided that the following requirements are satisfied:

(a) The trust must be a valid trust under state law, or otherwise would be a valid trust but for the fact that there is no corpus.

(b) The trust must be irrevocable or will, by its terms, become irrevocable upon the Participant's death.

(c) The beneficiaries of the trust who are beneficiaries with respect to the trust's interest in the Participant's benefit must be identifiable from the trust agreement.

(d) The Participant must provide the Plan Administrator with either:

9

AC 01406

(i)    A copy of the trust agreement (and the Participant must agree to provide the Plan Administrator with any amendments to the trust agreement within a reasonable time); or

(ii)    A list of all the beneficiaries of the trust (and the Participant must: (A) certify that, to the best of his knowledge, the list is complete and the requirements set forth in paragraphs (a) through (c) above are satisfied; (B) agree to provide the Plan Administrator with corrected certifications in the event of any amendments to the trust agreement within a reasonable time; and (C) agree to provide the Plan Administrator with a copy of the trust agreement upon demand).

(3) Section 2.23 of Article 2 shall be renumbered Section 2.24, Section 2.24 of Article 2 shall be renumbered Section 2.25, and so on.

(4) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.23:

Distribution Calendar Year means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under Section 6.3(a). The required minimum distribution for a Participant's first Distribution Calendar Year shall be made on or before his Required Beginning Date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's Required Beginning Date occurs, shall be made on or before December 31st of that Distribution Calendar Year.

(5) Section 2.39 of Article 2 shall be renumbered Section 2.40, Section 2.40 of Article 2 shall be renumbered Section 2.41, and so on.

(6) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.39:

Life Expectancy means the value calculated using the "Single Life Table" in Treasury Regulation Section 1.401(a)(9)-9.

AC 01407

(7) Section 2.52 of Article 2 shall be renumbered Section 2.53, Section 2.53 of Article 2 shall be renumbered Section 2.54, and so on.

(8) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.52.

Required Beginning Date means April 1st of the calendar year following the later of: (a) the calendar year in which a Participant attains age 70½, or (b) the calendar year in which the Participant retires; provided that, in the case of a Five Percent Owner, Required Beginning Date means April 1st of the calendar year following the calendar year in which the Participant attains age 70½.

(9) Article 6, Section 6.3, of the Plan shall be amended to include the following new provisions, which shall appear directly following the current provisions of Section 6.3:

(a) Time of Distribution. The Participant's entire interest shall be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date. Effective January 1, 2003, if the Participant dies before distributions begin, the Participant's entire interest shall be distributed, or begin to be distributed, no later than as follows:

(i) If the Participant's surviving spouse is his sole Designated Beneficiary, then distributions to the surviving spouse shall begin by December 31st of the calendar year immediately following the calendar year in which the Participant died, or by December 31st of the calendar year in which the Participant would have attained age 70 ½, if later.

(ii) If the Participant's surviving spouse is not his sole Designated Beneficiary, then distributions to the Designated Beneficiary shall begin by December 31st of the calendar year immediately following the calendar year in which the Participant died.

(iii) If there is no Designated Beneficiary as of September 30th of the calendar year following the calendar year of the Participant's death, the Participant's entire interest shall be distributed by December 31st of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(iv) If the Participant's surviving spouse is his sole Designated Beneficiary and the surviving spouse dies after the Participant, but

11

AC 01408

before distributions to the surviving spouse begin, Sections 6.3(a)(ii) and (iii) shall apply as if the surviving spouse were the Participant.

(b) Amount Required to be Distributed by Required Beginning Date. Effective January 1, 2003, the amount that must be distributed on or before the Participant's Required Beginning Date (or, if the Participant dies before distributions begin, the date distributions are required to begin under Sections 6.3(a)(i)-(iv), as applicable), is the payment required for one payment interval. The second payment need not be made until the end of the next payment interval even if that payment interval ends in the next calendar year. All of the Participant's benefit accruals as of the last day of the first Distribution Calendar Year shall be included in the calculation of the amount of the annuity payments for payment intervals ending on or after the Participant's Required Beginning Date.

(c) General Annuity Requirements. Effective January 1, 2003, if the Participant's interest is paid in the form of annuity distributions under the Plan, payments under the annuity shall satisfy the following requirements:

(i) The annuity distributions shall be paid in periodic payments made at intervals not longer than one year.

(ii) The distribution period shall be over a life (or lives) or over a period certain not longer than the period described in Section 6.3(d)(ii).

(iii) Once payments have begun over a period certain, the period certain shall not be changed even if the period certain is shorter than the maximum permitted.

(iv) Payments shall be either non-increasing or increase only as follows:

(A) By an annual percentage increase that does not exceed the annual percentage increase in a cost-of-living index that is based on prices of all items and issued by the Bureau of Labor Statistics;

(B) To the extent of the reduction in the amount of the Participant's payments to provide for a survivor benefit upon death, but only if the Designated Beneficiary whose life was begin used to determine the distribution period described in Section 6.3(d) dies or is no longer the Participant's Designated Beneficiary pursuant to a "qualified domestic relations order" within the meaning of Code Section 414(p);

12

AC 01409

(C) To provide cash refunds of employee contributions upon the Participant's death; or

(D) To pay increased benefits that result from an amendment to the Plan.

(d) Requirements for Annuity Distributions That Commence During Participant's Lifetime.

(i) *Joint Life Annuities Where the Designated Beneficiary is Not the Participant's Spouse.* Effective January 1, 2003, if the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a non-spouse Designated Beneficiary, annuity payments to be made on or after the Participant's Required Beginning Date to the Designated Beneficiary after the Participant's death shall not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Q&A-2 of Treasury Regulation Section 1.401(a)(9)-6T. Effective January 1, 2003, if the form of distribution combines a joint and survivor annuity for the joint lives of the Participant and a non-spouse Designated Beneficiary and a period certain annuity, the requirement in the preceding sentence shall apply to annuity payments to be made to the Designated Beneficiary after the expiration of the period certain.

(ii) *Period Certain Annuities.* Effective January 1, 2003, unless the Participant's spouse is his sole Designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the "Uniform Lifetime Table" set forth in Treasury Regulation Section 1.401(a)(9)-9 for the calendar year that contains the annuity starting date. If the annuity starting date precedes the year in which the Participant reaches age 70, the applicable distribution period for the Participant shall be the distribution period for age 70 under the "Uniform Lifetime Table," plus the excess of 70 over the age of the Participant as of his birthday in the calendar year that contains the annuity starting date. Effective January 1, 2003, if the Participant's spouse is his sole Designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain shall not exceed the longer of the applicable distribution period for the Participant under the "Uniform Lifetime Table," or the joint life and last survivor expectancy of the Participant and his spouse as determined under the "Joint and Last Survivor Table" set forth in the Treasury Regulation Section

13

AC 01410

1.401(a)(9)-9, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the calendar year that contains the annuity starting date.

(e) <u>Requirements For Minimum Distributions Where Participant Dies Before Date Distributions Begin.</u>

(i) *Participant Survived by Designated Beneficiary*.    Effective January 1, 2003, if a Participant dies before the date distribution of his interest begins and there is a Designated Beneficiary, the Participant's entire interest shall be distributed, beginning no later than the time described in Section 6.3(a), over the life of the Designated Beneficiary or over a period certain not exceeding:

(A) Unless the annuity starting date is before the first Distribution Calendar Year, the Life Expectancy of the Designated Beneficiary determined using the Designated Beneficiary's age as of the Designated Beneficiary's birthday in the calendar year immediately following the calendar year of the Participant's death; or

(B) If the annuity starting date is before the first Distribution Calendar Year, the Life Expectancy of the Designated Beneficiary determined using the Designated Beneficiary's age as of the Designated Beneficiary's birthday in the calendar year that contains the annuity starting date.

(ii) *No Designated Beneficiary*.   Effective January 1, 2003, if the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30th of the calendar year following the calendar year of the Participant's death, distribution of the Participant's entire interest shall be completed by December 31st of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(iii) *Death of Surviving Spouse Before Distributions to Surviving Spouse Begin*.   Effective January 1, 2003, if the Participant dies before the date distributions begin, the Participant's surviving spouse is the Participant's sole Designated Beneficiary, and the surviving spouse dies before distributions to the surviving spouse begin, Sections 6.3(e)(i) and (ii) shall apply as if the surviving spouse were the Participant, except that the time by which distributions must begin shall be determined without regard to Section 6.3(a)(i).

(f) <u>Additional Accruals</u>.  Effective January 1, 2003, if a Participant returns to employment after his Required Beginning Date and accrues additional benefits under the Plan, the additional accruals shall be distributed beginning with the first monthly benefit payment

14

AC 01411

made to the Participant during the calendar year immediately following the calendar year in which the additional amount accrued.

(g) Actuarial Increases. Effective January 1, 2003, if a Participant, other than a Five Percent Owner, retires after the calendar year in which he attains age 70½, his accrued benefit shall be actuarially increased to take into account any period after age 70½ in which he was not receiving benefits under the Plan. The actuarial increase shall be provided for the period beginning on April 1st following the calendar year in which the Participant attains age 70½ and ending on the date on which benefits commence after retirement.

The actuarial increase shall be the same as, and not in addition to, the actuarial increase required for the same period under Code Section 411 to reflect any delay in the payment of benefits after Normal Retirement Age. However, the actuarial increase required under this Section shall be provided even during any period in which benefits are suspended in accordance with ERISA Section 203(a)(3)(B).

The benefit payable with respect to a Participant as of the end of the period for which the actuarial increase was made shall be no less than:

(i) the Actuarial Equivalent of the benefit that would have been payable as of April 1st following the calendar year in which the Participant attained age 70½, if distributions had commenced on that date; plus

(ii) the Actuarial Equivalent of any additional benefits accrued after April 1st following the calendar year in which the Participant attained age 70½; reduced by

(iii) the Actuarial Equivalent of any distributions made to the Participant after April 1st following the calendar year in which the Participant attained age 70½.

WHEREAS, the ULLICO Inc. 401(k) Plan and Trust ("Plan") was amended and restated effective February 28, 2002. And,

WHEREAS, pursuant to Article 17, Section 17.1, of the Plan, the Employee Benefit Plans Administrative Committee ("Committee") has the right to make any amendment to the Plan that it deems advisable, including any amendment to ensure the continued qualification of the Plan under provisions of the Internal Revenue Code ("Code"). And,

WHEREAS, the Committee desires to amend the Plan in accordance with Revenue Procedure 2002-29 to comply with final and temporary regulations under Code Section 401(a)(9), which provide

AC 01412

new rules regarding the manner and form in which distributions must be made to, or on behalf of, a Participant who reaches his or her required benefit payment commencement date. Therefore, be it

RESOLVED: "That the Plan is hereby amended as follows:

(1) Article 2, Section 2.2, shall be amended to include the following new language, which shall appear directly following the current language of Section 2.2.

For purposes of Article 12, Section 12.3, Account Balance means the balance of a Participant's Accounts as of the last valuation date in the calendar year immediately preceding the Distribution Calendar Year ("valuation calendar year"), increased by the amount of any contributions made and allocated or forfeitures allocated to such Accounts as of dates in the valuation calendar year after the valuation date, and decreased by any distributions made in the valuation calendar year after the valuation date. A Participant's Account Balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the Distribution Calendar Year if distributed or transferred in the valuation calendar year.

(2) Section 2.18 of Article 2 shall be renumbered Section 2.19, Section 2.19 of Article 2 shall be renumbered Section 2.20, and so on.

(3) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.18:

Designated Beneficiary means an individual or trust designated as a Beneficiary under the Plan pursuant to Section 2.7. The members of a class of Beneficiaries capable of expansion or contraction shall be treated as being identifiable if it is possible to identify the class member with the shortest Life Expectancy. In the event a Participant designates a trust as his Beneficiary under Section 2.7 of the Plan, the beneficiaries of the trust shall be treated as the Participant's Designated Beneficiaries, provided that the following requirements are satisfied:

(a) The trust must be a valid trust under state law, or otherwise would be a valid trust but for the fact that there is no corpus.

(b) The trust must be irrevocable or will, by its terms, become irrevocable upon the Participant's death.

(c) The beneficiaries of the trust who are beneficiaries with respect to the trust's interest in the Participant's benefit must be

16

AC 01413

identifiable from the trust agreement.

(d) The Participant must provide the Plan Administrator with either:

(i) A copy of the trust agreement (and the Participant must agree to provide the Plan Administrator with any amendments to the trust agreement within a reasonable time); or

(ii) A list of all the beneficiaries of the trust (and the Participant must: (A) certify that, to the best of his knowledge, the list is complete and the requirements set forth in paragraphs (a) through (c) above are satisfied; (B) agree to provide the Plan Administrator with corrected certifications in the event of any amendments to the trust agreement within a reasonable time; and (C) agree to provide the Plan Administrator with a copy of the trust agreement upon demand).

(3) Section 2.23 of Article 2 shall be renumbered Section 2.24, Section 2.24 of Article 2 shall be renumbered Section 2.25, and so on.

(4) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.23:

Distribution Calendar Year means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under Section 12.3(a). The required minimum distribution for a Participant's first Distribution Calendar Year shall be made on or before his Required Beginning Date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's Required Beginning Date occurs, shall be made on or before December 31st of that Distribution Calendar Year.

(5) Section 2.46 of Article 2 shall be renumbered Section 2.47, Section 2.47 of Article 2 shall be renumbered Section 2.48, and so on.

(6) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.46:

17

AC 01414

Life Expectancy means the value calculated using the "Single Life Table" in Treasury Regulation Section 1.401(a)(9)-9.

(7) Section 2.60 of Article 2 shall be renumbered Section 2.61, Section 2.61 of Article 2 shall be renumbered Section 2.62, and so on.

(8) Article 2 shall be amended to include the following new definition, which shall appear as Section 2.60:

For Plan Years prior to January 1, 2000, the Required Beginning Date of a Participant shall be April 1st of the calendar year following the calendar year in which the Participant attains age 70½. Effective for Plan Years beginning on or after January 1, 2000, the Required Beginning Date of a Participant, other than a Five Percent Owner, shall be irrevocably elected by the Participant upon his attainment of age 70½ and shall be April 1st of the calendar year following the later of either: (a) the calendar year in which he attains age 70½, or (b) the calendar year in which he retires.

(9) Article 12, Section 12.3, of the Plan shall be amended and restated as follows:

(a) Time of Distribution. The Participant's Account Balance shall be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date. Effective January 1, 2003, if the Participant dies before distributions begin, the Participant's Account Balance shall be distributed, or begin to be distributed, no later than as follows:

(i) If the Participant's surviving spouse is his sole Designated Beneficiary, then distributions to the surviving spouse shall begin by December 31st of the calendar year immediately following the calendar year in which the Participant died, or by December 31st of the calendar year in which the Participant would have attained age 70½, if later.

(ii) If the Participant's surviving spouse is not his sole Designated Beneficiary, then distributions to the Designated Beneficiary shall begin by December 31st of the calendar year immediately following the calendar year in which the Participant died.

(iii) If there is no Designated Beneficiary as of September 30th of the calendar year following the calendar year of the Participant's death, the Participant's entire interest shall be

18

AC 01415

distributed by December 31st of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(iv) If the Participant's surviving spouse is his sole Designated Beneficiary and the surviving spouse dies after the Participant, but before distributions to the surviving spouse begin, Sections 12.3(a)(ii) and (iii) shall apply as if the surviving spouse were the Participant.

Distributions shall be considered to begin on a Participant's Required Beginning Date for purposes of Sections 12.3(a)(i)-(iii), above. Distributions shall be considered to begin on the date distributions are required to begin to a Participant's surviving spouse under Section 12.3(a)(i) for purposes of Section 12.3(a)(iv).

(b) Amount of Required Minimum Distribution.

