IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JAMES W. LUCE,                          :
                                        :
     Plaintiff,                         :
                                        :
v.                                      :
                                        :
THE UNION LABOR LIFE AUXILIARY          :        Civil Action No. 03-cv1014
RETIREMENT BENEFITS PLAN, *et al.*,     :
                                        :
     Defendants.                        :

**MEMORANDUM IN SUPPORT OF PLAINTIFF JAMES W. LUCE'S
MOTION FOR A PRELIMINARY INJUNCTION PREVENTING
THE ULLICO DEFENDANTS FROM PROSECUTING A
COUNTERCLAIM AGAINST LUCE IN A RELATED ACTION IN THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

I. <u>Introduction</u>

A.    **ULLICO, Inc.'s New Board of Directors Bowed to Political Pressure to
Improperly Withhold Luce's Pension.**

    Plaintiff James W. Luce ("Luce") is the recently retired Executive Vice President

of ULLICO Inc.  ULLICO, Inc. is a Maryland corporation formed in 1987 for the

purpose of recapitalizing the Union Labor Life Insurance Company (hereinafter

"ULLICO").  ULLICO was founded in 1925 by the American Federation of Labor to

make life insurance available to trade union members who could not obtain it elsewhere.

Since the initial capitalization of ULLICO, Inc. with the proceeds of its private placement

of stock to large trade unions and their pension plans in 1987, ULLICO, Inc. has operated

as a private holding company for ULLICO and several other financial services subsidiaries serving the labor community.

This civil action, and a related civil case, <u>Carabillo v. ULLICO, Inc.</u>, C.A. No. 03-1556 (RJL), pending in the United States District Court for the District of Columbia before The Honorable Richard J. Leon, (hereinafter the "Carabillo Case") are the product of recent, tumultuous and highly public media exposés and political attacks on the former directors and officers of ULLICO, Inc. *Business Week, The Wall Street Journal, The Washington Post* and various Senators and Congressmen have accused them of unfairly profiting on repurchases of their stock by ULLICO, Inc. on terms and conditions, and at prices, that were unavailable to the other shareholders.

1.    *Business Week* "Breaks" the Story.

On April 8, 2002, *Business Week* published a story titled "A Black Eye for Labor" that criticized directors of ULLICO, Inc. for trading in the company's stock. The article charged that the directors had obtained a "disproportionate share" of an extraordinary one billion dollar windfall profit ULLICO, Inc. had reaped because of its executives' presciently timed seven and a half million dollar investment in the predecessor to Global Crossing Ltd. seven months before that company's initial public offering in September 1998. The story was picked up by the *Wall Street Journal* and other outlets due to the intense media focus on corporate governance abuses in the midst of the Enron scandal unfolding in the spring and summer of 2002. Subsequent scurrilous articles by less reputable sources accused several prominent leaders of major labor unions, who sat on the Board of Directors of ULLICO, Inc. of hypocrisy for criticizing lax corporate

governance oversight by Enron directors while doing little better themselves in running ULLICO, Inc. Despite the spuriousness of these comparisons – Enron's bankruptcy wiped out all of its shareholders' equity while ULLICO, Inc. returned hundreds of millions of dollars in stock profits to its shareholders – the targeted labor union leaders were understandably sensitive about the charges. John Sweeney, President of the AFL-CIO, and a ULLICO, Inc. director, immediately demanded an independent investigation of the propriety of the purchase and sale of ULLICO, Inc. stock by its directors.

    2.    <u>Anti-Labor Interest Groups Joined the Fray.</u>

In the ensuing months anti-labor organizations such as the National Right to Work Legal Defense Foundation ("NRWLDF") and the National Legal and Policy Center seized the opportunity to launch transparently political attacks on organized labor using ULLICO as a "poster child" for alleged union corruption. The NRWLDF filed an unfair labor practice complaint against ULLICO with the National Labor Relations Board that has never been adjudicated. The National Legal and Policy Center took out a full page advertisement in *Roll Call* magazine, a prominent Capitol Hill publication, in the form of an "open letter" to ULLICO Board members demanding they refund their stock profits and resign from the Board.

    3.    <u>ULLICO, Inc. Hired James Thompson to do an Internal Investigation.</u>

On April 29, 2002, the Board of Directors of ULLICO, Inc. responded to the media firestorm by appointing former Republican Governor James Thompson of Illinois and his Chicago law firm Winston & Strawn, as Special Counsel to investigate the events surrounding ULLICO, Inc.'s 1998 and 1999 stock sales to directors and senior officers,

its stock repurchase programs and the distribution of the gains on the Global Crossing investment among the various shareholders. Thompson's investigation lasted seven months, included 40 witness interviews and a review of thousands of pages of documents at a cost to ULLICO, Inc. of millions of dollars. On November 26, 2002, Thompson submitted a written Special Counsel Report to the ULLICO Board (the " Thompson Report"). (Exhibit 1).

4.    The ULLICO, Inc. Board of Directors' Delegated Review of The
    Thompson Report to a Special Committee of Independent Directors.

On December 2, 2002, the ULLICO Board of Directors met and, despite enormous political pressure to release the Report, voted not to make the Thompson Report public. Instead, the Board implemented the recommendation of the Thompson Report to create a Special Committee of independent directors who had not participated in the challenged stock transactions. As the Thompson Report recommended, the Board delegated to the Special Committee the job of reviewing the Report and deciding whether to accept its conclusions and recommendations.

