May 20, 2005



**VIA FACSIMILE AND U.S. MAIL**

Robert E. Scully, Jr.
Rees, Broome & Diaz, P.C.
8133 Leesburg Pike, Ninth Floor
Tysons Corner
Vienna, VA 22182-2706

      Re:    James W. Luce Appeal to the Employee Benefit Plans
                 Administrative Committee as Plan Administrator for the
                 ULLICO Inc. Pension Plan and Trust

Dear Mr. Scully:

      At its April 22, May 5, May 12, and May 18, 2005 meetings, the Employee Benefit Plans Administrative Committee (the "Administrative Committee"), acting in its capacity as the Plan Administrator of the ULLICO Inc. Pension Plan and Trust (the "Plan"), considered Mr. James W. Luce's appeal from the earlier determination of his pension benefit. In your March 30, 2005 letter, you set forth on behalf of Mr. Luce a number of arguments challenging the initial decision that the amount of Mr. Luce's pension should be determined by the application of a 2.0% accrual rate in effect under the Plan prior to July 24, 2001. At issue is whether a document adopted by the Plan's Benefits Committee on July 24, 2001, purporting to amend the Plan to increase the accrual rate to 2.5%, was an effective amendment to the Plan. The Administrative Committee has considered Mr. Luce's submissions and has examined other documents that appear to bear upon the issues that he has raised. For the reasons set forth below, the Administrative Committee has concluded that the purported July 24, 2001 amendment to the Plan was not adopted in accordance with the Plan's provision governing the amendment process and is therefore of no force or effect. Consequently, the Administrative Committee has denied Mr. Luce's appeal, and confirmed that the amount of Mr. Luce's pension was properly determined using a 2.0% accrual rate.

## I. Background

The ULLICO Pension Plan and Trust was adopted by the Board of Directors of ULLICO Inc., effective December 31, 1994. It replaced certain predecessor plans. The original Plan document dated May 1995 (the "1995 Plan") contained the following relevant provisions.

The Plan Sponsor is ULLICO Inc. 1995 Plan, § 2.45. The Plan Sponsor is authorized to appoint the Employee Benefit Plans Administrative Committee, which is "responsible for the implementation and general administration of the Plan and shall have the exclusive right to determine in its sole discretion any questions arising in connection with the interpretation, application or administration of the Plan . . ." 1995 Plan, § 8.4.

The 1995 Plan also provided in relevant part that "[t]he Plan Sponsor reserves the right to modify or amend this Plan at any time. . . . Any amendment shall be made pursuant to a resolution adopted by the Board of Directors of the Plan Sponsor." 1995 Plan, § 11.1.

The normal retirement benefit under the 1995 Plan was determined by multiplying a participant's years of service by 2.0% of the participant's Average Salary. 1995 Plan, § 5.1.[1]

On May 5, 1997, the Executive Committee of the Board of Directors of ULLICO Inc.[2] adopted a series of resolutions providing for the following:

- Amending the By-laws of ULLICO Inc. to eliminate a standing committee of the Board known as the Welfare Committee.[3]

- Creating a new Benefits Committee to consist of the senior officers of ULLICO Inc.

- Authorizing the new Benefits Committee to act as fiduciaries for all pension and welfare plans maintained by ULLICO Inc.

- Authorizing the new Benefits Committee, as fiduciaries, to appoint trustees for such plans and charging the Benefits

---

[1] Under certain circumstances not relevant here, the accrual rate specified in section 5.1 was 1.75%.

[2] The by-laws of ULLICO Inc. provide that the Executive Committee "shall have and exercise all the duties and powers of the Board of Directors . . ." By-Laws (Adopted October 14, 1987 with revisions through May 5, 1997), Art. VI, § 2.

[3] The Welfare Committee evidently had not met or taken any action with respect to the Plan for many years.