(i) *Distributions Made During Participant's Lifetime*. Effective January 1, 2003, during a Participant's lifetime, the required minimum distribution for each Distribution Calendar Year shall be the lesser of:

(A) The quotient obtained by dividing the Participant's Account Balance by the distribution period in the "Uniform Lifetime Table" set forth in Treasury Regulation Section 1.401(a)(9)-9, using the Participant's age as of his birthday in the Distribution Calendar Year; or

(B) If the Participant's sole Designated Beneficiary for the Distribution Calendar Year is his spouse, the quotient obtained by dividing the Participant's Account Balance by the number in the "Joint and Last Survivor Table" set forth in Treasury Regulation Section 1.401(a)(9)-9, using the Participant's and spouse's ages as of their respective birthdays in the Distribution Calendar Year.

Required minimum distributions shall be determined under this Subsection beginning with the first Distribution Calendar Year and continuing through and including the Distribution Calendar Year that includes the date of the Participant's death.

(ii) *Required Minimum Distribution After Participant's Death*. Effective January 1, 2003, if a Participant dies on or after the date that distribution of his Account Balance begins and if

19

AC 01416

the Participant has a Designated Beneficiary, the minimum amount that shall be distributed for each Distribution Calendar Year after the calendar year of the Participant's death is the quotient obtained by dividing his Account Balance by the longer of his remaining Life Expectancy or the remaining Life Expectancy of his Designated Beneficiary, determined as follows:

(A) The Participant's remaining Life Expectancy shall be calculated using his age in the calendar year of his death, reduced by one for each subsequent calendar year.

(B) If the Participant's surviving spouse is his sole Designated Beneficiary, the remaining Life Expectancy of the surviving spouse shall be calculated for each Distribution Calendar Year after the calendar year of the Participant's death using the surviving spouse's age as of the surviving spouse's birthday in that year. For Distribution Calendar Years after the calendar year of the surviving spouse's death, the remaining Life Expectancy of the spouse is calculated using the spouse's age as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(C) If the Participant's surviving spouse is not his sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using the Designated Beneficiary's age in the calendar year following the calendar year of the Participant's death, reduced by one for each subsequent calendar year.

Effective January 1, 2003, if as Participant dies on or after the date that distribution of his Account Balance begins, and if he has no Designated Beneficiary as of September 30th of the calendar year after the calendar year of his death, the minimum amount that shall be distributed for each Distribution Calendar Year after the calendar year of his death is the quotient obtained by dividing his Account Balance by his remaining Life Expectancy, calculated using his age in the calendar year of his death, reduced by one for each subsequent calendar year.

(iii) *Death Before Distribution Begins*. Effective January 1, 2003, if a Participant dies before the date that distribution of his Account Balance begins and if the Participant has a Designated Beneficiary, the minimum amount that shall be

20

AC 01417

distributed for each Distribution Calendar Year after the calendar year of the Participant's death is the quotient obtained by dividing his Account Balance by the remaining Life Expectancy of his Designated Beneficiary, determined as provided in Section 12.3(b)(ii). If the Participant dies before the date that distribution of his Account Balance begins, and if he has no Designated Beneficiary as of September 30th of the calendar year following the calendar year of his death, distribution of his entire Account Balance shall be completed by December 31st of the calendar year containing the fifth (5th) anniversary of his death. If the Participant dies before the date that distribution of his Account Balance begins, if his surviving spouse is his sole Designated Beneficiary, and if the surviving spouse dies before distributions are required to begin under Section 12.3(a), this Subsection shall apply as if the surviving spouse were the Participant."



(TAB 8)

21

AC 01418

REDACTED

REDACTED

REDACTED

REDACTED

AC 01419

REDACTED

REDACTED

REDACTED

REDACTED

AC 01420

26. <u>Adjournment</u>. There being no further business to discuss, the meeting adjourned at 4:34 p.m.

Edward C. Sullivan
Secretary

370 Corp Secy Meetings Minutes 2004
UCO 1GD Minutes 012904

24

AC 01421

**13**

MINUTES OF THE
MEETING OF THE BOARD OF DIRECTORS
OF
ULLICO INC.
HELD THURSDAY, SEPTEMBER 9, 2004
AT THE OFFICES OF ULLICO INC.
LOCATED AT 1625 EYE STREET, NW
WASHINGTON, D.C.
AT 10:00 A.M.

**ATTENDEES:**

| | |
|---|---|
| Dana Brigham | Jeremiah J. O'Connor |
| John J. Flynn | Terence M. O'Sullivan |
| James A. Grogan | Richard Ravitch |
| James D. Heczko | Vincent R. Sombrotto |
| Joseph J. Hunt | Edward C. Sullivan |
| Earl J. Kruse | Richard L. Trumka |
| Edward J. McElroy | |

**MEMBERS ABSENT:**
Morton Bahr
Joseph T. Hansen
Martin J. Maddaloni
Michael J. Sullivan
George Tedeschi

**OTHERS IN ATTENDANCE:**
Howard Bard, Esq., Feder Semo & Bard PC
Bill Bergfeld, Executive Assistant to Terence O'Sullivan
Marcelle Benjamin, Manager, Corporate Secretary's Office
William W. Blanton, Jr., Vice President, Actuary
Edward Grebow, President
Theodore T. Green, General Counsel
Pam Greenwalt, Director Corporate Communications
Herbert A. Kolben, Vice President, Real Estate Banking
James J. Kennedy, Jr., Senior Vice President, Investment Sales, Marketing and Operations
Janice Kneeland, Executive Assistant to Terence O'Sullivan
Joseph R. Linehan, Vice President, Private Capital
Donald Price, Vice President, Enterprise Risk Management
Damon Silvers, Counsel to the Chairman and CEO
Mark Singleton, Senior Vice President and Chief Financial Officer
Teresa Valentine, Associate General Counsel
Dallison Veach, Corporate Paralegal
Thomas Wardell, Esq., McKenna, Long and Aldridge LLP

1.  Chairman O'Sullivan called the meeting to order at 10:15 and called the roll.

2.  Adoption of Minutes from the Board of Directors' Meeting held May 20, 2004. Upon motion and second, it was unanimously:

AC 01427

In the course of the foregoing review of the litigation involving the former officers, the Board was presented with the following resolution which after full discussion was moved, seconded, and unanimously adopted:

*Whereas*, the Union Labor Life Auxiliary Retirement Benefits Plan (the "Auxiliary Plan") was established January 1, 1983, as a non-qualified deferred compensation plan for certain senior officers whose retirement benefits under the Qualified Plan (defined below) were reduced due to restrictions imposed by the Internal Revenue Code, and provides that ULLICO reserves the right to interpret and amend the Auxiliary Plan;

*Whereas*, the ULLICO Inc. Pension Plan and Trust (the "Qualified Plan") was amended and restated effective February 28, 2002, and pursuant to Article 11, Section 11.1 of such Plan, the Board of Directors (the "Board") has the right to amend the Plan as it deems advisable;

*Whereas*, on May 5, 1997, the Executive Committee of ULLICO Inc. ("ULLICO"), adopted a Resolution creating the Benefits Committee, charging the Benefits Committee members to "act as fiduciaries to all plans created…for the benefit and welfare of the Corporation's employees…" and with the "…full authority for the administration of such Plans;"

*Whereas*, the Executive Committee's May 5, 1997 Resolution did not delegate to the Benefits Committee the authority to amend, modify, or alter the terms of employee benefit plans sponsored by ULLICO or its subsidiaries;

*Whereas*, the Benefits Committee, under the management of former Chairman, Chief Executive Officer, and President Robert A. Georgine ("Georgine"), former Chief Legal Officer Joseph A. Carabillo ("Carabillo"), former Chief Financial Officer John Grelle ("Grelle"), and former Executive Vice

14

AC 01428

President, James Luce ("Luce"), purported to amend the Qualified Plan by increasing certain benefits payable to Plan Participants and their eligible Beneficiaries, and such amendments were not disclosed to, or approved by, the Board or the Executive Committee;

*Whereas,* the benefit increases voted upon by Georgine, Carabillo, Grelle, and Luce, including (i) an increase in the percentage of the average salary used to determine a participant's normal retirement benefit (from 2 percent to 2.5 percent), and (ii) the inclusion of incentive pay in the Qualified Plan's definition of compensation, had the effect of significantly increasing Qualified Plan benefits purportedly owed to them, and increasing the benefits purportedly owed to them under the Auxiliary Plan;

*Whereas,* the Board has concluded that the Benefits Committee exceeded its delegated authority in purportedly amending the Plan;

*Whereas,* the Board retained Governor James R. Thompson to conduct an independent examination of certain stock offerings and stock repurchases that were developed and implemented by Georgine, Carabillo, Grelle, and Luce, and Gov. Thompson concluded that there was a compelling argument that former senior officers failed to satisfy their fiduciary obligations to ULLICO when they orchestrated and participated in stock transactions that yielded millions of dollars in personal windfalls to themselves;

*Whereas,* the Board directed that the Regulatory and Litigation Sub-Committee, chaired by the Honorable Abner Mikva, consider the findings of Gov. Thompson, and recommend to the Board what remedial action, if any, should be pursued;

*Whereas,* on July 22, 2003, the Board adopted the recommendations of the Regulatory and Litigation Sub-Committee, and suspended all payments into or out of benefit plans with respect to Georgine, Carabillo, Grelle, and Luce, including, but not limited to, the Auxiliary Plan, pending further analysis of such former officers' conduct while employed by ULLICO;

*Whereas,* following the Board's additional review of their conduct while employed by ULLICO, it was now

RESOLVED:    "That Georgine and Carabillo breached their respective duties of loyalty owed to the Company, and, as such, are not eligible for any Auxiliary Plan benefits to which they would have otherwise been eligible in the absence of such breach." And, it was

FURTHER
RESOLVED:    "That as Georgine and Carabillo engaged in self-dealing by acting *ultra vires* and voting in favor of purported amendments to the Qualified Plan that had the effect of increasing their benefits under such Plan and the Auxiliary Plan, any benefits under the Qualified Plan for which either Georgine or Carabillo may otherwise be eligible shall be calculated without regard to benefit increases that the Benefits Committee purported to approve during their employment with ULLICO." And, it was

FURTHER
RESOLVED:    "That as Grelle and Luce engaged in self-dealing by acting *ultra vires* and voting in favor of purported amendments to the Qualified Plan that had the effect of increasing their benefits under such Plan and the Auxiliary Plan, any benefits under the Qualified Plan or Auxiliary Plan for which either Grelle or Luce may otherwise be eligible shall be calculated without regard to benefit increases that the Benefits Committee purported to approve during their employment with ULLICO." And, it was

15

AC 01429

FURTHER
RESOLVED:  "That with respect to Georgine and Luce, who are presently receiving payments from the Qualified Plan as retirees, such payments shall be recalculated as of the first payment date following adoption of this Resolution, to reflect that any further payments under the Qualified Plan shall not include the unauthorized benefit increases that the Benefits Committee purported to adopt during their employment with ULLICO." And, it was

FURTHER
RESOLVED:  "That any amounts paid by the Qualified Plan to Georgine or Luce prior to the date of this Resolution, which are attributable to unauthorized benefit increases that the Benefits Committee purported to adopt during their employment with ULLICO, shall be claimed as amounts owed to the Plan in the existing litigation involving such former officers." And, it was

FURTHER
RESOLVED:  "That no payments to Grelle or Luce in connection with the Auxiliary Plan shall be made until such time as litigation between such former officers and ULLICO (and its subsidiaries or affiliated plans) is terminated or resolved." And, it was

FURTHER
RESOLVED:  "That notwithstanding anything to the contrary, this Resolution shall not be construed as ratifying any actions of the Benefits Committee with respect its purported amendments to the Qualified Plan, and does not in any way waive, alter, or modify claims that ULLICO, or plans sponsored by ULLICO, may have against Georgine, Carabillo, Grelle, and Luce, including claims with respect to such former officers' benefits under the Auxiliary Plan." And, it was

FURTHER
RESOLVED:  "That the Board of Directors reserves the right, upon further investigation and analysis, to take additional action with respect to the current Pension Benefits being paid to Georgine and Luce, including, but not limited to, a suspension of such benefits."

22. Board of Directors Meeting Schedule.  It was noted that the next Meetings of the Boards of Directors of ULLICO Inc. are scheduled for November 10, 2004, February 10, 2005, April 7, 2005, May 19, 2005 and July 27, 2005. The November 10th date was changed from November 11th to accommodate Veteran's Day.

23. Adjournment.  There being no further business before the Board, the meeting adjourned at 2:50 p.m.

*Edward C. Sullivan*
Edward C. Sullivan
Secretary

AC 01430

**14**

**ULLICO Inc. Pension Plan and Trust**
**Amendment Number 7**
**Adopted by the Board of Directors of ULLICO Inc.**
**September 9, 2004**

*Incentive Compensation For Salespersons*

**Section 2.61** is amended as follows:

Effective January 1, 2004, incentive compensation paid in the form of commissions to salespersons employed by the Sponsoring Employer ULLICO Group shall be included within the Plan's definition of "Sponsoring Employer ULLICO Group Compensation," to a maximum of $100,000 per calendar year.

For purposes of this provision, the term "salespersons" shall be defined as those Sponsoring Group ULLICO Employees subject to a written commission plan or agreement adopted by the Company.

AC 00922

**15**

**ULLICO Inc. Pension Plan and Trust
Amendment Number 8
Adopted by the Board of Directors of ULLICO Inc.
September 9, 2004**

*Prospective Benefit Calculation Reduction*

**Effective November 1, 2004, the Plan is Amended as follows:**

1.    **Article 5, Section 5.1(a),** of the Plan is amended to include the following new subsection, which shall appear as subsection (6):

    (6)    Notwithstanding any provision herein to the contrary, the Normal Retirement Benefit of a Participant other than a Participant who is covered under a collective bargaining agreement with OPEIU Local 153, who retires on or after November 1, 2004, shall be the greater of:

        (A)    The Normal Retirement Benefit calculated under subsections (1) through (5), above, taking into account the Participant's Sponsoring Employer ULLICO Group Years of Benefit Service as of October 31, 2004; or

        (B)    The Normal Retirement Benefit calculated under subsections (1) through (3), above, taking into account all of the Participant's Sponsoring Employer ULLICO Group Years of Benefit Service; provided that:

            (i)    Sponsoring Employer ULLICO Group Years of Benefit Service after the first (1st) thirty-five (35) shall be disregarded for purposes of subsections (1) through (3); and

            (ii)    All references to "thirty-six (36) full, consecutive calendar months" in the definition of Average Salary, as set forth in Article II, Section 2.7, shall be replaced with "sixty (60) full, consecutive calendar months."

        In the case of a Participant who, as of October 31, 2004, has in excess of thirty-five (35) Sponsoring Employer ULLICO Group Years of Benefit Service, the reference to "thirty-five (35)" in Section 5.1(a)(6)(B)(i), above, shall be replaced with such Participant's actual number of Sponsoring Employer ULLICO Group Years of Benefit Service, up to a maximum of forty (40) Sponsoring Employer ULLICO Group Years of Benefit Service.

**AC 00923**

2.   **Article 5, Section 5.3(a),** is amended to include the following new subsection, which shall appear as subsection (3).

(3)   Notwithstanding any provision herein to the contrary, the Early Retirement Benefit of a Participant who retires on or after November 1, 2004, has attained age sixty-two (62), and has earned fifteen (15) Sponsoring Employer ULLICO Group Years of Benefit Service shall be the greater of:

(A)   The amount of the Sponsoring Employer ULLICO Group Benefit under Section 5.1(a)(6)(A), with no reduction for early commencement;

(B)   The amount of the Sponsoring Employer ULLICO Group Benefit under Section 5.1(a)(6)(B), reduced by three-tenths of one percent (.3%) for each month calculated to the nearest month, between the Participant's Early Retirement Date and Normal Retirement Date.

3.   **Article 6, Section 6.1(c)(2)(B),** is renumbered as Section 6.1(c)(2)(C).

4.   **Article 6, Section 6.1(c)(2),** is amended to include the following new subsection, which shall appear as subsection (B).

(B)   (i)   <u>Participant's Portion of QJSA.</u>   Notwithstanding any provision herein to the contrary, if a Qualified Joint and Survivor Annuity ("QJSA") is paid on or after November 1, 2004, to a Participant other than a Participant covered under a collective bargaining agreement with OPEIU Local 153, it shall be the greater of the benefit calculated under (a) or (b), below.