The Special Committee (hereinafter the "Dunlop Committee") was led by its Chairman John Dunlop, a former Labor Secretary in the Ford Administration, Professor Emeritus of Economics at Harvard University and an advisor on labor relations to every American president since Franklin D. Roosevelt.[1] His Co-Chair was Daniel Mintz, M.D. Professor of Medicine (and founder of the Diabetes Research Institute) at the University

---

[1] Unfortunately, Professor Dunlop died in early October before he could testify about his work as Co-Chair of the Special Committee. His Obituary in the October 4, 2003 New York Times portrays an amazing career of public and academic service. (Exhibit 2).

of Miami. The Dunlop Committee members included Terence O'Sullivan, President of

the Laborers International Union and ULLICO Inc.'s current Chairman and CEO; Lenore

Miller, former President of the Retail, Wholesale & Department Store Union and a

current ULLICO, Inc. Director; James Rankin, President of the Glass, Molders, Pottery,

Plastics and Allied Workers International Union and a current ULLICO, Inc. Director;

and Vincent Sombrotto, former President of the Mailhandlers Union and a current

ULLICO, Inc. Director; as well as former ULLICO, Inc., Directors John Joyce, former

President of the Bricklayers & Allied Craft Workers, and John Wilhelm, President of the

Hotel Employees and Restaurant Employees International Union. The Dunlop

Committee thoroughly reviewed the Thompson Report and its recommendations. Its

members sought and obtained advice from Thomas Green of Sidley, Austin, Brown &

Wood, and James J. Hanks, Jr. the author of the leading publication on Maryland

corporate law and a partner in the Baltimore office of Ballard Spahr Andrews &

Ingersoll, L.L.P.

5.    The Dunlop Committee Refused to Adopt Thompson's Findings and
      Recommendations.

      The Dunlop Committee rejected Thompson's conclusion that ULLICO's directors,

as well as its then Chairman, President and CEO Robert Georgine, and its Chief Legal

officer, Joseph Carabillo, had breached their fiduciary duties of loyalty and care to the

Company. Consequently, it rejected Thompson's recommendation that those individuals

be required to return the profits they made on ULLICO, Inc.'s stock. The Dunlop

Committee also rejected Thompson's enthusiastic embrace of Dean Mark Sargent's

Jesuitical interpretation of Maryland fiduciary duty law. James Hanks' practical observation that post-hoc repudiation of fully disclosed stock repurchase programs and executive compensation practices that appeared reasonable and entirely fair to the corporation and its outside counsel, including Arnold and Porter, at the time they were approved by disinterested members of the ULLICO, Inc. Compensation Committee and Board is not consistent with Maryland law. Further, the Special Committee declined to adopt Thompson's recommendation that the Board conduct a further investigation to determine the reasonableness of the "compensation" received by John Grelle, ULLICO, Inc.'s former CFO, and Luce in the form of stock sales and the portion of their deferred compensation benefits earned based on their "deemed" investment in ULLICO, Inc. stock.[2] (Exhibit 3).

6.    Political Pressure Mounted on ULLICO, Inc. to Release the Thompson Report.

Chairman Georgine's recommendation that the Board not make the Thompson report public, and instead refer the matter to the Dunlop Committee, infuriated several prominent directors who resigned from the ULLICO Board in disagreement with the Board's adoption of Georgine's recommendation. On December 2, 2002, AFL-CIO President John Sweeney, AFL-CIO Executive Vice President Linda Chavez-Thompson, and Frank Hanley, President of the International Union of Operating Engineers resigned

---

[2] The Thompson Report stated that Grelle and Luce "did not appear to be significantly involved in the creation or promotion of the 1998 and 1999 stock offer programs, the 2000 stock repurchase program or the "discretionary" stock repurchase program. Nor does it appear that they were directly responsible for recommending or approving any of these programs." (Exhibit 1 at 101).

6

from the ULLICO, Inc. Board on the grounds that the investigation process had not resulted in adequate disclosure of the facts to the public or to rank and file union members. In March 2003, Carpenters and Joiners of America Union President Douglas J. McCarron and Hotel and Restaurant Workers President John Wilhelm also resigned from the ULLICO, Inc. Board.

On March 28, 2003, the Dunlop Committee's Report was presented to the ULLICO, Inc. Board. The Dunlop Committee Report observed that the Thompson Report uncovered no illegality on the part of Board members and officers, and concluded that there was no basis to call for return of profits on sale of ULLICO, Inc. stock. Although committee members Sombrotto and O'Sullivan agreed that nothing illegal was done, Sombrotto opined that voluntary restoration of stock profits would be appropriate while O'Sullivan recommended that only the full adoption of the Thompson Report's remedial actions would put the issues behind the Company. At this same meeting, the ULLICO, Inc. Board voted to disclose both the Thompson Report and the Dunlop Committee's Report to its shareholders, governmental authorities and the press.

7.    Release of the Thompson Report Spured Media Attacks, Congressional Investigations and Election of a New Board.

On May 2, 2003, *The Washington Post* editorial page weighed in with an editorial titled: "Give Back the Money" that advocated ULLICO, Inc. follow Thompson's recommendations and force the return of stock trading profits by all ULLICO, Inc.'s officers and directors. The editorial noted that the labor unions that controlled the majority of the ULLICO, Inc. voting stock had decided that only a new group of "reform

directors" that "appears to be committed to both ousting Mr. Georgine and recovering some of the gains" could restore confidence in the company and quell the firestorm of adverse publicity. (Exhibit 4).

On May 8, 2003, a slate of new directors who pledged to adopt the Thompson Report recommendations, was elected at the annual meeting of the ULLICO, Inc. shareholders. Robert Georgine resigned as President and Chairman of the Board at the Board of Directors meeting held earlier that day.