- 3 -

> Committee "with reporting any and all material changes in each and every plan created for the benefit and welfare of the employees . . . on at least an annual basis to the Corporation's Executive Committee."
>
> - Authorizing the appropriate officers and employees of ULLICO Inc. "to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

The minutes of the May 5, 1997 Executive Committee meeting introduce the foregoing resolutions with a summary of a statement by the Committee Chairman, Robert A. Georgine, who, among other things, explained his view that there was "a need for there to be a more hands-on style of management of the benefit programs. Management proposed a restructuring by eliminating the Welfare Committee of the Board in favor of a Benefit Committee made up of Senior Management. The management committee would meet regularly to administer, plan and effect changes in the benefit plans."

On October 14, 1997, the Benefits Committee established by the May 5, 1997 Board resolution adopted seven resolutions regarding the Plan. Six of these resolutions directly related to modifications of the terms of the Plan. The final resolution directed that "Legal and Human Resources will work together to draft language reflecting all plan language changes and submit the changes to the Benefits Committee for approval."

On February 11, 1998, the Executive Committee of the Board of Directors adopted a resolution amending the Plan to provide for a cost of living increase for certain retirees. The Executive Committee adopted similar resolutions providing for cost of living increases for retirees on February 11, 2000 and February 22, 2002.

Following the Executive Committee's action on February 11, 1998, the Benefits Committee met from time to time and adopted various resolutions relating to the Plan. Some of these actions concerned matters, such as changes in the asset allocation investment guidelines for the Plan, which did not require any modification of the Plan's terms. Other resolutions provided for amendments to the Plan's terms to accomplish various objectives, including amendments designed in response to changes in the Internal Revenue Code relating to the tax qualification requirements for pension plans. Other resolutions provided for

- 4 -

amendments that modified various aspects of the Plan's terms directly relating to the amount of benefits to be paid under the Plan. In particular, on July 24, 2001, the Benefits Committee adopted a resolution amending section 5.1 of the Plan to increase the accrual rate for normal retirement benefits from 2.0% of Average Salary to 2.5% of Average Salary for all Years of Benefit Service, effective January 1, 2002.

Effective February 28, 2002, the 1995 Plan was purportedly replaced by an amended and restated Plan document. Among other things, this restated document contains an increase in the accrual rate from 2.0% to 2.5% for participants who retire on or after January 1, 2002.

On August 12, 2002, the Benefits Committee adopted a resolution "to increase the Special Spouse Benefit in Section 7.1(a), 7.1(b) and 7.1(e) from 50 percent to 75 percent." On April 17, 2003, the Benefits Committee adopted a resolution to include overtime pay, effective January 1, 2000, in the definition of Compensation for participants retiring from active service on or after April 17, 2003.

After the Benefits Committee adopted the April 17, 2003 resolution, it did not adopt any additional resolutions purporting to amend the terms of the Plan.

At a meeting of the Board of Directors on April 16, 2003, the Board adopted a resolution amending the Plan to provide for an Early Retirement Program that provided for fully subsidized early retirement benefits for certain employees who satisfied certain age and years of service requirements and who elected to retire under this program by May 7, 2003, and who in fact retired effective June 1, 2003. This resolution contained the following recitals, among others:

> WHEREAS, on May 5, 1997, the Executive Committee adopted a Resolution creating the Benefits Committee, and charged such Committee with full authority with respect to the administration of all plans created, or to be created, for the benefit and welfare of ULLICO Inc. employees and employees of it subsidiaries. And,
>
> WHEREAS, Article IV, Section 2 of the ULLICO Inc. By-laws invests the Board of Directors with the authority to conduct, manage, and control the affairs and business of ULLICO Inc. . . .
>
> WHEREAS, pursuant to Section 11.1 of the Plan, the Board of Directors may adopt a resolution to amend the Plan. And,

WHEREAS, the Benefits Committee understand that management of ULLICO Inc. wishes to undertake a restructuring of certain areas of business, which includes cost reduction activities, including a reduction in personnel. And,

\*　　\*　　\*

WHEREAS, the Benefits Committee recommends that the Plan be amended by the Board of Directors to make the Early Retirement Plan available on April 16, 2003 . . .