(a)   The Participant's portion of a subsidized seventy-five percent (75%) QJSA under Section 6.1(c)(2)(A), above, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(A), or

(b)   The Participant's portion of an unsubsidized fifty percent (50%) QJSA under Article 2, Section 2.48, calculated based upon the Participant's benefit under Article 5, Section 5.1(a)(6)(B).

(ii)   <u>Survivor Portion of QJSA.</u>   Notwithstanding any provision herein to the contrary, if the survivor portion of a QJSA is paid on or after November 1, 2004, to a Surviving Spouse of a Participant other than a Participant covered under a collective bargaining agreement with OPEIU Local 153, it shall be the greater of the benefit calculated under (a) or (b), below.

AC 00924

    (a)    The survivor portion of a subsidized seventy-five percent (75%) QJSA under Section 6.1(c)(2)(A), above, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(A); or

    (b)    The survivor portion of an unsubsidized fifty percent (50%) QJSA under Article 2, Section 2.48, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(B).

5.    **Article 7, Section 7.1(a),** is amended to include the following new subsection, which shall appear as subsection (3):

    (3)    Notwithstanding anything herein to the contrary, if the benefit is paid on or after November 1, 2004, to the Surviving Spouse of a Participant other than a Participant covered under a collective bargaining agreement with OPEIU Local 153, it shall be the greater of:

    (A)    The survivor portion of an unsubsidized seventy-five percent (75%) QJSA under Article 2, Section 2.48, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(A); or

    (B)    The survivor portion of an unsubsidized fifty percent (50%) QJSA under Article 2, Section 2.48, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(B).

6.    **Article 7, Section 7.1(b),** is amended to include the following new language, at the end thereof:

Notwithstanding anything herein to the contrary, if the benefit is paid on or after November 1, 2004, to the Surviving Spouse of a Participant other than a Participant covered under a collective bargaining agreement with OPEIU Local 153, it shall be the greater of:

    (1)    The survivor portion of an unsubsidized seventy-five percent (75%) QJSA under Article 2, Section 2.48, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(A); or

    (2)    The survivor portion of an unsubsidized fifty percent (50%) QJSA under Article 2, Section 2.48, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(B).

7.    **Article 7, Section 7.1(e)(2)(B),** is renumbered as Section 7.1(e)(2)(C) and Article 7, Section 7.1(e)(2)(C) shall be renumbered as Section 7.1(e)(2)(D).

AC 00925

8.  **Article 7, Section 7.1(e)(2),** is amended to include the following new subsection, which shall appear as subsection (B):

(B)  Notwithstanding anything herein to the contrary, if the benefit is paid on or after November 1, 2004, to the Surviving Spouse of a Participant other than a Participant covered under a collective bargaining agreement with OPEIU Local 153, it shall be the greater of:

   (i)  The survivor portion of a subsidized seventy-five percent (75%) QJSA under Article 6, Section 6.1(c)(2)(A), calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(A); or

   (ii)  The survivor portion of an unsubsidized fifty percent (50%) QJSA under Article 2, Section 2.48, calculated based on the Participant's benefit under Article 5, Section 5.1(a)(6)(B)."

AC 00926

**16**

**ULLICO Inc. Pension Plan and Trust**
**Amendment Number 9**
**Adopted by the Board of Directors of ULLICO Inc.**
**September 9, 2004**

*Benefit Calculations of Former Officers*

**Article 5, Section 5.1(a),** of the Plan is amended to include the following new subsection, which shall appear as subsection (7):

(7)     Notwithstanding any provision herein to the contrary, the Pension Benefit Calculations of former ULLICO Inc. Officers, who served as members of the Employee Benefit Plans Administrative Committee, Robert A. Georgine, Joseph A. Carabillo, John Grelle, and James Luce shall be calculated under subsections (1) through (3) above.

AC 00927

**17**



Theodore T. Green
Senior Vice President and
General Counsel

**ULLICO Inc.**
1625 Eye Street. NW
Washington, DC 20006
202.962.8466 tel
tgreen@ullico.com

www.ullico.com

January 14, 2005

Mr. James W. Luce
10712 Milkweed Drive
Great Falls, VA  22066

Dear Mr. Luce:

Prospectively, your monthly benefit from the ULLICO Inc. Pension Plan and Trust ("Plan") will be paid at $5,879.70.  This benefit amount has been calculated based upon two percent of your high three years of service for each year of service under the Plan.  The continued payment of a benefit is not -and should not be interpreted as - a waiver of the Company's position that the Plan should be made whole for the unauthorized liability your actions caused, or of any other claim now being considered in pending litigation.  Further, the Company reserves for the benefit of the Plan the right to set off the excess payments received to date against future payments.

After investigation, it has been recognized that the Plan was being administered in accordance with unauthorized amendments that increased the compensation taken into account and provided for an accrual of benefits at a rate that was twenty-five percent greater than authorized by the Board of Directors.  While your benefit was not directly affected by the change of compensation taken into account to determine benefits for purposes of this Plan, your unauthorized action that changed the rate of benefit accrual, increased your benefit by twenty-five percent.  The current recalculation simply returns your benefit to the amount that was properly authorized.

Sincerely,

*Theodore T. Green*

TTG/keb

O:\Green\Letters\Georgine-Benefit Payment.doc

18

James W. Luce
10712 Millweed Dr.    Great Falls Va, 22066
Telephone 703-759-5204    E-Mail: jwluce@aol.com

February 1, 2005

Theodore T. Green, Sr. Vice President
and General Counsel
ULLICO Inc.
1625 Eye Street, N.W.
Washington, D.C.  20006

Employee Benefit Plans Administrative Committee,
  as Plan Administrator for the ULLICO Inc. Pension
  Plan and Trust
c/o Mark Singleton, Member
1625 Eye Street, N.W.
Washington, D.C.  20006

                    Re:    Review of Denial of Benefits

Gentlemen:

        I have received a letter from Theodore T. Green dated January 14, 2005, stating
that my monthly benefit from the ULLICO Inc. Pension Plan and Trust (the "Plan") will
be reduced from its present level.  I attach a copy of that notice.  This reduction in
retirement benefits is a denial of the vested benefits to which I am entitled under the Plan.

        Please accept this letter as my appeal of an adverse benefit determination and as a
request for a full and fair review of the benefits decision referred to in Mr. Green's letter,
as is my right under Article 9.3 of the Plan and 29 C.F.R. § 2560.503-1(h).  Further,
without waiving my appeal and request for review, this letter should also be considered
as a claim for restoration of the full retirement benefits due to me under the Plan.
Pursuant to Article 9.4 of the Plan and 29 C.F.R. § 2560.503-1(i)(1), I anticipate a
response within 60 days from your receipt of this letter.

        I hereby request a hearing before the Plan Administrator as provided for under
Article 9.3 of the Plan, and will be represented by counsel in connection with the review
procedure and at the hearing.  I hereby designate Robert E. Scully, Jr., Rees, Broome &
Diaz, P.C., 8133 Leesburg Pike, 9th Floor, Vienna, Virginia 22182, as counsel with full
authority to act for me in these proceedings.  I hereby authorize you to communicate with
my counsel with respect to further proceedings in this matter.

        I also exercise my right to review the pertinent documents and to submit a written
statement to the Plan Administrator after my counsel and I have had an opportunity to
review the record of the Plan Administrator's decision to reduce my benefits.  As
required by 29 C.F.R. § 2560.503-1(h)(2)(iii), please immediately provide me copies of
all documents, records, and other information relevant to your decision to reduce my Plan

Theodore T. Green, Sr. Vice President
and General Counsel
February 1, 2005
Page 2

benefits. I note that these copies must be provided free of charge, and must include all
documents that were "relied upon in making the benefit determination" or "generated in
the course of making the benefit determination" as required by 29 C.F.R. § 2560.503-
1(m)(8). Pursuant to this request, the documents provided should include, without
limitation, the records of the investigation to which Mr. Green referred in the second
paragraph of his letter, along with the record of the proceedings of the Employee Benefit
Plan's Administrative Committee and/or the Board of Directors of ULLICO, Inc. that
resulted in the decision to reduce my retirement benefits. These documents and records
should be forwarded to my counsel immediately. Also, please forward to my counsel
confirmation of all other retirees who received a similar notice of the benefit reduction as
described in Mr. Green's letter.

Finally, should the Plan implement the reduction as described in Mr. Green's
letter, please accept this notice of my demand to eliminate the reduction for the 50%
spouse annuity election I made in May 2003 and to allow me to elect another form of
benefit. If I had known of the most recent reduction in my Plan benefits prior to my
retirement, I would not have made the spousal annuity election in May 2003. Of course,
this is contingent on my wife signing off - which she has agreed to do.

Very truly yours,

James W. Luce

cc:    ULLICO Board of Directors
       Robert E. Scully, Jr., Esquire

K:\12\12410\00003\CORR\050201 letter to Theodore Green and Mark Singleton.doc

Theodore T. Green, Sr. Vice President
and General Counsel
February 1, 2005
Page 3


Bcc:   Karen Wahle, Esquire

**19**

James W. Luce
10712 Milkweed Dr.   Great Falls Va, 22066
Telephone 703-759-5204   E-Mail: jwluce@aol.com

February 21, 2005

Mr. Lou Hejl, Asst Vice President
ULLICO Inc.
1625 Eye Street, NW
Washington, DC 20006

Re:   <u>Ms. Michelle Thomas' Letter of February 8, 2005</u>
      <u>ULLICO Retirement Benefit GA00223; CTF# 002348533</u>

Dear Lou,

I received the attached letter from Ms. Thomas dated February 8, 2005, stating that my monthly benefit will be $5,879.70. I am writing this letter to formalize the requests I made during our telephone conversation on Tuesday, February 15, 2005.

Please send me a copy of any documents that your office relied on and which provided the authority from the ULLICO Inc. Pension Plan and Trust (the "Plan") for this reduction in my monthly Plan benefit. Also, please provide the details of the calculation (accrual rate, years of service, compensation, etc.) used to determine this revised monthly benefit amount.

Also, please provide whatever form(s) are necessary for me to <u>not</u> elect the 50% spouse annuity option given this most recent notice of a reduction in my benefit. If I had known of this current version of the determination of my Plan benefits prior to my retirement, I would not have made the spousal annuity election in May 2003. Of course, this is contingent on my wife agreeing to this election – which she has agreed to do.

Finally, I have paid Medicare taxes based on the present value of my future Plan benefits which were based on the higher level of benefit payments previously promised to and disclosed to me by Plan representatives and which have been paid since my retirement on June 1, 2003 by the Plan. Please take whatever action is necessary to correct the amounts that were reported; deducted from my past compensation; and paid on my behalf to the appropriate agencies. At a minimum, please prepare a revised W-2 statement to reflect what Ms. Thomas' letter describes as my new monthly Plan benefit.

Nothing in this letter should be construed as a waiver of my claim for full benefits from the Plan including the promises and disclosures made to me by Plan representatives prior to my decision to elect the 2003 early retirement plan offered to me by ULLICO Inc.

Very truly yours,

James W. Luce

AC 00082

**20**

# FILE

REES, BROOME & DIAZ, P. C.

COUNSELLORS AT LAW

8133 LEESBURG PIKE, NINTH FLOOR

TYSONS CORNER

VIENNA, VIRGINIA 22182-2706

TELEPHONE (703) 790-1911

FAX: (703) 848-2530

WWW.RBDLAW.COM

JOEL M. BIRKEN*
RAYMOND J. DIAZ*+
JONATHAN J. BROOME, JR.
JOHN F. BOLAND*
ROBERT E. SCULLY, JR.* +
JUAN R. CARDENAS
BRUCE E. TITUS*+
PETER S. PHILBIN+
WILLIAM P. DALY, JR.
ANDREW B. GOLKOW*
SUSAN RICHARDS SALEN*+
RICHARD M. WARE, JR.+
EDWARD J. O'CONNELL III*
MARK P. GRAHAM
TODD A. SINKINS*

LELLA AMISS E. PAPE+
SHERRY D. SOANES+
MELISSA A. MORRIS
URSULA A. KOENIG
RORY K. NUGENT
KIMBERLEY O'HALLORAN-CORDRAY
EMILY D. HARWOOD
CHRISTOPHER B. DEMERS

OF COUNSEL
MICHAEL L. O'REILLY
DANIEL R. GROPPER*

JAMES M. REES (1941-1986)

March 10, 2005

\* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN MARYLAND
° ALSO ADMITTED TO PATENT BAR

Theodore T Green, Sr. Vice-President
  and General Counsel
ULLICO Inc.
1625 Eye Street, N.W.
Washington, D.C.  20006

Employee Benefits Plans Administrative Committee
as Plan Administrator for the ULLICO Inc.
Pension Plan and Trust
c/o Mark Singleton, Member
1625 Eye Street, N.W.
Washington, D.C.  20006

    Re:  Failure to Provide Information and Documents

Gentlemen:

   On February 4, 2005, you received, by certified mail, a letter from James W. Luce ("Luce") dated February 2, 2005.  That letter gave you notice of Luce's appeal from an adverse benefit determination described in Mr. Green's letter dated January 14, 2005. Luce's letter requested copies of the documents and information relevant to the decision to reduce Luce's Plan Benefits under the ULLICO Inc. Pension Plan and Trust.  The letter also identified me as counsel to Mr. Luce in connection with his appeal of the denial of benefits.

   To date, neither Mr. Luce nor I have received any communication from the Plan Administrator acknowledging receipt of the Notice of Appeal.  We have not received the requested documents and information to which we are entitled for purposes of preparing for the appeals hearing he requested.  We have not received the names of the other

REES, BROOME & DIAZ, P.C.

Theodore T Green, Sr. Vice-President
   and General Counsel
Mark Singleton, Member
March 10, 2005
Page 2

retirees who received notice of reduction of their retirement benefits.  This information is
necessary to determine whether the benefit plan determinations have been applied
consistently with respect to similarly situated claimants.  29 C.F.R. § 2560.503-1(b)(5).

    The Plan Administrator's denial of the requested information is a violation of the
applicable regulations which create minimum standards for full and fair review of
Mr. Luce's claim and the Plan's adverse benefits determination.  29 C.F.R.
2560.503-1(h)(2).  Failure to comply with those minimum standards undermines any
claim that the Plan Administrator's eventual decision should be given judicial deference.

    Unless we receive copies of the documents, records or other information to
which Luce is entitled under 29 C.F.R. § 2560.503-1(j), Luce will have no alternative but
to seek statutory penalties against the plan administrator pursuant to ERISA § 502 (c).

    We look forward to your immediate reply.

             Very truly yours,

             REES, BROOME & DIAZ, P.C.

        By: _____
             Robert E. Scully, Jr.

RES:mbl
cc:  James W. Luce

REES, BROOME & DIAZ, P.C.

Theodore T Green, Sr. Vice-President
  and General Counsel
Mark Singleton, Member
March 10, 2005
Page 3


bcc: Karen Wahle


K:\12\12410\00002\CORR\050308 letter to Theodore Green.doc

**21**





RECEIVED
MAR 1 4 2005
By_____

Theodore T. Green
Senior Vice President and
General Counsel

**ULLICO Inc.**
1625 Eye Street, NW
Washington, DC 20006
202.962.8466 tel
tgreen@ullico.com

www.ullico.com

March 11, 2005

**VIA CERTIFIED MAIL-RETURN RECEIPT**

James W. Luce
10712 Milkweed Drive
Great Falls VA 22066

Re:    **ULLICO Inc. Pension Plan and Trust/Adverse Benefit Determination Appeal**

Dear Mr. Luce:

This is in response to your letter of February 1, 2005, to me and the Employee Benefits Administrative Committee (the "Committee"), and your letter of February 21, 2005, to ULLICO Inc. Assistant Vice President Lou Hejl.

With respect to your letter of February 1, 2005, pursuant to your request, the Committee will treat your letter as an Appeal of an Adverse Benefit Determination, and pursuant to Section 9.3 of the ULLICO Inc. Pension Plan and Trust, has scheduled the hearing for Wednesday, March 23. You should appear at 11:00 a.m. at 1625 I Street N.W., Room 216.