The Senate Governmental Affairs Committee chaired by Senator Collins (R– Maine) promptly scheduled a hearing on the "ULLICO stock scandal" matter for June 19, 2003. Thompson was the lead witness at the hearing. Senator Collins and other Senators congratulated Thompson on his Report and made it clear that the new ULLICO, Inc. Board had no choice but to implement his recommendations. Senator Collins announced her prejudgment in a carefully crafted opening statement carried live on C-SPAN before a single witness testified: "Senior ULLICO officials who profited from those transactions should return those funds to their rightful owners – the workers and families who own shares in the company." Press Statement: Senator Collins Urges ULLICO to Continue Its Cleanup Efforts, June 19, 2003. (Exhibit 5). The House Committee on Education and the Workforce chaired by Representative John Boehner (R–Ohio) convened its own hearing, and issued its own condemnatory press release, on June 17, 2003. (Exhibit 6).

The new ULLICO, Inc. Board got the message sent by the legislative branch of the federal government - loud and clear. It quickly appointed a new Subcommittee chaired by Abner Mikva, the former Chief Judge of the United States Court of Appeals for the

District of Columbia Circuit to: " [Review] the remaining stock transactions, as well as past executive compensation and past attorney and other service provider conduct." *See* Testimony of Terrance M. O'Sullivan, Chairman & CEO of ULLICO, Inc., Senate Governmental Affairs Committee, United States Senate, June 19, 2003. (Exhibit 7 at 3). That Subcommittee reflexively recommended that ULLICO, Inc. demand repayment from former officials and directors, and require the resignation of any director who failed to comply – just as they had been warned to do by Senator Collins and Representative Boehner.

B.    **Luce Served ULLICO, Inc. Loyally for Over Twenty Years, was Allowed to Take Early Retirement and was Rehired as a Consultant.**

Luce served ULLICO and, subsequently, ULLICO, Inc. with distinction for over 20 years, rising to the position of Executive Vice President of ULLICO, Inc. in 1985. No one who served on the Board of Directors of ULLICO, Inc. prior to May 8, 2003 ever accused Luce of being disloyal to ULLICO, Inc. Thompson reserved judgment on Luce's conduct in his Report, which simply recommended further consideration of the reasonableness of Luce's compensation, including the stock repurchase offers made to him by Chairman Georgine. Luce met with ULLICO, Inc.'s new Chairman and CEO Terrance O'Sullivan on May 9, 2003, and communicated his need to make a final decision whether to accept the company's offer of the Early Retirement Program adopted by the ULLICO, Inc. Board of Directors on April 16, 2003. First Amended Complaint (F. Am. Compl. ¶ 32). Luce offered to negotiate an acceptable plan for the return of his profits on ULLICO, Inc. stock sales and asked O'Sullivan to consider whether Luce's

continued employment or his services as a consultant after retirement would assist in the

management transition. Luce was allowed to retire, effective May 31, 2003, under the

Early Retirement Program. Luce's potential contributions to an efficient management

transition at ULLICO, Inc. were so obvious and important that Ed Grebow, the new

Acting President of ULLICO, Inc., asked him to stay on in a consulting capacity for sixty

days after he retired. Luce agreed and the parties signed a Consulting Agreement under

which he remained at ULLICO, Inc. through July 2003. (F. Am. Compl. ¶¶ 51-54).

C.     **ULLICO, Inc. Unilaterally Froze Luce's Benefits After he Retired.**

ULLICO and ULLICO, Inc. sponsor several employee benefit plans. Luce was a

beneficiary of three of those plans: the ULLICO, Inc. Pension Plan and Trust (the

"Qualified Plan"); the Union Labor Life Auxiliary Retirement Benefits Plan (the

"Auxiliary Plan"); and the ULLICO, Inc. Nonqualified Deferred Compensation Plan (the

"Deferred Comp Plan"). The ULLICO, Inc. Pension Plan and Trust is the ERISA

qualified benefits plan for all employees of ULLICO, Inc.'s subsidiary companies. The

Auxiliary Plan was created as an unfunded "excess benefits plan" by Union Labor Life

Insurance Company in 1983 and later amended to become a "top hat" plan. (F. Am.

Compl. ¶¶ 16-19). The Deferred Comp Plan was adopted by the Compensation

Committee of ULLICO, Inc. in August 1998 to allow certain eligible employees,

including the Chairman, CEO and President, Executive Vice President, Senior Vice

President-Investments, Senior Vice President and Chief Financial Officer and Vice

President and Chief Legal Officer, to defer up to twenty five percent (25%) of their

annual employment compensation until termination of employment or retirement, thereby

10

deferring income tax liability consistent with federal law. Under the early retirement program, Luce was entitled to begin receiving benefits under each of those plans as of May 31, 2003.

    1.    <u>Luce is Receiving Qualified Plan Benefits.</u>

ULLICO, Inc. is currently paying Luce the monthly retirement payment to which he is entitled under the Qualified Plan because retirement benefits payable under a qualified plan are not subject to alienation or forfeiture. *See* 29 U.S.C. §§ 1051 <u>et</u>. <u>seq</u>., and <u>Guidry v. Sheet Metal Workers Nat'l Pension Fund</u>, 493 U.S. 365, 376-77 (1990) (no equitable exception to ERISA's anti-alienation provisions applicable to "vested" benefits even in the event of embezzlement). However, ULLICO, Inc. has refused to pay Luce the benefits owed to him under the Auxiliary Plan and the Deferred Comp Plan apparently because the statutory anti-alienation provisions of ERISA do not apply to "top hat" plan benefits. *See* <u>Aramony v. United Way</u>, 1998 U.S. Dist. LEXIS 5885, *32-33 (S.D.N.Y. 1998) *aff'd in part, rev'd in part and remanded on other grounds*, 191 F.3d 140, 146-47 (2d Cir. 1999) (federal common law derived from relevant state contract and tort law controls the attempt to withhold payment of "top hat" benefits).