The minutes of the April 16, 2003 meeting reflect that Mr. Luce was one of the senior officers present at the meeting and that he discussed the details of the proposed Early Retirement Plan with the Board. The minutes also reflect that Mr. Luce advised the Board that he would be one of the employees eligible to elect the subsidized early retirement benefits available under the proposed amendment to the Plan.

Following the Board's April 16, 2003 meeting, the membership of the Board underwent significant change. This change appears to have been connected to concerns arising from a discretionary stock repurchase program in place during the years 1999 through 2001. On April 29, 2002, the Board had appointed an outside special counsel to investigate a number of issues relating to stock transactions by ULLICO Inc.'s officers and directors. The special counsel reported to the Board concerning his investigation on November 30, 2002. Thereafter, certain members of the Board resigned and certain officers, including Mr. Luce, retired, and the Board took various actions against them, including, in some cases, the commencement of litigation.

Beginning with its meeting on May 13, 2003, the reconstituted Board of Directors took a number of actions to improve corporate governance. At later meetings, the Board adopted various resolutions amending the Plan to address issues arising from the actions of the Benefits Committee following the May 5, 1997 Executive Committee resolution establishing the Benefits Committee. These resolutions consistently reflect that in the view of the new Board, the May 5, 1997 Executive Committee resolution establishing the Benefits Committee "did not delegate to the Benefits Committee, the authority to amend, modify, or alter the terms of employee benefit plans sponsored by ULLICO Inc. or its subsidiaries." Minutes of the Meeting of the Board of Directors of ULLICO Inc., October 15, 2003 at 5. Moreover, the new Board made it clear that its actions adopting various amendments to the Plan "shall not be construed as ratifying the actions of the Benefits Committee with respect to its purported amendment of the Plan . . ."

Minutes of the Meeting of the Board of Directors of ULLICO Inc., January 29, 2004 at 7.

On September 9, 2004, the reconstituted Board adopted a resolution concerning, among other things, the validity of the Benefits Committee's purported July 24, 2001 amendment to the Plan increasing the accrual rate from 2.0% to 2.5% for participants retiring on and after January 1, 2002. As in previous resolutions of the reconstituted Board, the September 9, 2004 resolution expressed the Board's view that the May 5, 1997 resolution of the Executive Committee "did not delegate to the Benefits Committee the authority to amend, modify, or alter the terms of employee benefit plans sponsored by ULLICO or its subsidiaries." The reconstituted Board also expressed the view that "the Benefits Committee, under the management of former Chairman, Chief Executive Officer, and President Robert A. Georgine ("Georgine"), former Chief Legal Officer Joseph A. Carabillo ("Carabillo"), former Chief Financial Officer John Grelle ("Grelle"), and former Executive Vice President, James Luce ("Luce"), purported to amend the Qualified Plan by increasing certain benefits payable to Plan Participants and their eligible Beneficiaries, and such amendments were not disclosed to, or approved by, the Board or the Executive Committee," and that "the Benefits Committee exceeded its delegated authority in purportedly amending the Plan."

Based on these views, the Board resolved, among other things, as to Mr. Luce, "[t]hat as . . . Luce engaged in self-dealing by acting *ultra vires* and voting in favor of purported amendments to the Qualified Plan [i.e., the Plan at issue in this decision] that had the effect of increasing [his] benefits under such Plan . . ., any benefits under the Qualified Plan . . . for which . . . Luce may otherwise be eligible shall be calculated without regard to benefit increases that the Benefits Committee purported to approve during [his] employment with ULLICO." The Board further directed that payments to Mr. Luce be prospectively reduced to the level provided under the Plan without regard to the unauthorized amendments adopted by the Benefits Committee. The Board again confirmed that its action "shall not be construed as ratifying any actions of the Benefits Committee with respect [to] its purported amendments to the Qualified Plan . . . ." Minutes of the Meeting of the Board of Directors of ULLICO Inc. held Thursday, September 9, 2004 at 14-16.