In both of your letters, you request documents or other information relied upon by the Plan Administrator relevant to its decision to reduce your benefit. Further, in your letter of February 1, 2005, you request identification of all other retirees who received a similar notice of a benefit reduction.

In accordance with Department of Labor Regulation 2560.503-1(h)(2)(iii), you are entitled to obtain, free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim for benefits. Department of Labor 2560.503-1(m)(8) provides that a document, record, or other information is considered "relevant" to a claimant's claim if: (1) it was relied upon in making the benefit determination; (2) it was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; or (3) it demonstrates compliance with the administrative processes and safeguards required in making the benefit determination. Accordingly, I am enclosing a Resolution adopted on September 9, 2004, by the ULLICO Inc. Board of Directors, acting as the Plan Sponsor of the ULLICO Inc. Pension Plan and Trust. This Resolution represents the document relied upon by the Plan Administrator in reducing your benefit, and is therefore attached in response to your requests.

Additionally, you have requested (1) the opportunity to change your benefit election as a result of the reduction of your benefit and (2) that the Company take whatever action necessary with regard to Medicare taxes previously paid based on the present value of your benefit. With regard to your change of benefit election, I have enclosed a form for you to implement such a change should you choose to do so. With respect to the Medicare tax issue, the Company is currently examining this issue.

Mr. James W. Luce
March 11, 2005
Page 2


Finally, your request for the names of other retirees who received a similar notice of a benefit reduction is not the kind of information required to be provided to a participant by applicable regulation or the terms of the Plan. Therefore, your request for such information is declined.

Sincerely,

TTG/keb

Enclosures

cc:    ~~Robert E. Scully, Jr., Esq.~~
       Tony Trenga, Esq.

O:\Green\Letters\Luce-Adverse Benefit Determination Appeal.doc

*Whereas*, the Union Labor Life Auxiliary Retirement Benefits Plan (the "Auxiliary Plan") was established January 1, 1983, as a non-qualified deferred compensation plan for certain senior officers whose retirement benefits under the Qualified Plan (defined below) were reduced due to restrictions imposed by the Internal Revenue Code, and provides that ULLICO reserves the right to interpret and amend the Auxiliary Plan;

*Whereas*, the ULLICO Inc. Pension Plan and Trust (the "Qualified Plan") was amended and restated effective February 28, 2002, and pursuant to Article 11, Section 11.1 of such Plan, the Board of Directors (the "Board") has the right to amend the Plan as it deems advisable;

*Whereas*, on May 5, 1997, the Executive Committee of ULLICO Inc. ("ULLICO"), adopted a Resolution creating the Benefits Committee, charging the Benefits Committee members to "act as fiduciaries to all plans created…for the benefit and welfare of the Corporation's employees…" and with the "…full authority for the administration of such Plans;"

*Whereas*, the Executive Committee's May 5, 1997 Resolution did not delegate to the Benefits Committee the authority to amend, modify, or alter the terms of employee benefit plans sponsored by ULLICO or its subsidiaries;

*Whereas*, the Benefits Committee, under the management of former Chairman, Chief Executive Officer, and President Robert A. Georgine ("Georgine"), former Chief Legal Officer Joseph A. Carabillo ("Carabillo"), former Chief Financial Officer John Grelle ("Grelle"), and former Executive Vice President, James Luce ("Luce"), purported to amend the Qualified Plan by increasing certain benefits payable to Plan Participants and their eligible Beneficiaries, and such amendments were not disclosed to, or approved by, the Board or the Executive Committee;

*Whereas*, the benefit increases voted upon by Georgine, Carabillo, Grelle, and Luce, including (i) an increase in the percentage of the average salary used to determine a participant's normal retirement benefit (from 2 percent to 2.5 percent), and (ii) the inclusion of incentive pay in the Qualified Plan's definition of compensation, had the effect of significantly increasing Qualified Plan benefits purportedly owed to them, and increasing the benefits purportedly owed to them under the Auxiliary Plan;

*Whereas*, the Board has concluded that the Benefits Committee exceeded its delegated authority in purportedly amending the Plan;

*Whereas*, the Board retained Governor James R. Thompson to conduct an independent examination of certain stock offerings and stock repurchases that were developed and implemented by Georgine, Carabillo, Grelle, and Luce, and Gov. Thompson concluded that there was a compelling argument that former senior officers failed to satisfy their fiduciary obligations to ULLICO when they orchestrated and participated in stock transactions that yielded millions of dollars in personal windfalls to themselves;

*Whereas*, the Board directed that the Regulatory and Litigation Sub-Committee, chaired by the Honorable Abner Mikva, consider the findings of Gov. Thompson, and recommend to the Board what remedial action, if any, should be pursued;

*Whereas*, on July 22, 2003, the Board adopted the recommendations of the Regulatory and Litigation Sub-Committee, and suspended all payments into or out of benefit plans with respect to Georgine, Carabillo, Grelle, and Luce, including, but not limited to, the Auxiliary Plan, pending further analysis of such former officers' conduct while employed by ULLICO;

*Whereas*, following the Board's additional review of their conduct while employed by ULLICO, it was now

RESOLVED:    "That Georgine and Carabillo breached their respective duties of loyalty owed to the Company, and, as such, are not eligible for any Auxiliary Plan benefits to which they would have otherwise been eligible in the absence of such breach." And, it was

FURTHER
RESOLVED:    "That as Georgine and Carabillo engaged in self-dealing by acting *ultra vires* and voting in favor of purported amendments to the Qualified Plan that had the effect of increasing their benefits under such Plan and the Auxiliary Plan, any benefits under the Qualified Plan for which either Georgine or Carabillo may otherwise be eligible shall be calculated without regard to benefit increases that the Benefits Committee purported to approve during their employment with ULLICO." And, it was

FURTHER
RESOLVED:    "That as Grelle and Luce engaged in self-dealing by acting *ultra vires* and voting in favor of purported amendments to the Qualified Plan that had the effect of increasing their benefits under such Plan and the Auxiliary Plan, any benefits under the Qualified Plan or Auxiliary Plan for which either Grelle or Luce may otherwise be eligible shall be calculated without regard to benefit increases that the Benefits Committee purported to approve during their employment with ULLICO." And, it was

FURTHER
RESOLVED:    "That with respect to Georgine and Luce, who are presently receiving payments from the Qualified Plan as retirees, such payments shall be recalculated as of the first payment date following adoption of this Resolution, to reflect that any further payments under the Qualified Plan shall not include the unauthorized benefit increases that the Benefits Committee purported to adopt during their employment with ULLICO." And, it was

FURTHER
RESOLVED:    "That any amounts paid by the Qualified Plan to Georgine or Luce prior to the date of this Resolution, which are attributable to unauthorized benefit increases that the Benefits Committee purported to adopt during their employment with ULLICO, shall be claimed as amounts owed to the Plan in the existing litigation involving such former officers." And, it was

FURTHER
RESOLVED:    "That no payments to Grelle or Luce in connection with the Auxiliary Plan shall be made until such time as litigation between such former officers and ULLICO (and its subsidiaries or affiliated plans) is terminated or resolved." And, it was

**FURTHER
RESOLVED:**     "That notwithstanding anything to the contrary, this Resolution shall not be construed as ratifying any actions of the Benefits Committee with respect its purported amendments to the Qualified Plan, and does not in any way waive, alter, or modify claims that ULLICO, or plans sponsored by ULLICO, may have against Georgine, Carabillo, Grelle, and Luce, including claims with respect to such former officers' benefits under the Auxiliary Plan." And, it was

**FURTHER
RESOLVED:**     "That the Board of Directors reserves the right, upon further investigation and analysis, to take additional action with respect to the current Pension Benefits being paid to Georgine and Luce, including, but not limited to, a suspension of such benefits."

UN   N LABOR LIFE INSURANCE COMPANY

# REJECTION FORM

**ticipant's Name** _____

I do not wish to receive my Annuity Fund benefits in the form of a Husband and Wife (50% Joint & Survivor) Annuity Benefit. I do understand that rejecting this form of benefit means, that no benefit will be paid to my spouse by the Annuity Fund after my date of death. My surviving spouse is only entitled to the balance remaining in my Annuity Account. I further understand that this rejection is irrevocable once the Lump Sum Distribution of benefits has been paid.

*Check One*

- ☐    I hereby swear that I am not legally married at this time.
- ☐    I hereby swear that I am unable to locate my spouse.
- ☐    I hereby swear that the person co-signing this document below is my current legal spouse, to whom I have been legally married throughout the last 12 month period.

_____       _____

Date                                  Participant's Signature

                                            _____

                                            Participant's Social Security Number

State of _____               County of _____

ᴑn the _____ day of _____, 20____ before me came _____ known to me to be the person in and who executed the foregoing statement and she/he duly acknowledge to me that she/he executed the same.

                                            _____

                                            Notary Public

**Spouse's Name** _____

I swear that I am the legal spouse of the employee described above. I hereby consent to my spouse's rejection of the Husband and Wife (50% Joint & Survivor) Annuity Benefit. I do understand that as a result, I will not be paid a benefit from the Annuity Fund after my spouse's death. I am only entitled to the balance remaining in my spouse's Annuity Account. I further recognize that this rejection is irrevocable once a Lump Sum Distribution of benefits has been made.

_____       _____

Date                                  Spouse's Signature

                                            _____

                                            Spouse's Social Security Number

State of _____              County of _____

ꞟ the _____ day of _____, 20____ before me came _____ known to me to be the person in and who executed the foregoing statement and she/he duly acknowledge to me that she/he executed the same.

                                            _____

                                            Notary Public

**22**

REES, BROOME & DIAZ, P. C.

COUNSELLORS AT LAW

8133 LEESBURG PIKE, NINTH FLOOR

TYSONS CORNER

VIENNA, VIRGINIA 22182-2706

TELEPHONE (703) 790-1911

FAX: (703) 848-2530

WWW.RBDLAW.COM

JOEL M. BIRKEN*
RAYMOND J. DIAZ*+
JONATHAN J. BROOME, JR.
JOHN F. BOLAND*
ROBERT E. SCULLY, JR.* +
JUAN R. CARDENAS
BRUCE E. TITUS*+
PETER S. PHILBIN+
WILLIAM P. DALY, JR.
ANDREW B. GOLKOW*
SUSAN RICHARDS SALEN*+
RICHARD M. WARE, JR.+
EDWARD J. O'CONNELL III*
MARK P. GRAHAM
TODD A. SINKINS*

LELLA AMISS E. PAPE+
SHERRY D. SOANES+
MELISSA A. MORRIS
URSULA A. KOENIG
RORY K. NUGENT
KIMBERLEY O'HALLORAN-CORDRAY
EMILY D. HARWOOD
CHRISTOPHER B. DEMERS

OF COUNSEL
MICHAEL L. O'REILLY
DANIEL L. GROPPER-

JAMES M. REES (1941-1986)

March 30, 2005

* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN MARYLAND
° ALSO ADMITTED TO PATENT BAR

**VIA FEDEX PRIORTY OVERNIGHT**

Theodore T. Green, Senior Vice-President
and General Counsel
ULLICO Inc.
1625 Eye Street, N.W.
Washington, D.C. 20006



Employee Benefit Plans Administrative Committee,
As Plan Administrator for the ULLICO Inc. Pension Plan and Trust
c/o Mark Singleton, Member
1625 Eye Street, N.W.
Washington, D.C. 20006

Re:    James W. Luce/Appeal of Adverse Benefit Determination By the
       Plan Administrator for the ULLICO Inc. Pension Plan and Trust

Gentlemen:

This letter shall serve as a summary of the grounds for reversal of the Plan
Administrator's denial of retirement benefits owed to James W. Luce ("Luce") by the
ULLICO Inc. Pension Plan and Trust (the "Plan") described in Mr. Green's letter dated
January 14, 2005.

1.    The Plan Administrator Erred by Denying Benefits to Luce That the Plan Pays to
      Similarly Situated Claimants.

The Department of Labor's Claims Procedure Regulations set minimum standards
for employee benefit plan procedures pertaining to claims for benefits by participants and

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
  and General Counsel
Mark Singleton
March 30, 2005
Page 2

beneficiaries. 29 CFR § 2560.503-1. The Plan's procedures are not reasonable, and violate the statute, because they do not contain administrative processes and safeguards designed to ensure that the plan provisions are applied consistently with respect to similarly situated claimants. § 2560.503-1(a)(5). Mr. Singleton and the Employee Benefit Plan's Administrative Committee are well aware that numerous individuals in addition to Luce have retired from the Sponsoring Employee ULLICO Group since January 1, 2002, who have begun receiving retirement benefits computed pursuant to Article V, Section 5.1(a)(5) (increasing from 2% to 2.5% the percentage of a Participant's Average Salary used to determine the Normal Retirement Benefit for any Participant who retires on or after January 1, 2002).

Because Luce was denied disclosure of the identity of each individual who retired from the Sponsoring Employee ULLICO Group after January 1, 2002, who is receiving retirement benefits pursuant to that section of the Plan, Luce is not able, at this time, to identify each similarly situated individual who is receiving benefits that are being denied to him.

The Plan Administrator's decision to refuse to pay Luce benefits based upon the invalidity of a Plan Amendment while paying benefits to other similarly situated retirees under the terms of the same Plan Amendment is a clear violation of ERISA and the Department of Labor regulations. The decision to deny Luce his vested retirement benefit under the Plan must be reversed.

2.    The Plan Administrator Exceeded the Scope of His Authority to Interpret and Apply the Plan.

Article VIII, Section 8.4 of the Plan contains the description of the responsibilities of the Plan Administration Committee. The applicable section of the Plan states: "The Committee shall be responsible for the implementation and general administration of the Plan and shall have the exclusive right to determine in its sole discretion any question arising in connection with the interpretation, application or administration of the Plan and its determination shall be conclusive and binding upon any and all Participants and Beneficiaries."

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
 and General Counsel
Mark Singleton
March 30, 2005
Page 3


     The Plan Administrator reduced the vested retirement benefits being paid to James W. Luce without interpreting or applying the Plan.  To the contrary, it relied upon a resolution of the Board of Directors of ULLICO Inc., the Plan Sponsor, declaring that the applicable Plan amendment was never properly adopted.  The Plan Administrator simply deferred to a decision of the Board of Directors of the Plan Sponsor directing it to deny Luce a vested retirement benefit.  That decision exceeded the scope of the Plan Administrator's discretionary authority under the Plan as well as under applicable federal law.  See Johannssen v. District No. 1 – Pacific Coast District, 292 F.3d 159, 169 (4th Cir. 2004).  ("Such legal questions are appropriate terrain for the courts, not Plan Administrators, …")  The proper method for a Plan Administrator to resist a claim for benefits which it believes to be the product of an illegitimate attempt to amend the Plan is to apply to the federal courts for a resolution of the issue.  Id. at 170.

     In Joseph A. Carabillo v. ULLICO Inc. Pension Plan and Trust, et al., United States District Court for the District of Columbia, Civil Action No. 4-cv-776 (RJL), the ULLICO Inc. Pension Plan and Trust and Mark Singleton, in his capacity as a member of the Employee Benefit Plan's Administrative Committee, filed a counterclaim against James W. Luce seeking the very relief they have now awarded themselves by self-help.  Count I of that counterclaim asserts that Luce along with Joseph Carabillo and John Grelle (as members of the Benefits Committee) breached their fiduciary duties under ERISA by "purport[ing] to amend the qualified plan on two separate occasions." (Counterclaim ¶¶ 17-18) (Exhibit 1).  Both the Plan Administrator and the Plan Sponsor, ULLICO Inc., contend that that the amendment to the Qualified Plan on July 21, 2001, by the Benefits Committee, attempted to modify the Qualified Plan's benefit formula by increasing the applicable percentage from 2% to 2.5%.  (Id. ¶ 18).  This amendment was attempted, according to the counterclaim Plaintiffs, "without authority" and "without disclosures to the [ULLICO] Board."  (Id. ¶ 19).