    2.    <u>ULLICO, Inc. Improperly Froze all of Luce's Top Hat Plan Benefits.</u>

Informally on June 8, 2003, Grebow and Damon Silvers, Special Counsel to ULLICO, Inc.'s Chairman and CEO O'Sullivan, told Luce that despite their personal belief that he had done nothing wrong and had not been disloyal to ULLICO, Inc., the new Board of Directors would take actions to withhold the additional Plan benefits (F. Am. Compl. ¶ 37-38). Luce met with ULLICO, Inc.'s Chairman and CEO on July 11,

11

2003, to request an explanation of the Company's intention with respect to the additional Plan benefits. At that meeting Luce again offered to continue in a consulting role if the terms and conditions of return of his profits on the sale of ULLICO, Inc. stock could be resolved in some mutually agreeable manner. O'Sullivan told Luce that he did not believe Luce had done anything wrong and promised to provide answers to Luce's questions and a response to his offer of compromise. After not receiving a response to multiple inquiries to O'Sullivan, Luce made several written demands for an explanation of ULLICO, Inc.'s refusal to pay him benefits due under the "top hat" plans. However, these demands were met with silence (F. Am. Compl. ¶¶ 39-40). In fact, it was not until two months later that O'Sullivan sent Luce a letter demanding return of his stock profits in response to this legal action. (F. Am. Compl. ¶ 44).

Luce's benefits under these additional plans are substantial. His Auxiliary Benefit Plan entitlement is at least $18,330 per month. Through November 1, 2003, these unpaid benefits equal at least $109,980. His unpaid Deferred Compensation Plan benefits were worth approximately $1.4 million when the First Amended Complaint was filed. (F. Am. Compl. ¶ 30). He accepted ULLICO, Inc.'s offer of early retirement, in reliance upon explicit promises of payment of both benefits from ULLICO, Inc. and needs the funds to support his family during his retirement. (F. Am. Compl. ¶ 32-34).

3.    ULLICO, Inc. has no Legal Justification for Freezing Luce's Supplemental Benefits.

Neither the Auxiliary Plan nor the Deferred Comp Plan can use self help to offset their claims against Luce's benefits *pendente lite*. In 1997 Congress specifically

12

amended ERISA to allow a qualified plan to offset benefits due to a fiduciary only after

entry of a judgment or conviction that adjudicated the fiduciary's liability to the Plan for

breach of fiduciary duty. 29 U.S.C. § 1056(d)(4)(1)(A)(i) and (ii). There is no authority

for exempting these nonqualified plans from the normal civil adjudication process,

especially when the fiduciary duty claim upon which they base the right of offset does

not relate to Luce's conduct as a Plan fiduciary! The Auxiliary Plan and Deferred Comp

Plan are not a law unto themselves.

    The ULLICO, Inc. defendants are estopped from inducing Luce to accept early

retirement by specifically promising to honor the Plans' obligations to him and then

refusing to pay him the promised benefits by claiming a right to "offset" them against

claims that he breached his fiduciary duty as an officer of ULLICO, Inc., years ago, when

acting as settler of those same employee benefit plans. Aramony v. United Way, 191

F.3d 140, 152 n.5 (2d Cir. 1999) ("extraordinary circumstances" justifying application of

promissory estoppel in ERISA benefits litigation includes use of promise of benefits to

induce plaintiff to retire).

    Moreover, the ULLICO, Inc. defendants cannot claim that Luce forfeited his

retirement benefits by conduct disloyal to ULLICO, Inc. ULLICO, Inc. knew the

complete details of Luce's Deferred Compensation Plan benefits and stock profits. Both

were fully disclosed in the Thompson Report. Exhibit 1 at 89-90. The Dunlop

Committee found nothing improper or disloyal about either Luce's deemed investment in

ULLICO, Inc. stock under the Deferred Comp Plan or in ULLICO, Inc.'s repurchases of

his stock. Neither the new Chairman O'Sullivan nor the new President Grebow sought

to terminate Luce's employment. Instead they allowed him to take early retirement and then rehired him as a consultant while, in point of contrast, firing Chief Legal Officer Carabillo for cause to prevent him from qualifying for retirement benefits (F. Am. Compl. ¶¶ 53-54). By failing to discharge Luce for alleged disloyalty within a reasonable period after learning the facts upon which its ersatz accusation of disloyalty is based, ULLICO, Inc. condoned Luce's conduct, waived any forfeiture claim and, therefore, cannot refuse to pay him the additional pension benefits. Aramony v. United Way, 1998 U.S. Dist. LEXIS 5885, *36-37 (S.D.N.Y. 1998) *aff'd in part, rev'd in part and remanded on other grounds*, 191 F.3d 140 (2d Cir. 1999).

D.    The Procedural History of the District Court Litigation Between These Parties.

Luce filed the initial Complaint in this action on August 8, 2003. In the initial Complaint he sought a declaratory judgment of his right to payment of benefits from the Auxiliary Plan and an award of accrued benefits due from the Auxiliary Plan. The Auxiliary Plan was served by substituted service under the Virginia long-arm statute on August 22, 2003. ULLICO's registered agent, James F. McNulty was served in person with process on August 25, 2003.

In early September 2003, Miller & Chevalier, Chartered entered an appearance as counsel for both Defendants. Anthony J. Trenga requested an extension of time to answer or otherwise plead the initial complaint until October 1, 2003. Plaintiff's counsel agreed as is the custom in this District. The Defendants filed an appropriate Motion and Stipulation on September 11, 2003 and on September 16, 2003, this Court entered an Order granting the relief.