By letter dated January 14, 2005, Theodore T. Green, Senior Vice President and General Counsel of ULLICO Inc., advised Mr. Luce that the monthly pension benefit he had been receiving from the Plan would be prospectively reduced to $5,879.70. According to Mr. Green's letter, this reduced amount reflected Mr. Luce's pension amount calculated without regard to the purported July 24, 2001 amendment to the Plan adopted by the Benefits Committee which increased the accrual rate from 2.0% to 2.5%. Also according to Mr. Green's letter, this 25%

increase in the accrual rate was not authorized by ULLICO Inc.'s Board of Directors. Mr. Green also noted that another purported amendment to the Plan adopted by the Benefits Committee, which modified the definition of "compensation" to increase the amount of compensation taken into account in calculating pensions, did not affect Mr. Luce's own benefit computation and therefore did not affect the recomputation of Mr. Luce's monthly benefit.[4]

By letter dated February 1, 2005, Mr. Luce advised the Administrative Committee that he was appealing the action announced by Mr. Green's letter as "an adverse benefit determination" and requested the Administrative Committee to hold a hearing on his appeal in accordance with Article 9.3 of the Plan. In subsequent correspondence, the Administrative Committee scheduled a hearing for March 23, 2005. This hearing date was deferred at your request, as counsel to Mr. Luce, owing to a scheduling conflict. By letter dated March 30, 2005, you submitted detailed arguments objecting to the reduction in Mr. Luce's monthly pension, supported by various documents submitted as exhibits to your letter. On March 31, 2005, you met with the Administrative Committee to discuss the points raised by Mr. Luce's appeal. Thereafter, on May 12, 2005, the Administrative Committee, through counsel, invited Mr. Luce to submit any additional documents or comments that he believed relevant to any of the issues presented. Mr. Luce did not make any further submission.

The Administrative Committee has carefully considered all of the points raised in Mr. Luce's appeal and has conducted a comprehensive review of the documents relating to the issues. The Administrative Committee notes that in light of the circumstances surrounding the issues addressed in this decision, including the pendency of litigation involving both Mr. Luce, the Plan, ULLICO Inc., and other former officers or directors of ULLICO Inc., the Administrative Committee has retained Groom Law Group, Chartered, a law firm specializing in employee benefits matters, as independent counsel to advise it in respect to this decision.

## II.   Analysis

The central question in this appeal is whether the July 24, 2001 resolution adopted by the Benefits Committee increasing the Plan's accrual rate from 2.0% to

---

[4] Mr. Green's letter also noted the continued payment of pension benefits at the reduced level announced in his letter should not be taken as a waiver of "the Company's position that the Plan should be made whole for the unauthorized liability your actions caused, or of any other claim now being considered in pending litigation. Further, the Company reserves for the benefit of the Plan the right to set off the excess payments received to date against future payments." While your March 30, 2005 letter addresses these reservations of rights, the Administrative Committee does not view them as relevant to the central issue presented by Mr. Luce's appeal, which is whether his monthly pension benefit was properly reduced to reflect a 2.0% accrual rate. As you have observed, these issues are currently pending in litigation, and will not be addressed here.

2.5% (the "July 24 resolution") was a valid amendment of the 1995 Plan. To resolve this question, the Committee must first examine the statutory and decisional law concerning the validity of amendments to a plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA").

### A.   ERISA's requirements and the Plan document's provisions.

Section 402(b)(3) of ERISA requires that "Every employee benefit plan shall – (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan . . ." In satisfaction of this requirement, the 1995 Plan provides as follows:

> 11.1. <u>Reservation of Right to Amend Plan.</u> The Plan Sponsor reserves the right to modify or amend this Plan at any time. It may make any amendment that it deems advisable, including, but not limited to, any amendment to ensure the continued qualification of this Plan under the provisions of the [Internal Revenue] Code. Any amendment shall be made pursuant to a resolution adopted by the Board of Directors of the Plan Sponsor.