     Count I of the counterclaims in that action fails to state a claim for relief under ERISA, because none of the counterclaim Defendants acted in a fiduciary capacity when performing the Plan Amendment function.  See, Motion of the Counterclaim Defendants Carabillo, Grelle and Luce to Dismiss Counterclaims at 8-10.  (Exhibit 2).  However, the decision by the Plan Sponsor and Plan Administrator to seek a judicial resolution of the validity of the Plan Amendment was correct.  ULLICO's subsequent decision to shortcut that judicial process by directing the Plan Administrative Committee to stop paying

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
  and General Counsel
Mark Singleton
March 30, 2005
Page 4

vested retirement benefits owed to Luce under the Plan was simply lawless. The validity of the Plan Amendment is a matter for judicial decision in a properly filed civil action.

The Plan Administrator's decision to deny Luce benefits based upon the finding by the Board of Directors of ULLICO Inc., that the applicable Plan Amendment of July 21, 2001, was "*ultra vires*" is clearly wrong.

ULLICO Inc. is a Maryland corporation. A Maryland corporation may challenge the acts of its agents and representatives as "*ultra vires*" only in a civil action brought by or in the name of the corporation. Md. Code. Ann., Corporations and Ass'ns, § 1-403. (Michie 1988). The ULLICO Board of Directors has no power or authority to assert that defense in this forum, much less to adjudicate it unilaterally. The Plan Administrative Committee of the ULLICO Pension Plan has no authority whatsoever under the Plan, or applicable federal or state law, to decide whether the Benefits Committee of ULLICO Inc. acted "*ultra vires.*"

3.    The Plan Administrator's Decision that the July 21, 2001, Plan Amendment was Invalid Because it was Not Made Pursuant to a Resolution Adopted by the Board of Directors of the Plan Sponsor is Incorrect.

Article XI, Section 11.1 of the Plan provides that: "Any amendment shall be made pursuant to a resolution adopted by the Board of Directors of the Plan Sponsor." That simple requirement was met.

On May 5, 1997, the Executive Committee of ULLICO Inc.[1] approved a motion by its Chairman, Robert A. Georgine, to adopt: ". . . a more hands-on style of management of [ULLICO'S] benefit programs." Georgine noted that the ULLICO organization now had twenty-four corporations, over twenty health plans, and nine 401(K) and profit sharing plans and pension plans. He proposed:

---

[1]    Article VI, Section 2 of the ULLICO Inc. Bylaws vests in the Executive Committee the authority to exercise all of the duties and powers of the Board of Directors, with certain exceptions not relevant to this proceeding. Bylaws of ULLICO Inc. (Exhibit 3)

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
    and General Counsel
Mark Singleton
March 30, 2005
Page 5

> ". . . a restructuring by eliminating the Welfare Committee of
> the Board in favor of a Benefit Committee made up of Senior
> Management. The management committee would meet
> regularly to administer, plan and effect changes in the benefit
> plans." (Emphasis added).

The Benefits Committee was authorized to make substantive changes to the
employee benefit and welfare plans and was "charged with reporting any and all material
changes in each and every plan created for the benefit and welfare of the employees of
the Corporation . . . on at least an annual basis to the Corporation's Executive
Committee." (Emphasis added). The Executive Committee also authorized "the
appropriate officers and employees of the Corporation to acknowledge, execute and
deliver any and all such actions or documents which may be necessary or desirable to
effectuate the foregoing resolutions, and their acts and deeds in so doing shall be
conclusively presumed to be the acts and deeds of the Corporation." Meeting of the
Executive Committee of ULLICO Inc. held May 5, 1997. (Exhibit 4).

The Benefits Committee exercised its delegated power to perform the settlor
functions of ULLICO Inc., including numerous amendments of the Plan, for many years
without objection or complaint from the Executive Committee.

On July 17, 2001, Lou Hejl, Director of Corporate Benefits, presented the Benefits
Committee with a Memorandum "review[ing] the status of the funding of the Union
Labor Life Insurance Company Retirement Plan and to discuss potential enhancements
should the Benefits Committee desire to consider any changes." Hejl attached an
actuarial staff evaluation of the cost to the Company of an increase in pension accrual
rates above 2.0%, as well as a comparison between ULLICO's retirement benefits and
those of "other union affiliated organizations." Based on Hejl's analysis and
recommendations, the Benefits Committee decided to increase the pension accrual rate
from 2.0% to 2.5%, but only for employees of the Sponsoring Employee ULLICO Group
who retired after January 1, 2002. (Exhibit 5).

On December 23, 2002, ULLICO Inc., as Plan Sponsor of the ULLICO Inc.
Pension Plan and Trust, caused the Pension Plan and Trust to be amended and restated
effective as of February 28, 2002. The resolution of the Board of Directors approving the
amended and restated plan was attested to by the signature of Jacqueline J. Wong on page

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
  and General Counsel
Mark Singleton
March 30, 2005
Page 6

48 of the ULLICO Inc. Pension Plan and Trust as amended and restated effective as of
February 28, 2002. (Exhibit 6).  That document contains the increased pension
contribution rate amendment first adopted by the Benefits Committee in July, 2001.  See
Plan, Article V, Section 5.1(a)(5).

        Subsequently, ULLICO Inc., as Plan Sponsor, submitted the ULLICO Inc.
Pension Plan and Trust as Amended and Restated Effective as of February 28, 2002, to
the Internal Revenue Service with an application for a determination letter that it
remained a "qualified plan" under the Internal Revenue Code.  The IRS issued a
favorable determination on the Plan "based on the information you have supplied."
Letter dated September 25, 2002, from the Internal Revenue Service to ULLICO Inc.
(Exhibit 7).  Having obtained that favorable administrative ruling based on a
representation that the restated Plan document contained the entire Plan, as amended,
ULLICO Inc. is estopped to deny the validity of the plan amendments incorporated in the
restated Plan document, including the amendment of July 2001.  King v. Herbert J.
Thomas Mem. Hosp., 159 F.3d 192, 197-98 (4th Cir. 1998) (award of Social Security
Disability Benefits estopped plaintiff from claiming she was "able and competent" to
work).  Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth., 731 F. Supp.
747, 749 (E.D.La. 1990) (discontinuance of ICC investigation based on representations of
corporate relations bars subsequent change of position).

        On April 16, 2003, the Board of Directors of ULLICO Inc. adopted a resolution
implementing the "June 1, 2003 Early Retirement Program."  That program is based on
the existing Pension Plan and Trust contribution provisions.  The Board of Directors
passed a second resolution on April 23, 2003 clarifying the resolution of April 16, 2003
with respect to eligibility requirements.  That resolution, captioned "ULLICO Inc.
Pension Plan and Trust Amendment Number Two June 1, 2003 Early Retirement
Program" clearly provided that "the amount of benefit shall be equal to the Normal
Retirement Benefit as calculated pursuant to Section 5.1 of the Plan."  See Resolution,
Section 4.8(d) (Exhibit 8).

        The Plan Administrator's decision to reduce Luce's vested retirement benefits is
based entirely upon the ULLICO Inc. Board of Directors' erroneous claim (which
ULLICO is judicially estopped from asserting) that the Plan was never properly
amended.  That finding is clearly wrong and must be reversed.  James W. Luce is entitled
to his full vested retirement benefits under the terms of the Plan.

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
  and General Counsel
Mark Singleton
March 30, 2005
Page 7

4.    The Plan Administrator's Denial of Benefits Violates the Anti-Alienation
      Provisions of the Act.

        The Plan Administrator's decision to deny benefits to James W. Luce because of
his alleged participation in an improper attempt to amend the Plan without authorization
from the Board of Directors is a clear violation of ERISA. 29 U.S.C. § 1056(d) (1)
prohibits assignment or alienation of qualified plan pension benefits. Recent
amendments to the Act have made clear that offsets of a participant's benefits provided
under an employee pension benefit plan violate the anti-alienation provisions of the Act
unless they meet very strict standards. These standards include: entry of a judgment of
conviction of a crime involving the Plan or a civil judgment entered by a court in an
action brought in connection with a violation (or alleged violation) of Part 4 of ERISA.
See 29 U.S.C. § 1056(d)(4)(A).

        The Board of Directors resolution upon which the Plan Administrative Committee
relied in "recalculating" retirement payments owed to Luce under the qualified plan
clearly states that it was an inseparable part of its decision to assert a "set-off" against
amounts ULLICO claims Luce owes to the Plan in the pending litigation against Luce.
Such an action is a violation of the anti-alienation provisions of the Plan and the Act.
Herberger v. Shanbaum, 897 F.2d 801, 803-804 (5th Cir.1990).

        For the foregoing reasons, the denial of benefits decision by the Employee
Benefits Plan Administrative Committee as Plan Administrator for the ULLICO Inc.
Pension Plan and Trust must be reversed, and James W. Luce must be restored to the full
benefits to which he is entitled from the ULLICO Inc. Pension Plan and Trust.

                            Very truly yours,

                            REES, BROOME & DIAZ, P.C.

                            By:
                                Robert E. Scully, Jr.

RES:mbl
cc: Anthony J. Trenga, Esquire

K:\12\12410\00002\CORR\050329 letter to Theodore Green.doc

REES, BROOME & DIAZ, P.C.

Theodore T. Green, Sr. Vice-President
   and General Counsel
Mark Singleton
March 30, 2005
Page 8


bcc   Karen Wahle
        James W. Luce


K:\12\12410\00002\CORR\050329 letter to Theodore Green.doc

## EXHIBITS TO MARCH 30, 2005, LETTER TO ULLICO

| TAB NO. | EXHIBIT |
|---------|---------|
| 1. | Counterclaim of ULLICO Inc. *et al.* – Carabillo v. ULLICO Inc. Pension Plan |
| 2. | Motion of Counterclaim Defendants Carabillo, Grelle and Luce to Dismiss Counterclaims |
| 3. | Bylaws of ULLICO Inc. |
| 4. | Meeting of the Executive Committee of ULLICO Inc. held May 5, 1997 |
| 5. | July 17, 2001 Memo from L. Hejl |
| 6. | The Amended and Restated Plan |
| 7. | IRS Determination Letter dated September 25, 2002 |
| 8. | April 16, 2003, Resolution implementing the June 1, 2003, Early Retirement Program |

K:\12\12410\00002\CORR\Exhibit List.doc

**23**

*file*

May 20, 2005

**VIA FACSIMILE AND U.S. MAIL**



Robert E. Scully, Jr.
Rees, Broome & Diaz, P.C.
8133 Leesburg Pike, Ninth Floor
Tysons Corner
Vienna, VA 22182-2706

> Re:    James W. Luce Appeal to the Employee Benefit Plans
>        Administrative Committee as Plan Administrator for the
>        <u>ULLICO Inc. Pension Plan and Trust</u>

Dear Mr. Scully:

At its April 22, May 5, May 12, and May 18, 2005 meetings, the Employee Benefit Plans Administrative Committee (the "Administrative Committee"), acting in its capacity as the Plan Administrator of the ULLICO Inc. Pension Plan and Trust (the "Plan"), considered Mr. James W. Luce's appeal from the earlier determination of his pension benefit. In your March 30, 2005 letter, you set forth on behalf of Mr. Luce a number of arguments challenging the initial decision that the amount of Mr. Luce's pension should be determined by the application of a 2.0% accrual rate in effect under the Plan prior to July 24, 2001. At issue is whether a document adopted by the Plan's Benefits Committee on July 24, 2001, purporting to amend the Plan to increase the accrual rate to 2.5%, was an effective amendment to the Plan. The Administrative Committee has considered Mr. Luce's submissions and has examined other documents that appear to bear upon the issues that he has raised. For the reasons set forth below, the Administrative Committee has concluded that the purported July 24, 2001 amendment to the Plan was not adopted in accordance with the Plan's provision governing the amendment process and is therefore of no force or effect. Consequently, the Administrative Committee has denied Mr. Luce's appeal, and confirmed that the amount of Mr. Luce's pension was properly determined using a 2.0% accrual rate.

– 2 –

## I.    Background

The ULLICO Pension Plan and Trust was adopted by the Board of Directors of ULLICO Inc., effective December 31, 1994.  It replaced certain predecessor plans.  The original Plan document dated May 1995 (the "1995 Plan") contained the following relevant provisions.

The Plan Sponsor is ULLICO Inc.  1995 Plan, § 2.45.  The Plan Sponsor is authorized to appoint the Employee Benefit Plans Administrative Committee, which is "responsible for the implementation and general administration of the Plan and shall have the exclusive right to determine in its sole discretion any questions arising in connection with the interpretation, application or administration of the Plan . . ."  1995 Plan, § 8.4.

The 1995 Plan also provided in relevant part that "[t]he Plan Sponsor reserves the right to modify or amend this Plan at any time. . . .  Any amendment shall be made pursuant to a resolution adopted by the Board of Directors of the Plan Sponsor."  1995 Plan, § 11.1.

The normal retirement benefit under the 1995 Plan was determined by multiplying a participant's years of service by 2.0% of the participant's Average Salary.   1995 Plan, § 5.1.[1]

On May 5, 1997, the Executive Committee of the Board of Directors of ULLICO Inc.[2] adopted a series of resolutions providing for the following:

- Amending the By-laws of ULLICO Inc. to eliminate a standing committee of the Board known as the Welfare Committee.[3]

- Creating a new Benefits Committee to consist of the senior officers of ULLICO Inc.

- Authorizing the new Benefits Committee to act as fiduciaries for all pension and welfare plans maintained by ULLICO Inc.

- Authorizing the new Benefits Committee, as fiduciaries, to appoint trustees for such plans and charging the Benefits

---

[1] Under certain circumstances not relevant here, the accrual rate specified in section 5.1 was 1.75%.

[2] The by-laws of ULLICO Inc. provide that the Executive Committee "shall have and exercise all the duties and powers of the Board of Directors . . ."  By-Laws (Adopted October 14, 1987 with revisions through May 5, 1997), Art. VI, § 2.

[3] The Welfare Committee evidently had not met or taken any action with respect to the Plan for many years.

– 3 –

Committee "with reporting any and all material changes in each and every plan created for the benefit and welfare of the employees . . . on at least an annual basis to the Corporation's Executive Committee."

- Authorizing the appropriate officers and employees of ULLICO Inc. "to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

The minutes of the May 5, 1997 Executive Committee meeting introduce the foregoing resolutions with a summary of a statement by the Committee Chairman, Robert A. Georgine, who, among other things, explained his view that there was "a need for there to be a more hands-on style of management of the benefit programs. Management proposed a restructuring by eliminating the Welfare Committee of the Board in favor of a Benefit Committee made up of Senior Management. The management committee would meet regularly to administer, plan and effect changes in the benefit plans."

On October 14, 1997, the Benefits Committee established by the May 5, 1997 Board resolution adopted seven resolutions regarding the Plan. Six of these resolutions directly related to modifications of the terms of the Plan. The final resolution directed that "Legal and Human Resources will work together to draft language reflecting all plan language changes and submit the changes to the Benefits Committee for approval."

On February 11, 1998, the Executive Committee of the Board of Directors adopted a resolution amending the Plan to provide for a cost of living increase for certain retirees. The Executive Committee adopted similar resolutions providing for cost of living increases for retirees on February 11, 2000 and February 22, 2002.

Following the Executive Committee's action on February 11, 1998, the Benefits Committee met from time to time and adopted various resolutions relating to the Plan. Some of these actions concerned matters, such as changes in the asset allocation investment guidelines for the Plan, which did not require any modification of the Plan's terms. Other resolutions provided for amendments to the Plan's terms to accomplish various objectives, including amendments designed in response to changes in the Internal Revenue Code relating to the tax qualification requirements for pension plans. Other resolutions provided for

– 4 –

amendments that modified various aspects of the Plan's terms directly relating to
the amount of benefits to be paid under the Plan.  In particular, on July 24, 2001,
the Benefits Committee adopted a resolution amending section 5.1 of the Plan to
increase the accrual rate for normal retirement benefits from 2.0% of Average
Salary to 2.5% of Average Salary for all Years of Benefit Service, effective January
1, 2002.