On September 11, 2003, Terrance O'Sullivan, Chairman of the Board of ULLICO, Inc.,

sent Luce a letter demanding repayment within thirty (30) days of all profits Luce

received when ULLICO, Inc. repurchased any of his stock, whether as part of a formal

company tender offer or a discretionary offer to repurchase extended to Luce by

Georgine (F. Am. Compl. at Ex. 11). On the same day, Ted Green, General Counsel to

ULLICO, Inc. sent Luce a letter stating unequivocally that ULLICO, Inc. would not pay

Luce his pension benefits under the Auxiliary Plan or the Deferred Comp Plan (F. Am.

Compl. at Ex. 10).[3]

In response, Luce filed his First Amended Complaint in this action on October 7,

2003. That Complaint joined ULLICO, Inc. and the ULLICO, Inc. Nonqualified

Deferred Compensation Plan as additional defendants and added new Counts III and IV

seeking a declaration of his rights under the Deferred Comp Plan and an award of

benefits under that Plan.

On October 17, 2003, ULLICO, Inc. filed an Answer and Counterclaim in

Carabillo v. ULLICO, Inc. The counterclaim joined ULLICO, the Deferred Comp Plan

and the Auxiliary Plan as counterclaim plaintiffs. It also joined Luce as an additional

counterclaim defendant along with Robert A. Georgine, John K. Grelle and other nominal

---

[3] On September 30, 2003, counsel for Luce and the ULLICO defendants met in person to discuss the possible parameters within which Luce's claims might be settled. During those discussions, Luce's counsel requested a commitment that ULLICO would not file suit against Luce in any other jurisdiction and would file all of its counterclaims in this action. Counsel for ULLICO, was forthright in stating he could not make that commitment. Luce's counsel advised counsel for the ULLICO defendants that he was considering filing a First Amended Complaint joining the ULLICO, Inc. Nonqualified Deferred Compensation Plan and seeking a declaration of rights under that plan as well. Counsel for the ULLICO defendants requested an additional extension of time to plead in response to the original Complaint. Counsel for Luce agreed.

parties. (Exhibit 8). The counterclaim in the Carabillo case ("Carabillo Countercl.")

"seeks compensatory and equitable relief in connection with millions of dollars in

[alleged] windfall profits and other benefits that plaintiff and counterclaim defendant

Joseph Carabillo ("Carabillo") and certain other corporate insiders joined as counterclaim

defendants [allegedly] reaped through self-dealing during the period 1998-2001, all at the

expense of, and in [alleged] violation of their fiduciary and contractual duties to,

ULLICO and its shareholders." Carabillo Countercl. ¶ 1.

　　　The Carabillo Counterclaim contains ten counts, only three of which claim relief

against Luce. Count IV – Breach of Fiduciary Duty; Aiding and Abetting Breaches of

Fiduciary Duty and Unjust Enrichment (Against Luce) seeks judgment against Luce for

disgorgement of all profits he made on ULLICO, Inc. stock sales amounting to $789,299.

Carabillo Countercl. ¶ 109 and Wherefore Clause ¶ 4.  Count VI – Declaratory Judgment:

Auxiliary Retirement Benefits Plan (Against Georgine, Carabillo, Grelle and Luce) seeks

a declaratory judgment that the Auxiliary Plan was not properly amended in October

1999 and that Luce may not recover any benefits "calculated with reference to the

Amendment". Carabillo Countercl. ¶¶ 67-69 and 119-126.  This claim is the mirror

image of Count I in Luce's First Amended Complaint in this case. F. Am. Compl. ¶¶ 62-

79.  Count VII – Declaratory Judgment:  The Deferred Compensation Plan (Against

Georgine, Carabillo, Luce and Grelle) seeks a declaratory judgment that the Deferred

Comp Plan allowing participants to make "deemed investments" in ULLICO, Inc. stock

was "enacted without Board approval and was otherwise enacted in violation of the

fiduciary duties owed to ULLICO". Carabillo Countercl. ¶ 128, and therefore Luce is

16

"not entitled to a distribution of benefits under the Deferred Compensation Plan based on "deemed investments" in ULLICO stock as they claim". Carabillo Countercl. ¶ 133. This claim is the mirror image of Count III in Luce's First Amended Complaint in this case. F. Am. Compl. ¶ 87-95.

On October 17, 2003, as required by Local Rule 405(b)(2) of the United States District Court for the District of Columbia, ULLICO, Inc. filed a "Notice of Designation of Related Civil Cases pending in this or any other United States Court" identifying this case as involving common issues of fact and arising out of the same event or transaction. (Exhibit 9). Thus, there can be no good faith dispute that the claims made against Luce in the Carabillo Counterclaim are compulsory counterclaims in this first filed action.

## II. **Argument**

A.    **The Claims Against Luce in the Carabillo Case are Compulsory Counterclaims in this First filed Action.**

Federal Rule of Civil Procedure 13(a) Compulsory Counterclaims, provides in pertinent part:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, . . . .