The 1995 Plan defines the term "Plan Sponsor" to mean "ULLICO Inc." 1995 Plan, § 2.45. Neither this provision nor section 11.1 of the 1995 Plan has been amended or altered by any subsequent action of the Board of Directors, the Executive Committee of the Board, or the Benefits Committee. The Administrative Committee therefore concludes that by the plain terms of the 1995 Plan, as well as any subsequent actual or purported amendment to the 1995 Plan, the power to amend the Plan resides exclusively in the Plan Sponsor, ULLICO Inc. Consequently, on the face of the Plan document, the power to amend the Plan can be exercised in only one prescribed fashion, that is, "pursuant to a resolution adopted by the Board of Directors of [ULLICO Inc.]"

This construction of ERISA § 402(b)(3) and section 11.1 of the 1995 Plan document is confirmed by the case law. In *Curtiss-Wright Corporation v. Schoonejongen*, 514 U.S. 73 (1995), the Supreme Court explained that section 402(b)(3) of ERISA imposed two bedrock requirements on every employee benefit plan: it must specify a procedure for amending the plan and it must specify a procedure for identifying the person who has the authority to amend the plan. *Id.* at 78-79. Faced with a plan provision that specified that "the Company", that is, the sponsoring employer, had the authority to amend the plan, the Court had no difficulty concluding that the plan in question satisfied the first requirement of section 402(b)(3) – the procedure for amending the plan required action of "the Company." The Court then considered whether the plan also specified a

"procedure" for identifying the person who had the authority to amend the plan. The Court concluded that the plan's reference to "the Company" should be read in light of corporate law, which provides a ready means of identifying the persons who have authority to act on behalf of "the Company."

In the present case, the 1995 Plan's chosen means of prescribing the procedure for amending the Plan and of identifying the persons with the power to amend the Plan are far more specific than those in the plan considered in *Curtiss-Wright*. In particular, section 11.1 makes clear that the procedure for amending the Plan is the adoption of a resolution. Section 11.1 then makes clear that the persons empowered to amend the Plan are the directors of ULLICO Inc., acting in that capacity. As the Court observed in *Curtiss-Wright*, "ERISA . . . follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id.* at 85.

The courts have repeatedly emphasized the importance of strict adherence to a plan's amendment procedures. "Modifications to a written plan that do not conform to the formal amendment procedures threaten the actuarial soundness of the plan and thereby undercut the ability of plan participants to rely on their expected stream of benefits. . . . Strict adherence to a written plan also prevents a collusive agreement between an employer and a favored employee that could operate to the detriment of all other plan participants' rights." *Singer v. The Black & Decker Corporation*, 964 F.2d 1449, 1454 (4th Cir. 1992) (Wilkinson, J., concurring). Consistent with this, the courts have repeatedly held that any purported amendment that is not adopted in strict compliance with the plan's specified procedure is of no force or effect. *E.g., Depenbrock v. Cigna Corp.*, 389 F.2d 78, 81-82 (3d Cir. 2004) ("an amendment is ineffective if it is inconsistent with the governing instruments"). Because the July 24 resolution was not adopted in the manner prescribed by section 11.1 of the Plan, the resolution cannot be considered an effective amendment of the Plan.

### B.   Delegation of the power to amend the Plan.

Mr. Luce contends that the July 24 resolution adopted by the Benefits Committee was a valid exercise of the Board's power to amend the Plan. He asserts that the Board had delegated its amendment power to the Benefits Committee when the Executive Committee of the Board adopted the May 5, 1997 resolution (the "May 5 resolution") establishing the Benefits Committee. In support of this argument, Mr. Luce points to the summary of the introductory remarks made by Mr. Georgine at the May 5, 1997 Executive Committee meeting, in which he stated that "[t]he management committee would meet regularly to administer, plan and effect changes in the benefit plans." Mr. Luce also points to a

– 10 –

provision of the resolution that charges the Benefits Committee to report "any and all material changes in each and every plan created for the benefit and welfare of the employees of the Corporation . . . on at least an annual basis to the Corporation's Executive Committee."