Effective February 28, 2002, the 1995 Plan was purportedly replaced by an
amended and restated Plan document.  Among other things, this restated document
contains an increase in the accrual rate from 2.0% to 2.5% for participants who
retire on or after January 1, 2002.

On August 12, 2002, the Benefits Committee adopted a resolution "to
increase the Special Spouse Benefit in Section 7.1(a), 7.1(b) and 7.1(e) from 50
percent to 75 percent."  On April 17, 2003, the Benefits Committee adopted a
resolution to include overtime pay, effective January 1, 2000, in the definition of
Compensation for participants retiring from active service on or after April 17,
2003.

After the Benefits Committee adopted the April 17, 2003 resolution, it did
not adopt any additional resolutions purporting to amend the terms of the Plan.

At a meeting of the Board of Directors on April 16, 2003, the Board
adopted a resolution amending the Plan to provide for an Early Retirement
Program that provided for fully subsidized early retirement benefits for certain
employees who satisfied certain age and years of service requirements and who
elected to retire under this program by May 7, 2003, and who in fact retired
effective June 1, 2003.  This resolution contained the following recitals, among
others:

WHEREAS, on May 5, 1997, the Executive Committee adopted a
Resolution creating the Benefits Committee, and charged such Committee
with full authority with respect to the administration of all plans created, or
to be created, for the benefit and welfare of ULLICO Inc. employees and
employees of it subsidiaries.  And,

WHEREAS, Article IV, Section 2 of the ULLICO Inc. By-laws invests the
Board of Directors with the authority to conduct, manage, and control the
affairs and business of ULLICO Inc. . . .

WHEREAS, pursuant to Section 11.1 of the Plan, the Board of Directors
may adopt a resolution to amend the Plan.  And,

– 5 –

WHEREAS, the Benefits Committee understand that management of
ULLICO Inc. wishes to undertake a restructuring of certain areas of
business, which includes cost reduction activities, including a reduction in
personnel. And,

\*        \*        \*

WHEREAS, the Benefits Committee recommends that the Plan be amended
by the Board of Directors to make the Early Retirement Plan available on
April 16, 2003 . . .

The minutes of the April 16, 2003 meeting reflect that Mr. Luce was one of
the senior officers present at the meeting and that he discussed the details of the
proposed Early Retirement Plan with the Board. The minutes also reflect that Mr.
Luce advised the Board that he would be one of the employees eligible to elect the
subsidized early retirement benefits available under the proposed amendment to
the Plan.

Following the Board's April 16, 2003 meeting, the membership of the Board
underwent significant change. This change appears to have been connected to
concerns arising from a discretionary stock repurchase program in place during the
years 1999 through 2001. On April 29, 2002, the Board had appointed an outside
special counsel to investigate a number of issues relating to stock transactions by
ULLICO Inc.'s officers and directors. The special counsel reported to the Board
concerning his investigation on November 30, 2002. Thereafter, certain members
of the Board resigned and certain officers, including Mr. Luce, retired, and the
Board took various actions against them, including, in some cases, the
commencement of litigation.

Beginning with its meeting on May 13, 2003, the reconstituted Board of
Directors took a number of actions to improve corporate governance. At later
meetings, the Board adopted various resolutions amending the Plan to address
issues arising from the actions of the Benefits Committee following the May 5,
1997 Executive Committee resolution establishing the Benefits Committee. These
resolutions consistently reflect that in the view of the new Board, the May 5, 1997
Executive Committee resolution establishing the Benefits Committee "did not
delegate to the Benefits Committee, the authority to amend, modify, or alter the
terms of employee benefit plans sponsored by ULLICO Inc. or its subsidiaries."
Minutes of the Meeting of the Board of Directors of ULLICO Inc., October 15,
2003 at 5. Moreover, the new Board made it clear that its actions adopting various
amendments to the Plan "shall not be construed as ratifying the actions of the
Benefits Committee with respect to its purported amendment of the Plan . . ."

– 6 –

Minutes of the Meeting of the Board of Directors of ULLICO Inc., January 29, 2004 at 7.

On September 9, 2004, the reconstituted Board adopted a resolution concerning, among other things, the validity of the Benefits Committee's purported July 24, 2001 amendment to the Plan increasing the accrual rate from 2.0% to 2.5% for participants retiring on and after January 1, 2002. As in previous resolutions of the reconstituted Board, the September 9, 2004 resolution expressed the Board's view that the May 5, 1997 resolution of the Executive Committee "did not delegate to the Benefits Committee the authority to amend, modify, or alter the terms of employee benefit plans sponsored by ULLICO or its subsidiaries." The reconstituted Board also expressed the view that "the Benefits Committee, under the management of former Chairman, Chief Executive Officer, and President Robert A. Georgine ("Georgine"), former Chief Legal Officer Joseph A. Carabillo ("Carabillo"), former Chief Financial Officer John Grelle ("Grelle"), and former Executive Vice President, James Luce ("Luce"), purported to amend the Qualified Plan by increasing certain benefits payable to Plan Participants and their eligible Beneficiaries, and such amendments were not disclosed to, or approved by, the Board or the Executive Committee," and that "the Benefits Committee exceeded its delegated authority in purportedly amending the Plan."

Based on these views, the Board resolved, among other things, as to Mr. Luce, "[t]hat as . . . Luce engaged in self-dealing by acting *ultra vires* and voting in favor of purported amendments to the Qualified Plan [i.e., the Plan at issue in this decision] that had the effect of increasing [his] benefits under such Plan . . ., any benefits under the Qualified Plan . . . for which . . . Luce may otherwise be eligible shall be calculated without regard to benefit increases that the Benefits Committee purported to approve during [his] employment with ULLICO." The Board further directed that payments to Mr. Luce be prospectively reduced to the level provided under the Plan without regard to the unauthorized amendments adopted by the Benefits Committee. The Board again confirmed that its action "shall not be construed as ratifying any actions of the Benefits Committee with respect [to] its purported amendments to the Qualified Plan . . . ." Minutes of the Meeting of the Board of Directors of ULLICO Inc. held Thursday, September 9, 2004 at 14-16.

By letter dated January 14, 2005, Theodore T. Green, Senior Vice President and General Counsel of ULLICO Inc., advised Mr. Luce that the monthly pension benefit he had been receiving from the Plan would be prospectively reduced to $5,879.70. According to Mr. Green's letter, this reduced amount reflected Mr. Luce's pension amount calculated without regard to the purported July 24, 2001 amendment to the Plan adopted by the Benefits Committee which increased the accrual rate from 2.0% to 2.5%. Also according to Mr. Green's letter, this 25%

– 7 –

increase in the accrual rate was not authorized by ULLICO Inc.'s Board of Directors.  Mr. Green also noted that another purported amendment to the Plan adopted by the Benefits Committee, which modified the definition of "compensation" to increase the amount of compensation taken into account in calculating pensions, did not affect Mr. Luce's own benefit computation and therefore did not affect the recomputation of Mr. Luce's monthly benefit.[4]

By letter dated February 1, 2005, Mr. Luce advised the Administrative Committee that he was appealing the action announced by Mr. Green's letter as "an adverse benefit determination" and requested the Administrative Committee to hold a hearing on his appeal in accordance with Article 9.3 of the Plan.  In subsequent correspondence, the Administrative Committee scheduled a hearing for March 23, 2005.  This hearing date was deferred at your request, as counsel to Mr. Luce, owing to a scheduling conflict.  By letter dated March 30, 2005, you submitted detailed arguments objecting to the reduction in Mr. Luce's monthly pension, supported by various documents submitted as exhibits to your letter.  On March 31, 2005, you met with the Administrative Committee to discuss the points raised by Mr. Luce's appeal.  Thereafter, on May 12, 2005, the Administrative Committee, through counsel, invited Mr. Luce to submit any additional documents or comments that he believed relevant to any of the issues presented.  Mr. Luce did not make any further submission.

The Administrative Committee has carefully considered all of the points raised in Mr. Luce's appeal and has conducted a comprehensive review of the documents relating to the issues.  The Administrative Committee notes that in light of the circumstances surrounding the issues addressed in this decision, including the pendency of litigation involving both Mr. Luce, the Plan, ULLICO Inc., and other former officers or directors of ULLICO Inc., the Administrative Committee has retained Groom Law Group, Chartered, a law firm specializing in employee benefits matters, as independent counsel to advise it in respect to this decision.

## II.    Analysis

The central question in this appeal is whether the July 24, 2001 resolution adopted by the Benefits Committee increasing the Plan's accrual rate from 2.0% to

---

[4] Mr. Green's letter also noted the continued payment of pension benefits at the reduced level announced in his letter should not be taken as a waiver of "the Company's position that the Plan should be made whole for the unauthorized liability your actions caused, or of any other claim now being considered in pending litigation.  Further, the Company reserves for the benefit of the Plan the right to set off the excess payments received to date against future payments."  While your March 30, 2005 letter addresses these reservations of rights, the Administrative Committee does not view them as relevant to the central issue presented by Mr. Luce's appeal, which is whether his monthly pension benefit was properly reduced to reflect a 2.0% accrual rate.  As you have observed, these issues are currently pending in litigation, and will not be addressed here.

– 8 –

2.5% (the "July 24 resolution") was a valid amendment of the 1995 Plan. To resolve this question, the Committee must first examine the statutory and decisional law concerning the validity of amendments to a plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA").

### A.   ERISA's requirements and the Plan document's provisions.

Section 402(b)(3) of ERISA requires that "Every employee benefit plan shall – (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan . . ." In satisfaction of this requirement, the 1995 Plan provides as follows:

> 11.1. <u>Reservation of Right to Amend Plan.</u> The Plan Sponsor reserves the right to modify or amend this Plan at any time. It may make any amendment that it deems advisable, including, but not limited to, any amendment to ensure the continued qualification of this Plan under the provisions of the [Internal Revenue] Code. Any amendment shall be made pursuant to a resolution adopted by the Board of Directors of the Plan Sponsor.

The 1995 Plan defines the term "Plan Sponsor" to mean "ULLICO Inc." 1995 Plan, § 2.45. Neither this provision nor section 11.1 of the 1995 Plan has been amended or altered by any subsequent action of the Board of Directors, the Executive Committee of the Board, or the Benefits Committee. The Administrative Committee therefore concludes that by the plain terms of the 1995 Plan, as well as any subsequent actual or purported amendment to the 1995 Plan, the power to amend the Plan resides exclusively in the Plan Sponsor, ULLICO Inc. Consequently, on the face of the Plan document, the power to amend the Plan can be exercised in only one prescribed fashion, that is, "pursuant to a resolution adopted by the Board of Directors of [ULLICO Inc.]"

This construction of ERISA § 402(b)(3) and section 11.1 of the 1995 Plan document is confirmed by the case law. In *Curtiss-Wright Corporation v. Schoonejongen*, 514 U.S. 73 (1995), the Supreme Court explained that section 402(b)(3) of ERISA imposed two bedrock requirements on every employee benefit plan: it must specify a procedure for amending the plan and it must specify a procedure for identifying the person who has the authority to amend the plan. *Id.* at 78-79. Faced with a plan provision that specified that "the Company", that is, the sponsoring employer, had the authority to amend the plan, the Court had no difficulty concluding that the plan in question satisfied the first requirement of section 402(b)(3) – the procedure for amending the plan required action of "the Company." The Court then considered whether the plan also specified a

– 9 –

"procedure" for identifying the person who had the authority to amend the plan. The Court concluded that the plan's reference to "the Company" should be read in light of corporate law, which provides a ready means of identifying the persons who have authority to act on behalf of "the Company."

In the present case, the 1995 Plan's chosen means of prescribing the procedure for amending the Plan and of identifying the persons with the power to amend the Plan are far more specific than those in the plan considered in *Curtiss-Wright*. In particular, section 11.1 makes clear that the procedure for amending the Plan is the adoption of a resolution. Section 11.1 then makes clear that the persons empowered to amend the Plan are the directors of ULLICO Inc., acting in that capacity. As the Court observed in *Curtiss-Wright*, "ERISA . . . follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id.* at 85.

The courts have repeatedly emphasized the importance of strict adherence to a plan's amendment procedures. "Modifications to a written plan that do not conform to the formal amendment procedures threaten the actuarial soundness of the plan and thereby undercut the ability of plan participants to rely on their expected stream of benefits. . . . Strict adherence to a written plan also prevents a collusive agreement between an employer and a favored employee that could operate to the detriment of all other plan participants' rights." *Singer v. The Black & Decker Corporation*, 964 F.2d 1449, 1454 (4th Cir. 1992) (Wilkinson, J., concurring). Consistent with this, the courts have repeatedly held that any purported amendment that is not adopted in strict compliance with the plan's specified procedure is of no force or effect. *E.g.*, *Depenbrock v. Cigna Corp.*, 389 F.2d 78, 81-82 (3d Cir. 2004) ("an amendment is ineffective if it is inconsistent with the governing instruments"). Because the July 24 resolution was not adopted in the manner prescribed by section 11.1 of the Plan, the resolution cannot be considered an effective amendment of the Plan.

## B.    Delegation of the power to amend the Plan.

Mr. Luce contends that the July 24 resolution adopted by the Benefits Committee was a valid exercise of the Board's power to amend the Plan. He asserts that the Board had delegated its amendment power to the Benefits Committee when the Executive Committee of the Board adopted the May 5, 1997 resolution (the "May 5 resolution") establishing the Benefits Committee. In support of this argument, Mr. Luce points to the summary of the introductory remarks made by Mr. Georgine at the May 5, 1997 Executive Committee meeting, in which he stated that "[t]he management committee would meet regularly to administer, plan and effect changes in the benefit plans." Mr. Luce also points to a

– 10 –

provision of the resolution that charges the Benefits Committee to report "any and all material changes in each and every plan created for the benefit and welfare of the employees of the Corporation . . . on at least an annual basis to the Corporation's Executive Committee."

At the outset, the Administrative Committee questions whether the specific language of section 11.1, which provides only one procedure for amending the Plan and only one means of identifying the persons empowered to adopt an amendment, allows the Board to delegate its amendment power. In *Curtiss-Wright*, the Court observed that ERISA's requirement that every plan have a "coherent amendment procedure" serves several purposes, including providing plan administrators with a "mechanism for sorting out [valid amendments], from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms." *Id.* at 82. Given the specificity of this Plan's amendment procedure, allowing a delegation of the Board's power to amend defeats this purpose. Thus, it may be the case that the only means by which the Board could effectively confer amendment power on another person would be through an amendment to Plan section 11.1 itself – that is, by a clear expression embodied in the Plan document that specifies a means of identifying the other persons who hold the power to amend.

These considerations notwithstanding, for present purposes the Administrative Committee will assume that the Board could validly delegate amendment power to the Benefits Committee. However, an examination of the May 5 resolution leads the Administrative Committee to conclude that the May 5 resolution does not delegate amendment authority to the Benefits Committee.

The only language contained in the resolution that arguably refers to plan amendments is the passage identified by Mr. Luce requiring the Benefits Committee to "report[ ] any and all material changes" to the Executive Committee. By its terms, this language does not confer any power to the Benefits Committee to amend the Plan. Rather, it merely imposes a duty to report "material changes" to the Executive Committee. Moreover, this section of the resolution makes clear that in carrying out its functions, including the appointment of trustees for the various plans and reporting to the Executive Committee, the Benefits Committee members are functioning "as fiduciaries." While it may be possible to confer amendment authority on someone functioning as an ERISA fiduciary, it is unlikely that the Executive Committee would have chosen to do so, given the well-recognized principle that the act of amending a plan is not a fiduciary act. *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996).

Mr. Georgine's prefatory remark that the "committee would meet regularly to . . . effect changes in the benefit plans" could be interpreted to express his view

that the purpose of the resolution was to delegate the Board's amendment authority. The statement itself, however, is not part of the resolution, and there is nothing in the operative language of the resolution that delegates amendment authority to the Benefits Committee. It is "hornbook law" that prefatory comments do not change the plain meaning of the actual text of a resolution. *See White v. Investors Mgmt. Corp.*, 888 F.2d 1036, 1042 (4th Cir. 1989).