Luce is not a plaintiff in the Carabillo Case, and therefore, is not an "opposing party" against whom ULLICO, Inc. was required to assert counterclaims in that action.[4] ULLICO, Inc. decided to join the employee benefit plans as additional counterclaim plaintiffs and to join the former executive officers of ULLICO, Inc. as additional counterclaim defendants. ULLICO, Inc. also elected to assert permissive counterclaims against all of those new defendants in the Carabillo Counterclaim. ULLICO, Inc. and the two plans had no right to bring those claims against Luce as permissive counterclaims in the Carabillo Case. As the ULLICO, Inc. counter-claimants conceded in their Local Rule 405(b)(2) statement, those claims arise out of the same transaction or occurrence that is the subject matter of Luce's first filed action in this Court and, therefore, they are compulsory counterclaims that must be filed here unless: (1) the presence of third parties over whom the court cannot acquire jurisdiction is required for adjudication of those claims; or (2) at the time this action was commenced, on August 8, 2003, the claims were the subject of another pending action. Neither of those exceptions to Fed. R. Civ. P. 13(a) applies.

---

[4] Since the United States District Court for the District of Columbia lacks subject matter jurisdiction over the claims against Luce under the compulsory counterclaim rule, an independent basis for jurisdiction must exist as to him. The claims are compulsory counterclaims here so there is no federal question jurisdiction as to Luce. Complete diversity does not appear on the face of the original Carabillo complaint or the ULLICO, Inc. defendants' counterclaim. Even if original diversity did exist, 28 U.S.C. § 1367 (b) excludes "pendant party" supplemental jurisdiction in diversity cases. Mayatil v. Lizatex, U.S.A., 1993 U.S. Dist. LEXIS 6527, *7 (S.D.N.Y. 1993) (parties joined under Rule 13 (h) are within the exclusion); Hot Springs Associates, Inc., v. Kiesler, 1992 U.S. Dist. LEXIS 6042, *8-14 (W.D. Va. 1992). Thus, the only possible basis for subject matter jurisdiction over the claims against Luce is as "ancillary" to the alleged federal case and controversy raised in the Carabillo case under the supplemental jurisdiction statute. 28 U.S.C. § 1367(a). Whether the United States District Court for the District of Columbia will decide that it has supplemental jurisdiction and whether the court will decline to exercise it as to Luce under § 1367(c) remains to be seen.

1.    There are no Required Parties Over Whom this Court Cannot Acquire
Jurisdiction.

The ULLICO, Inc. defendants' claims against Luce do not require any other

parties for their complete adjudication.  A party is "required" for purposes of Fed. R. Civ.

P. 13(a) only when the party is "indispensable" for purposes of Fed. R. Civ. P. 19(b).

Southern Union Co. v. Southwest Gas Corp., 165 F. Supp. 2d 1010, 1035 (D.C. Ariz.

2001); Owens v. Blue Tee Corp., 177 F.R.D. 673, 681 (M.D. Ala. 1998); Harley-

Davidson Motor Co. v. Chrome Specialists, Inc., 173 F.R.D. 250, 253 (E.D. Wis. 1997);

Grumman Systems Support Corp. v. Data General Corp., 125 F.R.D. 160, 165 (N.D. Cal.

1988).

Carabillo, Grelle and Georgine are not indispensable parties to any counterclaim in

this case against Luce.  Under Fed. R. Civ. P. 19, the court must determine whether an

absent party is "necessary" and then, if that party cannot be joined, must decide whether

the party is "indispensable".  Grelle and Carabillo are both Virginia residents, Carabillo

Countercl. ¶¶ 8-9, and therefore could be joined as counterclaim defendants in this Court.

Georgine, on the other hand, is a Maryland resident.  Carabillo Countercl. ¶ 7.

Consequently acquisition of personal jurisdiction over him in this Court under the

Virginia long-arm statute is problematic.  However, Georgine is neither a "necessary" nor

an "indispensable" party in this action.  Even if, Georgine was alleged to be jointly and

severally liable with Luce for damages to the ULLICO defendants, under well established

federal law, he would not be classified as a necessary party by virtue of that fact.

Blumenthal-Kahn Elec. Partnership v. American Home Assurance Co., 2002 U.S. Dist.

LEXIS 25506, *3 (E.D. Va. 2002). However, ULLICO alleged joint and several liability only against Georgine and Carabillo with respect to Count I of the Carabillo Counterclaim. Luce was alleged to be separately liable for breach of fiduciary duty or aiding and abetting the fiduciary duty of another. Carabillo Countercl.; Wherefore Clause, ¶¶ 1-4 at 42.

Complete relief can be afforded to all the parties properly before this Court with respect to the pension benefit claims in Georgine's absence. Georgine does not claim an interest relating to the subject matter of the Luce litigation that in his absence might impair or impede his ability to protect his interests. He will not be bound by any declaratory judgment in the Luce case. If Georgine subsequently makes similar claims for benefits against the plans, those claims will not be barred by doctrines of issue or claim preclusion as he is not a party to this action. Keeping in mind that the Auxiliary Plan and the Deferred Compensation Plan are unfunded and the claims against the plans are essentially claims by general creditors against the assets of ULLICO, Inc. and ULLICO, it is obvious that adjudication of the rights and liabilities of Luce under those plans does not create a risk of harm to Georgine. A judgment in favor of Luce in this case will not cause a reduction or impairment of a discrete fund of plan assets to the prejudice of absent claimants as might be the case with a funded qualified plan.

More importantly, Georgine and Carabillo are alleged to have engaged in qualitatively different conduct than Luce and Grelle as both the Carabillo Counterclaim and the Thompson Report from which it was derived, concede. Thus, adjudication of Luce's rights to benefits, and the plan's defenses to payments of those benefits, does not

require adjudication of the conduct of Carabillo or Georgine. For those reasons, it is clear that Georgine is not an indispensable party to the ULLICO counterclaims and those counterclaims are indeed compulsory in this action.