At the outset, the Administrative Committee questions whether the specific language of section 11.1, which provides only one procedure for amending the Plan and only one means of identifying the persons empowered to adopt an amendment, allows the Board to delegate its amendment power. In *Curtiss-Wright*, the Court observed that ERISA's requirement that every plan have a "coherent amendment procedure" serves several purposes, including providing plan administrators with a "mechanism for sorting out [valid amendments], from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms." *Id.* at 82. Given the specificity of this Plan's amendment procedure, allowing a delegation of the Board's power to amend defeats this purpose. Thus, it may be the case that the only means by which the Board could effectively confer amendment power on another person would be through an amendment to Plan section 11.1 itself – that is, by a clear expression embodied in the Plan document that specifies a means of identifying the other persons who hold the power to amend.

These considerations notwithstanding, for present purposes the Administrative Committee will assume that the Board could validly delegate amendment power to the Benefits Committee. However, an examination of the May 5 resolution leads the Administrative Committee to conclude that the May 5 resolution does not delegate amendment authority to the Benefits Committee.

The only language contained in the resolution that arguably refers to plan amendments is the passage identified by Mr. Luce requiring the Benefits Committee to "report[ ] any and all material changes" to the Executive Committee. By its terms, this language does not confer any power to the Benefits Committee to amend the Plan. Rather, it merely imposes a duty to report "material changes" to the Executive Committee. Moreover, this section of the resolution makes clear that in carrying out its functions, including the appointment of trustees for the various plans and reporting to the Executive Committee, the Benefits Committee members are functioning "as fiduciaries." While it may be possible to confer amendment authority on someone functioning as an ERISA fiduciary, it is unlikely that the Executive Committee would have chosen to do so, given the well-recognized principle that the act of amending a plan is not a fiduciary act. *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996).

Mr. Georgine's prefatory remark that the "committee would meet regularly to . . . effect changes in the benefit plans" could be interpreted to express his view

that the purpose of the resolution was to delegate the Board's amendment authority. The statement itself, however, is not part of the resolution, and there is nothing in the operative language of the resolution that delegates amendment authority to the Benefits Committee. It is "hornbook law" that prefatory comments do not change the plain meaning of the actual text of a resolution. *See White v. Investors Mgmt. Corp.*, 888 F.2d 1036, 1042 (4th Cir. 1989).

More importantly, any arguable ambiguity in either Mr. Georgine's statement or in the resolution's directive to report "material changes" to the Executive Committee is easily resolved. One of the principal purposes of the May 5 resolution was to appoint a single committee of management officers to oversee all of ULLICO Inc.'s many plans and to confer on this newly constituted committee broad fiduciary authority to manage these various plans. It is clear from the early actions of the Benefits Committee that it acted to change such things as the Plan's investment guidelines and target asset allocations. Meeting of the Benefits Committee of ULLICO Inc. held October 14, 1997. These actions do not require a plan amendment, but could certainly fall within the category of "material changes" that the Benefits Committee was authorized to make as fiduciaries and then required to report to the Executive Committee. Similarly, the May 5 resolution specifically granted the Benefits Committee the authority to select plan trustees to hold the assets of the various plans, another "change" to the plans that would be considered a "material change."

Viewed in this context, both Mr. Georgine's prefatory statement and the May 5 resolution's explicit requirement to report "material changes" more naturally refer to the Benefits Committee's fiduciary functions such as investment oversight and the appointment and replacement of plan trustees. Consequently, the Administrative Committee concludes that nothing in the minutes of the May 5, 1997 meeting of the Executive Committee and the resolution that the Executive Committee adopted at that meeting can reasonably be read to delegate the Board's power to amend the Plan to the newly constituted Benefits Committee.

For these reasons, the Administrative Committee concludes that even if the Plan's explicit requirement that any amendment be by resolution of the Board of ULLICO Inc. could be read to permit a delegation of amendment authority, the May 5 resolution did not, either explicitly or by implication, delegate the Board's amendment authority under this Plan to the Benefits Committee.