More importantly, any arguable ambiguity in either Mr. Georgine's statement or in the resolution's directive to report "material changes" to the Executive Committee is easily resolved. One of the principal purposes of the May 5 resolution was to appoint a single committee of management officers to oversee all of ULLICO Inc.'s many plans and to confer on this newly constituted committee broad fiduciary authority to manage these various plans. It is clear from the early actions of the Benefits Committee that it acted to change such things as the Plan's investment guidelines and target asset allocations. Meeting of the Benefits Committee of ULLICO Inc. held October 14, 1997. These actions do not require a plan amendment, but could certainly fall within the category of "material changes" that the Benefits Committee was authorized to make as fiduciaries and then required to report to the Executive Committee. Similarly, the May 5 resolution specifically granted the Benefits Committee the authority to select plan trustees to hold the assets of the various plans, another "change" to the plans that would be considered a "material change."

Viewed in this context, both Mr. Georgine's prefatory statement and the May 5 resolution's explicit requirement to report "material changes" more naturally refer to the Benefits Committee's fiduciary functions such as investment oversight and the appointment and replacement of plan trustees. Consequently, the Administrative Committee concludes that nothing in the minutes of the May 5, 1997 meeting of the Executive Committee and the resolution that the Executive Committee adopted at that meeting can reasonably be read to delegate the Board's power to amend the Plan to the newly constituted Benefits Committee.

For these reasons, the Administrative Committee concludes that even if the Plan's explicit requirement that any amendment be by resolution of the Board of ULLICO Inc. could be read to permit a delegation of amendment authority, the May 5 resolution did not, either explicitly or by implication, delegate the Board's amendment authority under this Plan to the Benefits Committee.

## C.    Other issues.

Mr. Luce advances a number of other arguments which the Administrative Committee will address briefly.

– 12 –

First, Mr. Luce points to the existence of the February 28, 2002 restatement of the Plan ostensibly adopted by the Board of Directors and to the fact that the Benefits Committee adopted numerous amendments to the Plan "without objection or complaint from the Executive Committee." These observations arguably suggest that Mr. Luce is contending that the Board or the Executive Committee of the Board ratified the various amendments adopted by the Benefits Committee, including the July 24 resolution increasing the Plan's accrual rate.

It is well-settled that a principal cannot ratify the unauthorized act of an agent unless the principal has "a full and complete knowledge of all the material facts connected" to the act to be ratified. *Huppman v. Tighe*, 642 A.2d 309, 314 (Md. App. 1994) ("The authorities are crystal clear that a party cannot be found to have ratified, absent knowledge of the material facts undergirding the transaction."); *Integrated Consulting Services, Inc. v. LDDS Communications, Inc.*, 996 F. Supp. 470, 476-77 (D. Md. 1998) ("[K]nowledge of the material facts is an essential element of ratification...."); *see also* 2A Fletcher Cyclopedia of Private Corp. § 756. The Administrative Committee has carefully reviewed the minutes of the Board of Directors, the Executive Committee, and the Benefits Committee and has not found any evidence that the Board of Directors or the Executive Committee was ever advised of the Benefits Committee's activities with regard to amending the Plan.

In addition, the Administrative Committee's review of Board and Executive Committee minutes did not disclose any action by either body to adopt the February 28, 2002 restatement of the Plan. Indeed, there is no record that the Benefits Committee itself adopted this restatement of the Plan. The only indication that the restatement was adopted is the testament at the conclusion of the document, signed by Jacqueline J. Wong and witnessed by Grace H. Kramer, both employees within the Legal Department of ULLICO Inc., that "in witness whereof, and the adoption of this Plan on December 23, 2002, the Plan Sponsor has caused this ULLICO Inc. Pension Plan and Trust to be executed by its duly authorized officer." The reference to "the Plan Sponsor" rather than "the Board of Directors," coupled with the lack of any independent record of Board action, strongly suggests that some officer or officers of ULLICO Inc., rather than the Board or the Executive Committee of the Board, authorized the signing of the document. Consequently, the Administrative Committee concludes that there are no grounds to believe that the Board ratified the actions of the Benefits Committee.

Mr. Luce also argues that given the pendency of law suits involving ULLICO Inc., the Plan, Mr. Luce, and another former officer whose actions on the Benefits Committee have been called into question, the Administrative Committee

– 13 –

lacks the power to decide whether the July 24 resolution was a valid amendment to the Plan. In support of this position, he cites *Johannssen v. District No. 1 – Pacific Coast District*, 292 F.3d 159, 169 (4th Cir. 2004). *Johannssen*, however, did not decide that a plan administrator lacks the power to decide whether a purported plan amendment has been validly adopted. Instead, the court ruled, for a number of reasons, that the plan administrator's decision on the validity of an amendment would not be accorded the deference typically given to plan administrator decisions on questions involving the payment of benefits. Thus, nothing in *Johannssen* serves as a bar to the Administrative Committee's decision on the substantive issue that Mr. Luce himself has raised in his appeal.

The Administrative Committee is also mindful of the Supreme Court's observation concerning the need for plan administrators to have a mechanism for "sorting out" valid plan amendments from other forms of corporate communications that may appear to be plan amendments. In the Court's view, "plan administrators may have a statutory responsibility to do this sorting out." *Curtiss-Wright*, 514 U.S. at 82.

Mr. Luce also argues that because ULLICO Inc. has made various representations concerning the validity of the February 28, 2002 restatement of the Plan to the Internal Revenue Service and obtained a favorable determination letter from the Service, ULLICO Inc. is estopped to deny the validity of the July 24 resolution increasing the accrual rate. Whatever the merits of this argument, especially in light of the evident lack of knowledge on the part of the Board of Directors, it is irrelevant. The Administrative Committee is an independent body established under the Plan and charged with the authority to decide claims for benefits. The Plan is clearly a separate entity from ULLICO Inc. Even if ULLICO Inc. were somehow estopped, the Plan itself, acting through the Administrative Committee, is not estopped.

Mr. Luce also argues that the Plan's claims procedures are unreasonable and inadequate within the meaning of 29 CFR 2560.503-1(b)(5), which requires that a plan's claims procedures "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." Mr. Luce points to the circumstance that the Plan has continued to pay benefits at the 2.5% accrual rate to participants who retired on or after January 1, 2002, except for him and other former members of the Benefits Committee who have retired, as evidence that the Plan's claims procedures are flawed.

The Committee does not understand the regulation cited by Mr. Luce to require or permit the Committee to pay a benefit to Mr. Luce that is not provided in

– 14 –

the terms of the Plan. Nor does the Committee understand that regulation to require the Committee to reconsider the grant or denial of benefits to all other participants who are arguably similarly-situated, and the Committee declines to do so.[5]

As the Seventh Circuit has observed,

> An employer is supposed to apply the plan's written terms, and departure from those terms on one occasion does not estop the employer to enforce them on others. See, *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955 (7th Cir. 1998). Plaintiffs suggest that every divergence from a plan's criteria is an "amendment" of the plan entitling them to the same benefits, but that is a non-starter, rejected in *Frahm*. Amendments are accomplished through a formal process and produce a revised written instrument. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995). Deviations from a plan are just that – deviations. The plan remains what it was, and claims for benefits continue to be evaluated in light of its written criteria.

*McNab v. General Motors Corporation*, 162 F.3d 959, 961 (7th Cir. 1998).

Similarly, the courts uniformly recognize that even if there is a flaw in a claims procedure or an error in applying that procedure – and the Administrative Committee does not believe that either is the case here – that does not entitle a participant to a substantive remedy, such as the payment of a benefit for which the participant is not eligible. *E.g., Parker v. BankAmerica Corp.*, 50 F.3d 757, 768 (9th Cir. 1995) (plan's failure to comply with ERISA's disclosure requirements "is not sufficient for the former employees to recover benefits under the [plan] because 'ordinarily, a claimant who suffers because of a fiduciary's failure to comply with ERISA's procedural requirements is entitled to no substantive remedy.'") (quoting *Blau v. Del Monte Corp.*, 748 F.2d 1348, 13553 (9th Cir.), *cert. denied*, 474 U.S. 865 (1985)).

Finally, Mr. Luce argues that the reduction in his benefit based on the application of a 2.0% rate of accrual is a violation of ERISA's antialienation rule. 29 U.S.C. § 1056(d)(1). The Committee disagrees. Because the Plan was never validly amended to increase the accrual rate, Mr. Luce was never entitled to the higher benefit that was originally paid to him. Consequently, the Plan's present

---

[5] The Administrative Committee does note that Mr. Luce does not appear to have been treated differently from other similarly-situated participants. Mr. Luce and the other members of the Benefits Committee who have retired with the purported benefit of the July 24 resolution that they adopted do not appear to be similarly-situated to other retired participants who had no involvement with the activities of the Benefits Committee.

– 15 –

refusal to pay a benefit that is not owed is not an "alienation" of Mr. Luce's benefits.

## III.    Conclusion

For the reasons set forth above, the Administrative Committee has concluded that Mr. Luce is not entitled to the higher benefit level that was initially paid to him.

Mr. Luce should regard this letter as a final decision on review within the meaning of section 503 of the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder by the Department of Labor. Mr. Luce is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.  Mr. Luce has the right to bring an action under section 502(a) of the Employee Retirement Income Security Act of 1974, as amended.

Sincerely,

Employee Benefit Plans Administrative Committee as Plan Administrator for the ULLICO Inc. Pension Plan Trust

By: _Joseph R. Linehan_
    Joseph R. Linehan
    Chairman

24

REES, BROOME & DIAZ, P. C.
COUNSELLORS AT LAW
8133 LEESBURG PIKE, NINTH FLOOR
TYSONS CORNER
VIENNA, VIRGINIA 22182-2706
TELEPHONE (703) 790-1911
FAX: (703) 848-2530

WWW.RBDLAW.COM

JOEL M. BIRKEN*
RAYMOND J. DIAZ*+
JONATHAN J. BROOME, JR.
JOHN F. BOLAND*
ROBERT E. SCULLY, JR.* +
JUAN R. CARDENAS
BRUCE E. TITUS++
PETER S. PHILBIN+
WILLIAM P. DALY, JR.
ANDREW B. GOLKOW*
SUSAN RICHARDS SALEN*+
RICHARD M. WARE, JR.+
EDWARD J. O'CONNELL III*
MARK P. GRAHAM
TODD A. SINKINS*

LELLA AMISS E. PAPE+
URSULA A. KOENIG
RORY K. NUGENT
KIMBERLEY O'HALLORAN-CORDRAY
COURTNEY B. HARDEN
EMILY D. HARWOOD
CHRISTOPHER B. DEMERS
KATHERINE C. MCCARTHY

OF COUNSEL
MICHAEL L. O'REILLY
DANIEL R. GROPPER*

JAMES M. REES (1941-1986)

* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN MARYLAND
° ALSO ADMITTED TO PATENT BAR

May 24, 2005

**VIA FEDEX PRIORITY OVERNIGHT**

John R. Linehan, Chairman
Employee Benefit Plans Administrative Committee
Plan Administrator for the ULLICO Inc. Pension Plan Trust
c/o ULLICO Inc.
1625 Eye Street, N.W.
Washington, D.C. 20006



Gary M. Ford, Esquire
Groom Law Group
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-5811

Re:    James W. Luce - ULLICO Inc. Pension Plan and Trust
       Appeal of Denial of Benefits

Gentlemen:

I have received and transmitted to Jim Luce Mr. Linehan's letter of May 20, 2005, denying James W. Luce's appeal of the denial of his plan benefits (the "Decision").

As the Decision notes, Mr. Luce is entitled to receive, upon request and free of charge, reasonable access to, and copies of all documents, records and other information relevant to his claim for benefits. A document is relevant to his claim if: (1) it was relied upon in making the benefit determination; (2) it was submitted, considered or generated in the course of making the benefit determination; or (3) it demonstrates compliance with the administrative process and safeguards required in making the benefit determination. 29 C.F.R. § 2560.503-1(m)(8).

REES, BROOME & DIAZ, P.C.

John R. Linehan, Chairman
Gary M. Ford, Esquire
May 24, 2005
Page 2

Please accept this letter as a written request, on behalf of James W. Luce, for copies of all documents, records or other information relevant to Luce's claim for benefits to which he is entitled under the regulations.

My review of the Decision suggests that, at the very least, the following documents expressly referenced in the Decision meet the criteria established by the regulations:

1. The documents that "appear to bear upon the issues that [Luce] has raised." Decision at 1;

2. The October 14, 1997 resolutions of the Benefits Committee;

3. The Executive Committee resolutions of February 11, 1998, February 11, 2000, and February 22, 2002;

4. The Benefits Committee resolutions relating to the Plan, including resolutions changing asset allocation investment guidelines; amendments designed in response to changes in the Internal Revenue Code relating to the tax qualification requirements of pension plans; and amendments that modified various aspects of the Plan's terms directly relating to the amount of benefits to be paid under the Plan;

5. The August 12, 2002 Benefits Committee resolution to increase the special spousal benefit;

6. The April 17, 2003 Benefit Committee resolution to include overtime pay, effective January 1, 2000, in the definition of "compensation;"

7. The April 16, 2003 Board of Directors resolution amending the Plan to provide for an early retirement program;

8. The Resolutions of the Board of Directors on May 13, 2003, to improve corporate governance;

REES, BROOME & DIAZ, P.C.

John R. Linehan, Chairman
Gary M. Ford, Esquire
May 24, 2005
Page 3

9. Various resolutions amending the Plan to address issues arising from the actions of the Benefits Committee that: ". . . consistently reflect that in the view of the new Board, the May 5, 1997 Executive Committee resolution establishing the Benefits Committee. . . did not delegate to the Benefits Committee the authority to amend, modify or alter the terms of employee benefits plans sponsored by ULLICO Inc." Decision at 5.

10. The Minutes of the meeting of the Board of Directors of ULLICO Inc. on October 15, 2003;

11. Minutes of the meeting of the Board of Directors of ULLICO Inc. on January 29, 2004;

12. The September 9, 2004 resolution of the "reconstituted Board" concerning "among other things" the validity of the Benefits Committee's purported July 24, 2001 amendment to the Plan increasing the accrual rate from 2% to 2.5%; and all documents considered during the Committee's "comprehensive review of the documents relating to the issues." Decision at 6.

I look forward to receiving copies of the requested materials at your earliest possible convenience.

Very truly yours,

REES, BROOME & DIAZ, P.C.

By: _____
Robert E. Scully, Jr.

RESjr:mbl
cc:    James W. Luce

K:\12\12410\00002\CORR\050524 letter to John Linehan and Gary Ford.doc

REES, BROOME & DIAZ, P. C.

COUNSELLORS AT LAW

8133 LEESBURG PIKE, NINTH FLOOR

TYSONS CORNER

VIENNA, VIRGINIA 22182-2706

TELEPHONE (703) 790-1911

FAX: (703) 848-2530

WWW.RBDLAW.COM

JOEL M. BIRKEN*
RAYMOND J. DIAZ*+
JONATHAN J. BROOME, JR.
JOHN F. BOLAND*
ROBERT E. SCULLY, JR.* +
JUAN R. CARDENAS
BRUCE E. TITUS*+
PETER S. PHILBIN+
WILLIAM P. DALY, JR.
ANDREW B. GOLKOW*
SUSAN RICHARDS SALEN*+
RICHARD M. WARE, JR.+
EDWARD J. O'CONNELL III*
MARK P. GRAHAM
TODD A. SINKINS*

LELLA AMISS E. PAPE+
URSULA A. KOENIG
RORY K. NUGENT
KIMBERLEY O'HALLORAN-CORDRAY
COURTNEY B. HARDEN
EMILY D. HARWOOD
BARRETT W. THIES
CHRISTOPHER B. DEMERS
KATHERINE C. MCCARTHY

———

OF COUNSEL

MICHAEL L. O'REILLY
DANIEL R. GROPPER*

———

JAMES M. REES (1941-1986)

* ALSO ADMITTED IN THE DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN MARYLAND
* ALSO ADMITTED TO PATENT BAR

July 7, 2005



<u>VIA FIRST-CLASS MAIL AND TELEFAX</u>

William F. Hanrahan
Groom Law Group, Chartered
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-5811

Re:    James W. Luce - ULLICO, Inc. Pension Plan and Trust Appeal

Dear Mr. Hanrahan:

I have received your letter dated June 30, 2005, and the referenced enclosures identified as "... the bulk of the documents considered or relied upon by the Administrative Committee of the ULLICO, Inc. Pension Plan and Trust in connection with Mr. Luce's appeal of the denial of his claim for additional pension benefits."