**B.    This Court Should Decide Whether ULLICO's Compulsory Counterclaims are Adjudicated in this First Filed Action.**

The federal court in which the first filed case is brought decides the question of whether the first filed rule, or any of the exceptions to it, applies. <u>Affinity Memory & Micro, Inc. v. K&Q Enterprises, Inc.</u>, 20 F. Supp. 2d 948, 954 n.11 (E.D. Va. 1998). As Luce filed this action on August 8, 2003, and the counterclaims filed against him in the Carabillo Case are compulsory counterclaims as to him, this Court was the first to acquire jurisdiction and is the proper court to decide the entire case, <u>Laughlin v. Edwards Business Machines, Inc.</u>, 155 F.R.D. 543, 545 (W.D. Va. 1994), unless the balance of conveniences or special circumstances warrant transfer to the United States District Court for the District of Columbia. *See* 20 F. Supp. 2d at 954; <u>Daimler-Chrysler Corp. v. General Motors Corp.</u>, 133 F. Supp. 2d 1041, 1043 (N.D. Ohio 2001) (first to file rule makes good sense, establishes a bright line, is easy to apply and comports with rules of comity); <u>Kimberly-Clark Corp. v. McNeil-PPC, Inc.</u>, 260 F. Supp. 2d 738, 740 (E.D. Wis. 2003).

**C.    <u>Luce's Choice of this Forum is Entitled to Special Consideration.</u>**

Ordinarily a plaintiff's choice of forum is entitled to deference. If that choice is of his home forum, as Luce's is here, it is entitled to even greater weight than if he had

chosen a foreign forum.[5]  In an ERISA benefits case brought by a plan participant, the

plaintiffs' choice of venue is entitled to even greater deference.  Board of Trustees, Sheet

Metal Workers National Fund v. Baylor Heating & Air Conditioning, Inc., 702 F. Supp.

1253, 1256 n.11-13 (E.D. Va. 1988).  Consequently, unless special circumstances warrant

or the balance of convenience strongly tips in favor of the District of Columbia this Court

should retain jurisdiction.

D.    **Neither the Balance of Conveniences Nor Special Circumstances Warrant a Transfer of Venue to the United States District Court for the District of Columbia.**

  1.    The Convenience of the Witnesses does not Require Transfer.

Luce is a Virginia resident.  ULLICO, Inc. and ULLICO have their principal

places of business in the District of Columbia.  As is usually the case under these

circumstances, when the plaintiff files suit in his home district, "convenience of the

parties rarely if ever operates to justify transfer".  702 F. Supp. at 1259.

The convenience of the witnesses does not favor a transfer of this case to the

United States District Court for the District of Columbia.  Three of the four senior

officers of ULLICO, Inc., Luce, Grelle and Carabillo, whose conduct is challenged in the

Carabillo Counterclaim, live in Virginia.  Only Georgine lives in Maryland.  The

testimony of each of these four gentlemen will be essential for adjudication of the various

claims and defenses of the parties and their credibility is likely to be an important issue in

the case.  Consequently, they are witnesses who matter for transfer of venue purposes.

---

[5]  In contrast, Carabillo chose a foreign forum when he filed his original action in the United States District Court for the District of Columbia.

702 F. Supp. at 1258 n.17. The current and former members of the Executive Committee, Benefits Committee, Compensation Committee and the Board of Directors of ULLICO, Inc. are spread throughout the United States of America. *See* Declaration of Robert E. Scully, Jr. in Support of Motion of James W. Luce, ¶ 4, 5 & 8. Many of those union officials would have to travel to the Washington metropolitan region by air arriving either at Dulles International Airport or Reagan National Airport. The Court can certainly take judicial notice that the United States District for the Eastern District of Virginia, Alexandria Division is at least as convenient for travelers from outside the metropolitan region as is the United States District Court for the District of Columbia. The Virginia side of the river has cheaper lodging, dining and parking, not to mention southern hospitality. As the convenience of the out-of-town witnesses is the same regardless of where this dispute is adjudicated, the deference accorded to the plaintiffs' choice of form is not over ridden by that factor.[6]

2.    The Interests of Justice Favor Adjudicating this Case in the Eastern District of Virginia.

Clearly, the interests of justice are not served by trying the same core issues of fact, simultaneously, in two different federal trial courts located on opposite sides of the same great river. Neither Luce, nor (one hopes) the ULLICO defendants, want to prosecute and defend mirror image cases simultaneously in two different courts. Under the circumstances, the interests of justice require that one court give way to another.

---

[6] Several of those former directors may move from the witness to the party category as they have been threatened with suit by ULLICO, Inc. unless they return stock profits. However, their change in status should have no effect on the transfer analysis.

Here, Luce's choice of the United States District Court for the Eastern District of Virginia as the locale in which prompt and efficient justice may best be accomplished, is correct.

      (a)    Docket Conditions Favor Retaining this Case in the Eastern District of Virginia.

Luce's case and ULLICO, Inc.'s compulsory counterclaims against him and any other defendants ULLICO, Inc. may choose to join, will come to trial in this district move quickly and at far less expense than if the case is tried in the United States District Court for the District of Columbia.

While statistics regarding judicial workload and case disposition rates suffer from the same imprecision and potential for misuse as all such statistical analyses, a comparison of the most recent Judicial Caseload Profile Reports by the Administrative Office of the United States Courts is revealing. The report for the United States District Court for the Eastern District of Virginia is Exhibit 10. The report for the United States District Court for the District of Columbia is Exhibit 11.

The median time from filing to disposition for the surveyed civil cases was 10.5 months in the District of Columbia and just 4.4 months in the Eastern District of Virginia. The median time from filing to trial was 29 months in the District of Columbia and only 9 months in the Eastern District of Virginia.