C.  **Other issues.**

Mr. Luce advances a number of other arguments which the Administrative Committee will address briefly.

First, Mr. Luce points to the existence of the February 28, 2002 restatement of the Plan ostensibly adopted by the Board of Directors and to the fact that the Benefits Committee adopted numerous amendments to the Plan "without objection or complaint from the Executive Committee." These observations arguably suggest that Mr. Luce is contending that the Board or the Executive Committee of the Board ratified the various amendments adopted by the Benefits Committee, including the July 24 resolution increasing the Plan's accrual rate.

It is well-settled that a principal cannot ratify the unauthorized act of an agent unless the principal has "a full and complete knowledge of all the material facts connected" to the act to be ratified. *Huppman v. Tighe*, 642 A.2d 309, 314 (Md. App. 1994) ("The authorities are crystal clear that a party cannot be found to have ratified, absent knowledge of the material facts undergirding the transaction."); *Integrated Consulting Services, Inc. v. LDDS Communications, Inc.*, 996 F. Supp. 470, 476-77 (D. Md. 1998) ("[K]nowledge of the material facts is an essential element of ratification...."); *see also* 2A Fletcher Cyclopedia of Private Corp. § 756. The Administrative Committee has carefully reviewed the minutes of the Board of Directors, the Executive Committee, and the Benefits Committee and has not found any evidence that the Board of Directors or the Executive Committee was ever advised of the Benefits Committee's activities with regard to amending the Plan.

In addition, the Administrative Committee's review of Board and Executive Committee minutes did not disclose any action by either body to adopt the February 28, 2002 restatement of the Plan. Indeed, there is no record that the Benefits Committee itself adopted this restatement of the Plan. The only indication that the restatement was adopted is the testament at the conclusion of the document, signed by Jacqueline J. Wong and witnessed by Grace H. Kramer, both employees within the Legal Department of ULLICO Inc., that "in witness whereof, and the adoption of this Plan on December 23, 2002, the Plan Sponsor has caused this ULLICO Inc. Pension Plan and Trust to be executed by its duly authorized officer." The reference to "the Plan Sponsor" rather than "the Board of Directors," coupled with the lack of any independent record of Board action, strongly suggests that some officer or officers of ULLICO Inc., rather than the Board or the Executive Committee of the Board, authorized the signing of the document. Consequently, the Administrative Committee concludes that there are no grounds to believe that the Board ratified the actions of the Benefits Committee.

Mr. Luce also argues that given the pendency of law suits involving ULLICO Inc., the Plan, Mr. Luce, and another former officer whose actions on the Benefits Committee have been called into question, the Administrative Committee

– 13 –

lacks the power to decide whether the July 24 resolution was a valid amendment to the Plan. In support of this position, he cites *Johannssen v. District No. 1 – Pacific Coast District*, 292 F.3d 159, 169 (4th Cir. 2004). *Johannssen*, however, did not decide that a plan administrator lacks the power to decide whether a purported plan amendment has been validly adopted. Instead, the court ruled, for a number of reasons, that the plan administrator's decision on the validity of an amendment would not be accorded the deference typically given to plan administrator decisions on questions involving the payment of benefits. Thus, nothing in *Johannssen* serves as a bar to the Administrative Committee's decision on the substantive issue that Mr. Luce himself has raised in his appeal.

The Administrative Committee is also mindful of the Supreme Court's observation concerning the need for plan administrators to have a mechanism for "sorting out" valid plan amendments from other forms of corporate communications that may appear to be plan amendments. In the Court's view, "plan administrators may have a statutory responsibility to do this sorting out." *Curtiss-Wright*, 514 U.S. at 82.