I have reviewed your letter and the enclosed documents and have the following objections and comments:

1.    <u>There is no Basis for Withholding any Relevant Documents Based on an Attorney-Client Privilege</u>.

The following relevant documents were withheld based upon a purported attorney-client privilege:

- AC 00007 – AC 00031;
- AC 00063 – AC 00075;
- AC 00080 – AC 00081;
- AC 00094 – AC 00097;
- AC 00264 – AC 00274; and
- AC 01087 – AC 01100

REES, BROOME & DIAZ, P.C.

William F. Hanrahan
July 7, 2005
Page 2

As you know, there is no attorney-client privilege applicable to communications between counsel and the Plan Administrative Committee with respect to plan administration activities. See Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co., 543 F. Supp. 906, 909 (D.D.C. 1982) ("When an attorney advises a fiduciary about a matter dealing with the administration of an employees' benefit plan, the attorney's client is not the fiduciary personally but, rather, the trust's beneficiaries."); Everett v. US Air Group, Inc., 165 F.R.D. 1 (D.D.C. 1995) (employer could assert attorney-client privilege only when it sought legal counsel solely in its role as employer regarding issues other than administration of the plan). The adjudication of Mr. Luce's claim for benefits is a plan administration activity. Accordingly, any communications reflecting legal advice given to the Plan Administrative Committee cannot be withheld on the basis of privilege.

Similarly, when a document containing otherwise privileged communications between the settlor and its counsel are provided to, or disclosed to, the Plan Administrator as part of its review of a benefits claim or appeal, the attorney-client privilege is waived. It is a well-established principle of law that the attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party. In re Sealed Case, 676 F.2d 793 (D.C. Cir. 1982). Accordingly, any documents disclosed to the Plan Administrative Committee in connection with its review of Mr. Luce's claim certainly lost any applicable attorney-client privilege. See Lewis v. UNUM Corporation Severance Plan, 203 F.R.D. 615, 621-22 (D. Kan. 2001) (attorney-client privilege was waived when privileged documents were provided to plan committee as part of adjudication of benefits claim). Please provide the withheld documents forthwith.

2.    There is No Basis for Redacting Minutes of the Meetings of the Board of Directors of ULLICO, Inc., the Executive Committee of the Board, or the Benefits Committee.

The Department of Labor regulations require delivery of all documents, records and other information relevant to Luce's claim for benefits. A document, record or information is relevant to his claim if: (1) it was relied upon in making the benefit determination; (2) it was submitted, considered or generated in the course of making the benefit determination; or (3) it demonstrates compliance with the administrative process and safeguards required in making the benefit determination. 29 C.F.R. § 2560.503-1(m)(8). Any minutes of the Board of Directors of ULLICO, Inc., the Executive Committee of ULLICO, Inc. or the Benefits Committee that are part of the administrative record must be presented to Luce in precisely the format in which they were submitted to,

REES, BROOME & DIAZ, P.C.

William F. Hanrahan
July 7, 2005
Page 3

considered by, or generated by the Plan Administrative Committee. Please provide me with the authority on which you relied in concluding that the documents can be redacted "... to confine disclosure to information relevant to the questions presented by Mr. Luce's appeal." If there was material in the minutes of the ULLICO Board of Directors, Executive Committee, or Benefits Committee that was not relevant to the issues presented by Mr. Luce's appeal, the minutes could and should have been redacted before they were submitted to the Plan Administrative Committee. Your letter quite clearly reveals that no such redactions were made - since you are making them now.

The Plan Administrative Committee's position on this issue is unsupportable and unacceptable. Please present all minutes in precisely the format in which they were submitted to, considered by, or generated by the Plan Administrative Committee.

3.    <u>The Minutes of the Meetings of the Plan Administrative Committee Were Not Produced.</u>

We were surprised to find no minutes of the meetings of the Plan Administrative Committee held on April 22, May 5 and May 18, 2005, at which Mr. Luce's appeal was considered. We are aware that such minutes are routinely kept, and are obviously part of the administrative record. If you contend that other business was conducted at the meetings in addition to the Committee's review, consideration and decision of Mr. Luce's claim and appeal, such non-germane portions of the minutes might not be part of the administrative record in Luce's case. Please advise me at your earliest convenience if you intend to redact portions of the minutes of the meetings of the Plan Administrative Committee at which Mr. Luce's claims and appeals were considered.

4.    <u>All Documents "Generated in the Course of" the Benefits Determination Were Not Produced.</u>

We were also surprised to find no correspondence, emails or other communications between members of the Committee and other ULLICO employees, or between ULLICO employees and outside counsel. Pursuant to 29 C.F.R. § 2560.503-1(m)(8), all documents "generated in the course of making the benefit determination" must be provided to a claimant upon request. This would include all communications (including emails) between and among the Committee members, other ULLICO employees, and outside counsel relating to the claims adjudication process, deliberation, decision or procedures. None of these documents were provided.

REES, BROOME & DIAZ, P.C.

William F. Hanrahan
July 7, 2005
Page 4

If you contend that Mr. Luce is not entitled to these documents under the ERISA claims regulations, a position with which we strongly disagree, we nonetheless trust that you have taken steps to retain all such documents and emails in both your firm's and client's possession such that they will be available during discovery under the Federal Rules of Civil Procedure, and hereby put both the Groom Law Group and your client on notice that Mr. Luce intends to pursue such documents and emails should litigation ensue.

Very truly yours,

REES, BROOME & DIAZ, P.C.

By: _Emily Harwood_
Emily D. Harwood

mbl
cc:    James W. Luce

K:\12\12410\00003\corr\050707 Hanrahan Letter.doc

**26**



# GROOM
## LAW GROUP
### *www.groom.com*

William F. Hanrahan
(202) 861-6629
wfh@groom.com

July 13, 2005

**By Federal Express**

Emily D. Harwood, Esq.
Rees, Broome & Diaz, P.C.
8133 Leesburg Pike
Ninth Floor
Vienna, Virginia  22182

Re:    James W. Luce - ULLICO Inc. Pension Plan and Trust Appeal

Dear Ms. Harwood:

We are transmitting herewith the additional documents considered or relied upon by the Administrative Committee of the ULLICO Inc. Pension Plan and Trust in connection with Mr. Luce's appeal of the denial of his claim for additional pension benefits.  These additional documents are numbered AC 01204 through AC 01642.  These documents include the redacted minutes of the ULLICO Board of Directors, the Executive Committee of the Board, and the Benefits Committee.

We have reviewed your letter dated July 7, 2005, objecting to the Administrative Committee's redaction of documents that contain what the Committee believes to be privileged information or information not relevant to the review of Mr. Luce's claim for benefits.  Because your letter makes clear that these issues will be the subject of litigation, we think that the court proceeding is the appropriate forum to argue the merits of the parties' positions.

Your July 7 letter also raises a question about the need to produce minutes of the Administrative Committee's meetings concerning Mr. Luce's appeal.  We are examining

Groom Law Group, Chartered
1701 Pennsylvania Ave., N.W. • Washington, D.C. 20006-5811 • 202-857-0620 • Fax 202-659-4503



**GROOM**
**LAW GROUP**
*www.groom.com*

Emily D. Harwood, Esq.
July 13, 2005
Page 2

whether such minutes exist.  We will communicate further on this question as promptly
as possible.

Very truly yours,

*William F. Hanrahan*

William F. Hanrahan

Enclosures
cc:    Gary M. Ford (w/o encl.)
       James V. Cole (w/o encl.)

**27**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* ) | |
| ULLICO INC. LITIGATION ) | MASTER DOCKET AND |
| ) | CASE NUMBER:  1:03CV01556(RJL) |
| ) | |
| RELATED TO:  ALL CASES ) | |

## CONSOLIDATION AND SCHEDULING ORDER

Upon consideration of the reports of the parties under Federal Rule of Civil Procedure 26(f) and Local Civil Rule 16.3(d) in these related actions, and following consultation with the attorneys for the parties at Joint Status Conferences held on April 25 and May 16, 2005, the Court hereby enters the following Consolidation and Scheduling Order pursuant to Federal Rules of Civil Procedure 16(b) and 42(a).

1. *Pretrial Consolidation.*  The related actions styled *Carabillo v. ULLICO Inc.*, Case No. 1:03cv1556-RJL ("*Carabillo I*"), *Luce v. Union Labor Life Auxiliary Retirement Benefits Plan*, Case No. 1:04-cv-00118-RJL ("*Luce I*"), *Carabillo v. ULLICO Inc. Pension Plan and Trust*, Case No. 1:04-cv-00776-RJL ("*Carabillo II*"), and *ULLICO Inc. v. Luce*, Case No. 1:04-cv-1880-RJL ("*Luce II*") are, until further order, consolidated for discovery purposes only.  This order does not constitute a determination that these actions should or should not be consolidated for trial, nor does it have the effect of making any entity a party to an action in which it has not been joined and served in accordance with the Federal Rules of Civil Procedure.  A copy of this Order shall be filed in each such case.



2. *Filing Papers with the Court.* The purpose of the following instructions is to reduce the time and expense of duplicate filings of documents through the use of a master case file; while at the same time not congesting the master case with miscellaneous pleadings and orders that are of interest only to the parties directly affected by them. It is not intended that a party lose any rights based on a failure to follow these instructions.

(a) *Master Docket and File.* The clerk will maintain a master docket and case file under the style "*In re* ULLICO INC. LITIGATION," master file number 1:03cv1556-RJL. All orders, pleadings, motions, and other documents will, when filed and docketed in the master case file, be deemed filed and docketed in each individual case to the extent applicable.

(b) *Captions; Separate Filing.* Orders, pleadings, motions, and other documents will bear a caption similar to that of this order. If generally applicable to all consolidated actions, they shall include in their caption the notation that they relate to "ALL CASES" and be filed and docketed only in the master file. Documents intended to apply only to particular cases will indicate in their caption the case number of the case(s) to which they apply, and the clerk shall file and docket such documents both in the master case file and the specified individual case files. Pending motions need not be refiled, and will be ruled on by the Court in due course (unless withdrawn).

(c) *Discovery Requests and Responses.* Pursuant to Fed. R. Civ. P. 5(d), discovery requests and responses will not be filed with the Court except when specifically ordered by the Court or to the extent offered in connection with a motion.

2

3.    *Consolidated Pleadings*

The parties shall file consolidated pleadings in *Carabillo I, Luce I,* and *Carabillo II* as set forth below.

a.    Consolidated Complaint.  Joseph Carabillo, Robert Georgine, John Grelle and James Luce (hereinafter "the former officers") shall file a Consolidated Complaint on or before 20 days after the date of the entry of this Order in which they shall assert all claims within the scope of the *Carabillo I, Luce I,* and *Carabillo II* actions they intend to pursue, including any claims they intend to pursue that have been asserted in the original and amended complaints and claims they have or would assert in reply to the original and amended counterclaims already filed in those actions.

b.    Consolidated Answers and Counterclaims.  ULLICO Inc. and any other Defendants to the former officers' Consolidated Complaint (hereinafter "ULLICO") shall file a Consolidated Answer and Counterclaim on or before 20 days after the date the former officers' Consolidated Complaint is filed in which they shall assert all claims within the scope of the *Carabillo I, Luce I,* and *Carabillo II* actions they intend to pursue, including any claims they intend to pursue that have been asserted in the original and amended counterclaims already filed in those actions.

c.    Consolidated Reply.  The former officers and any other Defendants to ULLICO's Consolidated Counterclaim shall file a Consolidated Reply on or before 20 days after the date ULLICO's Consolidated Counterclaim is filed.

No further Rule 12 Motions shall be filed.  The net result of these Consolidated Pleadings shall be a Consolidated Complaint, Answer, Counterclaim and Reply in the *Carabillo I, Luce I,* and *Carabillo II* actions, and the original complaint in the *Luce II* action and response thereto.

3

The parties shall plead consistent with the Court's prior rulings on the motions to dismiss filed in *Carabillo I*, and all parties' positions shall be preserved with respect to those rulings for the purposes of appeal.

4. *Discovery*

(a) *Schedule.* Discovery shall begin upon the entry of this Order.

(b) *Initial Disclosures.* Initial disclosures under Rule 26(a) shall be made on or before two weeks from the date of the entry of this Order.

(c) *Fact Discovery.* Fact Discovery shall be completed on all the claims in the consolidated actions on or before nine months from the date of the entry of this Order.

(d) *General Limitations.* Unless modified below, the limits on discovery in Federal Rules of Civil Procedure 26-37 shall apply.

(e) *Documents.*

(1) *Rolling Production.* The parties must produce documents to which they have not raised an objection on a rolling basis rather than waiting until all documents responsive to a request have been gathered. The parties must meet and confer regarding a schedule for the orderly production of different categories of documents.

(2) *Avoidance of Multiple Requests and Coordination of Document Production with Other Courts.* Counsel shall, to the extent possible, coordinate and consolidate their requests for production and examination of documents to eliminate duplicative requests from the same party in this proceeding or in similar proceedings in other courts. No party shall request documents available to it at a document depository or from its co-Plaintiff or co-Defendant's counsel. Any party can move to compel production based upon a request for production by any other party.

4

(3) *Privilege.*  A party who, relying on any privilege or on the work product doctrine, does not produce all relevant or requested documents in response to a request for production of documents or a subpoena must state that it is invoking a privilege and must specify which privilege or doctrine it is invoking.  The parties are to confer to determine the format and time for production of privilege logs.

(f) *Interrogatories.*  Counsel shall, to the extent possible, combine their interrogatories to any party into a single set of questions.  No question shall be asked that has already been answered in response to interrogatories served by another party unless there is reason to believe that a different answer will be given.  Any party can move to compel answers to interrogatories based upon interrogatories propounded by any other party.  Each party shall serve no more than 50 interrogatories upon any other party without leave of Court.  For purposes of this provision, ULLICO shall constitute a single party.  Pursuant to Rule 26(e)(2), the parties must promptly amend answers to interrogatories to provide complete additional or corrective information.

(g) *Depositions.*  Carabillo and Luce may take up to 12 depositions of fact witnesses as a group without leave of Court, and Carabillo and Luce each has the right to notice up to 6 depositions solely at his discretion.  Counterclaim Defendants may take up to 18 depositions of fact witnesses as a group without leave of Court, and each Counterclaim Defendant has the right to notice up to 3 depositions solely at its own discretion.  Carabillo and Luce may cede one or more of their depositions to the other as may Counterclaim Defendants.  ULLICO may take up to 20 depositions of fact witnesses without leave of Court, and may take the depositions of the former officers for up to three non-consecutive days of seven hours each without leave of Court.

5. *Experts.* Rule 26(a)(2) Expert Disclosures shall be made on all the claims in the consolidated actions 30 days after the completion of fact discovery. Rule 26(a)(2)(C) Rebuttal Expert Disclosures shall be made 30 days after Rule 26(a)(2) Expert Disclosures. Expert Discovery shall be completed 30 days after Rule 26(a)(2)(C) Rebuttal Expert Disclosures. All Summary Judgment and *Daubert* Motions shall be filed no later than 60 days after the completion of Expert Discovery.

6. *Pending Motion for Protective Order.* Upon request of the moving party, Joseph A. Carabillo's previously filed Motion for Protective Order (Docket No. 92 in the 03-1556 matter) is hereby deemed withdrawn.

7. *Trial.* Dates for the final Pretrial Conference(s) and trial(s) shall be set by further order of the Court.

SO ORDERED.

Entered May __, 2005.

_____
Richard J. Leon
United States District Judge

6