These statistics reveal that civil cases are disposed of quite rapidly in the Eastern District of Virginia, a fact well known to both the court and to the lawyers who practice here. The rapid disposition is a product of several factors. Discovery usually lasts only

3-4 months in the Eastern District of Virginia. Trial dates are fixed and immutable. The legal culture has evolved a level of discipline adequate to comply with this stringent forced march to trial. Ellis, <u>Quicker and Less Expensive Enforcement of Patents: United States Courts</u>, at 15 (CASRIP Symposium Publication Series, Streamlining International Intellectual Property (1999)).

A pension beneficiary such as Luce, who had his retirement benefits frozen faces a potential financial crises if he cannot obtain prompt adjudication of his claims. He has far more to lose by delay than the corporate defendant ULLICO, Inc. or either of the plan defendants. Luce faces financial ruin if he is forced to wait over two years for his retirement benefits. His interest in prompt adjudication of his pension claims is best accomplished in this district. That fact should be accorded substantial weight in this Court's analysis of whether to retain jurisdiction. <u>Doe v. Connors</u>, 796 F. Supp. 214, 222 (W.D. Va. 1992).

The competing cases are at precisely the same state of development. The ULLICO, Inc. defendants have just answered the original Complaint in the Carabillo Case in the District of Columbia. That case has just been reassigned to United States District Judge Richard Leon. The initial status conference set by Judge Roberts has been canceled and no status conference has yet been scheduled in the United States District Court for the District of Columbia. Consequently, discovery has not begun there. Current Docket Report, Exhibit 12.

The ULLICO defendants are due to plead in response to Luce's First Amended Complaint on Monday, November 3, 2003. An initial scheduling order should be

forthcoming shortly in this case.  Since both cases are at the same stage of development, the court most likely to dispose of the dispute in the shortest period of time is the one in the best position to advance the interests of justice.

E.    **ULLICO, Inc.'s Predilection for Trading on the Reputation of former Circuit Court Judge Abner Mikva Warrants Consideration.**

Abner Mikva, former Chief Judge of the United States Circuit Court of Appeals for the District of Columbia Circuit was elected a director of ULLICO, Inc. on May 8, 2003.  Indeed, he was elected as a member of the "reform" slate of directors.  Shortly thereafter, he was appointed chairman of a special subcommittee of the Board of Directors that was delegated the authority to decide what legal claims to assert against the former officers and directors of ULLICO, Inc.  Carabillo Countercl. ¶ 81.  Unfortunately, ULLICO, Inc. officers in Congressional Testimony, press releases, and in the Carabillo Counterclaim, insist on referring to Abner Mikva as "Judge Mikva".  Id.; Exhibit 7 at 2-3.

There is little reason to believe that the honorific is being used at Abner Mikva's insistence.  By all accounts he is a rather self-effacing gentleman.  Nor is there any reason to believe that United States District Judge Leon would be improperly deferential to ULLICO, Inc. as a litigant in his Court simply because its special litigation committee is chaired by the former Chief Judge of the District of Columbia Circuit.  Indeed, it would be improper in passing on this motion to consider the qualifications or affiliations of the presiding judge in the other district.  To do so would involve unseemly judicial scrutiny in one district of the judges of another.  Minnesota Mining & Mfg. Co. v. Platt, 314 F.2d

369, 375 (7th Cir. 1963) *rev'd and remanded on other grounds*; <u>Platt v. 3M</u>, 376 U.S. 240 (1964).

However, it is improper for a party in any proceeding in federal court to use, in papers involved in the litigation, the designation "judge" to refer to any individual, unless that designation is necessary to accurately describe the person's status at a time pertinent to the lawsuit. Committee on Codes of Conduct, Advisory Opinion No. 72 (reviewed Jan. 16, 1998). This Court certainly may factor into the "interests of justice" analysis the improper attempt by ULLICO, Inc. to trade on Abner Mikva's status as a former judge of the judicial circuit in which the Carabillo Counterclaim was filed. The non-delegable duty of federal trial judges to ensure high standards of professional conduct in the management of cases before them and to prevent appearance of impropriety from arising is certainly a factor to be considered in deciding whether to transfer Luce's case to the United States Court for the District of Columbia. *See generally*, <u>Dacotah Mktg. & Research, L.L.C. v. Versatility, Inc.</u>, 21 F. Supp. 2d 570, 582 (E.D. Va. 1998). As the Committee on Codes of Conduct noted: "A litigant whose lawyer is called "Mr.", and whose adversary's lawyer is called "Judge", may reasonably lose a degree of confidence in the integrity and impartiality of the judiciary". That concern increases when it is the chair of the adversary's special litigation committee who is continually referred to by the corporate opponent as "judge", in the very courthouse in which he once presided.

III. **Conclusion**

For the reasons stated, James W. Luce's Motion for a Preliminary Injunction preventing the ULLICO defendants from prosecuting a counterclaim against Luce in the United States District Court for the District of Columbia should be granted.

Respectfully Submitted,

JAMES W. LUCE
By Counsel

Robert E. Scully, Jr.
Virginia State Bar No.:  19218
REES, BROOME & DIAZ, P.C.
8133 Leesburg Pike, Ninth Floor
Vienna, Virginia  22182
(703) 790-1911
Facsimile No. (703) 790-5249
Counsel for James W. Luce

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of November 2003, a true and accurate copy of the foregoing Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction was hand-delivered to:

Anthony J. Trenga
Miller & Chevalier, Chartered
655 15th Street, N.W., Suite 900
Washington, D.C.  20005-5701
Attorney for Defendants

Robert E. Scully, Jr.

\\Production\data\Clients\12\12410\00003\PLDNGS\031031 Memo in Support(4).doc

28