Mr. Luce also argues that because ULLICO Inc. has made various representations concerning the validity of the February 28, 2002 restatement of the Plan to the Internal Revenue Service and obtained a favorable determination letter from the Service, ULLICO Inc. is estopped to deny the validity of the July 24 resolution increasing the accrual rate. Whatever the merits of this argument, especially in light of the evident lack of knowledge on the part of the Board of Directors, it is irrelevant. The Administrative Committee is an independent body established under the Plan and charged with the authority to decide claims for benefits. The Plan is clearly a separate entity from ULLICO Inc. Even if ULLICO Inc. were somehow estopped, the Plan itself, acting through the Administrative Committee, is not estopped.

Mr. Luce also argues that the Plan's claims procedures are unreasonable and inadequate within the meaning of 29 CFR 2560.503-1(b)(5), which requires that a plan's claims procedures "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." Mr. Luce points to the circumstance that the Plan has continued to pay benefits at the 2.5% accrual rate to participants who retired on or after January 1, 2002, except for him and other former members of the Benefits Committee who have retired, as evidence that the Plan's claims procedures are flawed.

The Committee does not understand the regulation cited by Mr. Luce to require or permit the Committee to pay a benefit to Mr. Luce that is not provided in

the terms of the Plan. Nor does the Committee understand that regulation to require the Committee to reconsider the grant or denial of benefits to all other participants who are arguably similarly-situated, and the Committee declines to do so.[5]

As the Seventh Circuit has observed,

> An employer is supposed to apply the plan's written terms, and departure from those terms on one occasion does not estop the employer to enforce them on others. See, *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955 (7th Cir. 1998). Plaintiffs suggest that every divergence from a plan's criteria is an "amendment" of the plan entitling them to the same benefits, but that is a non-starter, rejected in *Frahm*. Amendments are accomplished through a formal process and produce a revised written instrument. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995). Deviations from a plan are just that – deviations. The plan remains what it was, and claims for benefits continue to be evaluated in light of its written criteria.

*McNab v. General Motors Corporation*, 162 F.3d 959, 961 (7th Cir. 1998).

Similarly, the courts uniformly recognize that even if there is a flaw in a claims procedure or an error in applying that procedure – and the Administrative Committee does not believe that either is the case here – that does not entitle a participant to a substantive remedy, such as the payment of a benefit for which the participant is not eligible. *E.g., Parker v. BankAmerica Corp.*, 50 F.3d 757, 768 (9th Cir. 1995) (plan's failure to comply with ERISA's disclosure requirements "is not sufficient for the former employees to recover benefits under the [plan] because 'ordinarily, a claimant who suffers because of a fiduciary's failure to comply with ERISA's procedural requirements is entitled to no substantive remedy.'") (quoting *Blau v. Del Monte Corp.*, 748 F.2d 1348, 13553 (9th Cir.), *cert. denied*, 474 U.S. 865 (1985)).

Finally, Mr. Luce argues that the reduction in his benefit based on the application of a 2.0% rate of accrual is a violation of ERISA's antialienation rule. 29 U.S.C. § 1056(d)(1). The Committee disagrees. Because the Plan was never validly amended to increase the accrual rate, Mr. Luce was never entitled to the higher benefit that was originally paid to him. Consequently, the Plan's present

---

[5] The Administrative Committee does note that Mr. Luce does not appear to have been treated differently from other similarly-situated participants. Mr. Luce and the other members of the Benefits Committee who have retired with the purported benefit of the July 24 resolution that they adopted do not appear to be similarly-situated to other retired participants who had no involvement with the activities of the Benefits Committee.

refusal to pay a benefit that is not owed is not an "alienation" of Mr. Luce's benefits.

### III. Conclusion

For the reasons set forth above, the Administrative Committee has concluded that Mr. Luce is not entitled to the higher benefit level that was initially paid to him.

Mr. Luce should regard this letter as a final decision on review within the meaning of section 503 of the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder by the Department of Labor. Mr. Luce is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits. Mr. Luce has the right to bring an action under section 502(a) of the Employee Retirement Income Security Act of 1974, as amended.

Sincerely,

Employee Benefit Plans Administrative
Committee as Plan Administrator for the
ULLICO Inc. Pension Plan Trust


By: _____
Joseph R. Linehan
Chairman